**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 11/30/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRIAN SUGHRIM, et al.,

                              Plaintiffs,

                  v.

STATE OF NEW YORK, et al.,

                              Defendants.

---

No.   19-CV-7977 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

    Plaintiffs Brian Sughrim, David Feliciano, Derek Gleixner, Khaldoun Alshamiri, and Roland Sofo—five New York State Department of Corrections and Community Supervision ("DOCCS") officers—bring this action against Defendants State of New York, DOCCS, and ten individual defendants—Anthony J. Annucci, the Acting Commissioner of DOCCS; John A. Shipley, the Director of Labor Relations of DOCCS; Na-Kia Walton, the Assistant Director of Labor Relations/ADA Coordinator of DOCCS; Leroy Fields, the Superintendent of Fishkill Correctional Facility ("Fishkill"); Stephen Urbanski, the Deputy Superintendent for Security Services at Fishkill; James Johnson, the Deputy Superintendent for Administrative Services at Fishkill; Alan Washer, a Corrections Captain at Fishkill; William Lee, the Superintendent of Eastern Correctional Facility ("Eastern"); Michael Bertone, Deputy Superintendent of Security at Eastern; and Thomas Napoli, Deputy Superintendent and Designee for Reasonable Accommodation at Cayuga Correctional Facility ("Cayuga") (collectively, the "DOCCS

Officials").[1]  Plaintiffs assert that Defendants have violated, and continue to violate, their right to maintain beards as an expression of their religious beliefs in contravention of the First and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Article I §§ 3 and 11 of the New York State Constitution; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*  Before the Court is Defendants' motion to dismiss Plaintiffs' complaint.  For the reasons that follow, the motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are drawn from Plaintiffs' Third Amended Complaint ("TAC" or "Complaint"), Dkt. 199, and are assumed to be true for the purposes of resolving this motion.[2]  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### I.    DOCCS's Grooming Policy

DOCCS's official grooming policy, Directive 3083, states that security staff appointed before January 25, 1990 are allowed to wear beards or goatees, regardless of reason or need, whereas "[s]ecurity staff appointed after January 25, 1990 are not permitted to wear beards or goatees." TAC ¶ 44.  Directive 3083 permits officers to have moustaches and sideburns, *id*. ¶ 45, and also provides that "[w]henever the Department requires an employee to wear a respirator, facial hair which would prevent a proper seal between the face and mask (e.g., beard/goatee) is prohibited," *id*. ¶ 46.

---

[1] All DOCCS Officials other than Defendant Annucci are sued in both their personal and official capacities. Annucci is sued only in his official capacity.

[2] Plaintiffs, upon stipulation of the parties, filed a Third Amended Complaint on November 19, 2020.   That complaint alleges that Plaintiff Feliciano received a 'right to sue' letter dated August 24, 2020 from the Equal Employment Opportunity Commission. It is otherwise identical to the Second Amended Complaint.  Defendants have reserved their arguments on their previously filed motion to dismiss.  *See* Dkt. 199-200.

DOCCS's official policy governing the use of respirators, set forth in Directive 4068, applies only to employees who "are assigned, or wish to be assigned, to positions wherein respiratory use is, or may be, required." *Id*. ¶¶ 47-48.  Such employees "shall be medically cleared and trained for use of the particular respirator(s) required for those positions." *Id*. ¶ 48.  Directive 4068 does not prohibit facial hair entirely, providing that an employee "who is required to wear a tight-fitting respirator must not have facial hair that comes between the sealing surface of the face piece and the face or that interferes with respirator valve function." *Id*. ¶¶ 49-50.  Directive 4068 recognizes that "no one respirator will fit every individual" and therefore requires employees who need to use respirators to be "fit-tested . . . [o]n an annual basis." *Id*. ¶ 51.  DOCCS does not conduct annual respirator-fit tests on all of its corrections officers. *Id*. ¶ 52.

DOCCS designates certain positions in its facilities as "clean-shaven posts." *Id*. ¶ 53. These are the positions to which Directive 4068 applies because employees working these positions may need to use respirators.  *Id*.  There are a limited number of clean-shaven posts in each DOCCS facility. *Id*. ¶ 54.  For instance, out of 544 posts at Fishkill, only 68 are clean-shaven posts.  *Id*. ¶ 55.  Plaintiffs contend that each DOCCS facility maintains only a small number of respirators; at Fishkill, for example, that number is less than twenty.  *Id*. ¶ 56.  As most security posts are not clean-shaven posts, numerous DOCCS security staff wear facial hair on the job.  *Id*. ¶ 57.  DOCCS has additionally granted accommodations for officers to wear beards for "secular reasons." *Id*. ¶ 17.

In October 2019, after this action was filed, DOCCS adopted Directive 2609, "Reasonable Accommodation of Religious Observance or Practices for Employees and Applicants," which provides that "[a]n employee who, in accordance with his or her religious beliefs, observes a particular manner of dress, hairstyle, beard, or other religious practice, should not be unreasonably

required to compromise his or her practice in the workplace." *Id*. ¶¶ 58-60.  Directive 2609 states that "[a]n employee may request a religious accommodation at any time, regardless of prior non-observance," and that  "[m]any religious accommodations may occur without any formal request, or any discussion," including, for example, "the wearing of religious headgear." *Id*. ¶¶ 61, 64. The directive further provides that "[c]ertain types of requests for reasonable accommodation of religious observance or practices should always be formally documented using forms" and identifies among such requests, "Requests for exemptions to Personal Grooming Standards (Directive #3083 . . . )." *Id*. ¶ 65.

Plaintiffs allege that one need not be clean-shaven in order to properly use a respirator, and that the applicable Federal Occupational Safety and Health Administration ("OSHA") regulations require only that users be able to achieve a proper seal from the mask as determined by a fit test. *Id*. ¶ 9; *see* 29 C.F.R. § 1910.134(g)(1) ("The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have . . . [f]acial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function . . . .  For all tight-fitting respirators, the employer shall ensure that employees perform a user seal check each time they put on the respirator.").   Relatedly, in 2016, DOCCS and the State of New York lost a class-action arbitration with the correctional officers' union after an arbitrator found that DOCCS's "clean-shaven" designation was neither required by OSHA regulations nor consistent with DOCCS's own grooming policies, ruling that officers at Mohawk Correctional Facility "who have facial hair are to be permitted to work certain 'clean shaven' posts if they can pass the necessary 'fit test.'"  TAC  ¶ 10.

## II.   Officers Sughrim and Feliciano

### A.  Background

Officer Sughrim, who joined DOCCS in December 1994, is Muslim.  *Id*. ¶ 68, 70.  His sincerely held religious beliefs, grounded in the Quran, Sunnah, and Hadith, require him to keep a beard.  *Id*. ¶ 69.  Sughrim has worn a beard between one-half-inch and one-inch long for most of his career with DOCCS, and it has never interfered with any aspect of his job responsibilities.  *Id*. ¶¶ 71-72.

Sughrim began working at Fishkill in or about 1995.  *Id*. ¶ 73.  His present post—a permanent post in the yard to which he has been assigned for approximately four years—is not a designated clean-shaven post.  *Id*. ¶¶ 74-76.  Sughrim was previously assigned to a permanent post in a housing unit—which was also not a designated clean-shaven post—for approximately twenty years.  *Id*. ¶¶ 77-78.  He has never been assigned to a clean-shaven post on either a permanent or temporary basis, nor has he switched posts with an officer assigned to a clean-shaven post.  *Id*. ¶ 79.  In his time at Fishkill, Sughrim has never had access to a respirator, or needed to wear a respirator to complete his job responsibilities.  *Id*. ¶¶ 80, 83.  At no point since graduating from the DOCCS Academy has Sughrim ever been evaluated or fit-tested for a respirator, or asked to wear a respirator.  *Id*. ¶¶ 81-82.

Officer Feliciano, who joined DOCCS in January 2000, is also Muslim.  *Id*. ¶ 87, 89.  His sincerely held religious beliefs, grounded in the Quran, Sunnah, and Hadith, require him to keep a beard.  *Id*. ¶ 88.  He has worn a beard between one and two inches in length for most of his career, which has never interfered with his job responsibilities.  *Id*. ¶¶ 90-91.

Feliciano's present post at Fishkill—a permanent post known as the "14/18" post in a housing unit—is not a designated clean-shaven post.  *Id*. ¶¶ 93, 95.  For approximately seven years prior to his current post, Feliciano was assigned to "RDO Relief"—meaning "Regular Day Off

Relief"—a non-clean-shaven post in which he provided coverage for other recreation and housing posts. *Id*. ¶¶ 96-98. Feliciano has never been assigned to a clean-shaven post on either a permanent or temporary basis. *Id*. ¶ 99. For several months approximately six years ago, Feliciano regularly swapped to a clean-shaven post two days each week. *Id*. ¶ 100. During his nearly twenty-year stint with DOOCS, Feliciano has never had access to a respirator, nor needed to wear a respirator to complete his job responsibilities. *Id*. ¶¶ 101-102. DOCCS has not directed Feliciano to be evaluated or fit-tested for a respirator or gas mask since early in his career. *Id*. ¶ 103.

### B. Requests for Medical Accommodation

DOCCS granted Sughrim and Feliciano medical accommodations to wear beards—in 1995 and 2003 respectively—based on diagnoses of pseudofolliculitis barbae, a condition in which shaving leads to ingrown hairs, painful bumps, and inflammation. *Id*. ¶¶ 103-110. In March 2019, Sughrim and Feliciano received a memo addressed to "all appropriate staff" from Defendants Urbanski and Johnson, Deputy Superintendents at Fishkill. *Id*. ¶ 112. The memo stated that security staff who had "an approved medical shaving exemption are required to resubmit for an approval every six months" and directed staff who had not resubmitted their medical shaving exemption "recently" to "provide updated medical documentation" along with the appropriate form. *Id*. ¶¶ 113-114. After he received the memo, Defendant Fields, the Fishkill Superintendent, directed Sughrim to submit updated medical documentation regarding his shaving restriction. *Id*. ¶¶ 115-116.

Sughrim and Feliciano both submitted to Defendant Johnson recent prescriptions from dermatologists advising that they not shave. *Id*. ¶ 117. The letter from Sughrim's dermatologist stated that Sughrim was "currently under my care and diagnosed with pseudofolliculitis barbae," that he "has tried various disposable and electric razors and skin care products both over the counter and prescribed with negative results," and that he "should be medically excused from

6

shaving due to his above mentioned condition." *Id.* ¶ 118. The letter from Feliciano's doctor likewise stated that Feliciano had "a history of pseudofolliculitis barbae" that shaving causes him razor bumps that "often become large, painful, infected, pus pimples that require topical antibiotics," and that daily shaving "would constantly exacerbate the condition." *Id.* ¶ 119.

DOCCS sent Sughrim and Feliciano notices that "[t]he medical note you provided was not sufficient" because DOCCS wanted "information as it relates to your attempts to utilize alternative hair removal options and medical treatment." *Id.* ¶ 120. The notices further asserted that "[u]niformed staff are required to be clean-shaven as outlined in Directives #3083 and #4068." *Id.* ¶ 122. The notices instructed Sughrim and Feliciano to "provide a photo of your clean-shaven face, along with conforming medical documentation." *Id.* ¶ 123. According to Plaintiffs, it was well-known in DOCCS that Sughrim and Feliciano were practicing Muslims when DOCCS instructed them to shave. *Id.* ¶ 124. Because shaving would be medically inadvisable and violate a tenet of their religious beliefs, Sughrim and Feliciano seek not to comply with DOCCS's directive to shave their beards. *Id.* ¶ 125.

### C. Requests for Religious Accommodation

Between late April and early May 2019, Sughrim and Feliciano both requested religious accommodations from DOCCS. *Id.* ¶ 126. Feliciano submitted his request on a DOCCS form entitled "Request for Religious Accommodation," which asks, in relevant part: "Are you assigned or swap to a clean-shaven post?;" "To what extent are you required to wear personal protective safety equipment?;" and "Do you ever have duties or assignments outside the physical perimeter of the facility?" *Id.* ¶¶ 127-128. Officer Feliciano wrote on the form: "I do not work any clean shaven posts, nor do I swap with any officers on clean shaven posts. . . . I am not required to wear personal protective safety equipment. . . ." *Id.* ¶ 129. Sughrim and Feliciano both submitted documentation from religious leaders attesting to their sincerely held Muslim beliefs. *Id.* ¶ 130.

7

Those requests were denied by separate letters, each dated August 5, 2019 and signed by Defendant Walton.  *Id*. ¶ 131.  The nearly identical letters stated that DOCCS "recognizes your right to request a religious accommodation for your sincerely held religious beliefs," but nonetheless directed Sughrim and Feliciano "to conform with the Department's personal grooming standards outlined in Directive #3083," i.e., to shave their beards.  *Id*. ¶¶ 132-133.  DOCCS premised its denial on the need for all security staff to be clean-shaven in case of an emergency, or other staffing need that would require a respirator.  *Id*. ¶ 134.  DOCCS did not offer an accommodation of any kind that would allow Sughrim or Feliciano to keep their beards.  *Id*. ¶ 154. According to DOCCS, their "request [to keep their beards] creates an undue hardship and burden on facility operations and impacts the safety and security within the facility."  *Id*. ¶ 135.

Sughrim and Feliciano contend that DOCCS's asserted justification was pretextual, as DOCCS had for years permitted them to wear beards without expressing concern for the safety or security of Fishkill.  *Id*. ¶¶ 136-38.  During the period when DOCCS was reviewing the religious accommodation requests submitted by Sughrim and Feliciano, DOCCS—for allegedly secular reasons—granted new beard accommodations, extended existing accommodations, and allowed other officers to have beards for medical reasons for several other officers at Fishkill.  *Id*. ¶¶ 139-140.  DOCCS also continues to permit other security officers at Fishkill and other facilities to have beards—some of whom have an accommodation, and some of whom do not.  *Id*. ¶ 142.  Some of the security officers who are permitted to have beards allegedly work in clean-shaven posts.  *Id*. ¶ 143.

Even if Sughrim or Feliciano were required to wear a respirator at work—a situation that purportedly has not arisen in more than two decades of service—DOCCS does not know whether they are, in fact, in compliance with Directive 4068 because it has not fit-tested them to determine

whether their facial hair "comes between the sealing surface of the face piece and the face or that interferes with respirator valve function." *Id*. ¶ 146.  There are sufficient security staff assigned to Fishkill to cover the clean-shaven posts; out of 544 posts at Fishkill, only 68 are clean-shaven posts. *Id*. ¶¶ 148-49.  Plaintiffs estimate that there are 734 clean-shaven officers at Fishkill—not counting Sughrim and Feliciano—who were available to cover those posts. *Id*. ¶¶ 150-153.

### D.  Discipline and Suspension

On August 5, 2019, Defendant Washer provided Sughrim with a copy of Walton's letter and directed him to shave before his shift the following day. *Id*. ¶ 156.  According to the Complaint, Washer knew that Sughrim was Muslim and that shaving would violate a tenet of his religious beliefs. *Id*. ¶ 157.  On both August 6 and 7, 2019, Sughrim reported for duty with a beard and worked without incident. *Id*. ¶¶ 158-159.  On August 8, 2019, Washer handed him a Notice of Discipline ("NOD") signed by Defendant Shipley, which stated that DOCCS was dismissing Sughrim from state service and that he would lose his accrued annual leave. *Id*. ¶¶ 161-163.  It stated that Sughrim was "insubordinate in that [he] failed to comply with an order given by a superior," that is, "Captain A. Washer gave you a direct order . . . to be clean shaven on your next tour of duty" and "[y]ou failed to comply with this order,"  and concluded that the penalty was appropriate because Sughrim's actions "are totally inconsistent with your duties and responsibilities as an employee with [DOCCS]" and "bring into question your continued suitability as an employee with this Department." *Id*. ¶¶ 164-166.  Shipley, who is the Director of DOCCS's Bureau of Labor Relations, knew that Sughrim was Muslim and that shaving would violate a tenet of his religious beliefs. *Id*. ¶¶ 171-173.

On August 10, 2019, when Sughrim reported for his next regular shift, he was told to stand in "line up" where "as many as six" officers wore beards, some of whom lacked a formal accommodation from DOCCS. *Id*. ¶ 167.  Captain Churns, after speaking with the DOCCS's

Bureau of Labor Relations to determine the effect of a new state law prohibiting discrimination against employees on the basis of facial hair, informed Sughrim that DOCCS intended to proceed with the suspension. [3]  *Id*. ¶¶ 168-171.  Sughrim was stripped of his badge and identification and escorted out of Fishkill in front of his friends and colleagues.  *Id*. ¶ 174.

Feliciano was informed that DOCCS had denied his religious accommodation request on or about August 5, 2019.  *Id*. ¶ 175.  Four days later, Defendant Urbanski told Feliciano that he needed to be clean-shaven for his next regular shift on August 13, 2019.  *Id*. ¶ 177.  When Feliciano reported on that day, Urbanski handed him a NOD signed by Shipley.  *Id*. ¶¶ 179-180.  The NOD contained the same statements as Sughrim's NOD, quoted above, except that it stated that DOCCS intended to impose a 30-day suspension as opposed to a dismissal.  *Id*. ¶¶ 181, 183.  On August 14, 2019, when Feliciano reported to work, Washer pulled him aside, instructed him to wait in the administrative building, and stripped him of his badge.  *Id*. ¶¶ 184-185.  Feliciano was then escorted out of the facility in front of his friends and colleagues.  *Id*. ¶ 185.  Defendants Urbanski, Shipley, and Washer, Feliciano claims, all knew that he was Muslim and that shaving would violate a tenet of his religious beliefs.  *Id*. ¶¶ 178, 182, 186.

The suspensions of Sughrim and Feliciano took effect immediately, and both were forced to use their accrued personal time to maintain their health benefits.  *Id*. ¶¶ 187-190.  During their suspensions, Sughrim and Feliciano were not able to work the overtime shifts that they customarily performed, and which enhanced their pension.  *Id* ¶ 191.  When DOCCS suspended Sughrim and Feliciano, they were added to the "lock out" book, which is kept at the front desk of Fishkill and

---

[3] On August 9, 2019, Governor Cuomo signed a law "prohibiting employment discrimination based on . . . facial hair."  TAC ¶ 18; *see also* N.Y. S4037/A4204 (amending N.Y. Exec. Law § 296).  According to Governor Cuomo, this law would "make clear that employers cannot refuse to hire, attain, promote, or take other discriminatory action against an individual for wearing . . . facial hair in accordance with tenets of their religion."  TAC ¶ 18.  The law applies to public employers, including DOCCS.  *Id*.

contains the names and photographs of officers who are not permitted to enter the facility, including former corrections officers who committed crimes or other serious misconduct. *Id.* ¶¶ 192-193. Sughrim and Feliciano were insulted, embarrassed, and demoralized by their inclusion in the lock out book. *Id.* ¶ 194.

On or about August 19, 2019, DOCCS sent Sughrim and Feliciano amended NODs, both signed by Shipley, which stated that DOCCS intended to dismiss both officers from state service. *Id.* ¶¶ 195-196. The amended NODs confirmed that both Sughrim and Feliciano were suspended without pay. *Id.* ¶ 197. Had Sughrim and Feliciano been dismissed from DOCCS, they would have lost their pensions and suffered other adverse and irreparable consequences. *Id.* ¶ 198.

### E. DOCCS's Further Actions After Plaintiffs Filed This Lawsuit

Sughrim and Feliciano filed this lawsuit on August 26, 2019. *Id.* ¶ 199. Shortly thereafter, DOCCS reinstated both officers with backpay and withdrew the NODs against them. *Id.* ¶ 200. On August 27, 2019, DOCCS granted Sughrim and Feliciano accommodations to keep their beards. *Id.* ¶¶ 201, 204. The accommodations limit the type and length of beards that Sughrim and Feliciano can wear—specifically, they can only wear beards "up to one inch in length" and are "not permitted to wear a goatee, pencil-lined beard, or any designer-type beard." *Id.* ¶ 205. Plaintiffs maintain that the accommodation given to Officer Feliciano is unreasonable because it does not accommodate his sincerely held religious beliefs, namely his request to wear a beard longer than one inch. *Id.* ¶ 206. Because Feliciano is not in compliance with this accommodation, he is subject to discipline at any time for his beard. *Id.* ¶ 207.

The accommodations also require Sughrim and Feliciano to submit a new religious accommodation request if they change posts or transfer to another facility. *Id.* ¶ 208. Both are concerned the DOCCS Officials will deny any new requests for religious accommodation for the same reason that their initial requests were denied. *Id.* ¶ 209. Since Sughrim and Feliciano were

reinstated, other officers at Fishkill have continued to openly wear beards, including on clean-shaven posts—some of whom never sought or obtained an accommodation—without facing discipline or harassment by DOCCS officials.  *Id*. ¶ 211.

## III.   Officer Gleixner

### A.  Background

Officer Gleixner, who joined DOCCS in June 2016, is Muslim.  *Id*. ¶¶ 213, 214.  His sincerely held religious beliefs, grounded in the Quran, Sunnah, and Hadith, require him to keep a modest beard.  *Id*. ¶ 214.

Gleixner currently works at Fishkill, and previously worked at Eastern.  *Id*. ¶ 216.  Before converting to Islam, Gleixner kept a beard and did not experience any harassment, discrimination, or discipline from DOCCS or DOCCS officials.  *Id*. ¶ 217.  Specifically, Gleixner had a beard when Lieutenant Michael Harms, a lieutenant on the team, asked him to transfer to Eastern and join the Corrections Emergency Response Team ("CERT") team there.  *Id*. ¶ 218.  As part of his training, Gleixner was successfully fit-tested for a seal with a respirator when he had a beard.  *Id*. ¶ 222.  He participated in various trainings with the CERT team, including being exposed to tear gas while he wore a respirator, all while he had a beard; he suffered no negative consequences.  *Id*. ¶ 223.

### B.  Request for Accommodation, Discrimination Complaints, and Discipline

In or around April 2019, Gleixner submitted, accompanied by a letter from his imam, a request to DOCCS's Office of Diversity & Inclusion for a religious accommodation to maintain a beard.  *Id*. ¶¶ 224, 227.  On May 3, 2019, while that request was still pending and while wearing a modest beard, Gleixner reported for duty to cover a shift for his "swap partner."  *Id*. ¶ 225.  Although Gleixner was not the only officer with a beard at the pre-shift briefing, he was singled out in front of other officers and ordered to report to Deputy Superintendent ("DSS") Michael

Bertone's office. *Id*. ¶ 226. Although Gleixner told DSS Bertone that his religious-accommodation request was pending, and showed him the letter from his imam, Bertone ordered Gleixner to shave or go home. *Id*. ¶¶ 227-228. Bertone did not order any other officers with beards to shave or go home that day. *Id*. ¶ 229.

Gleixner subsequently informed Superintendent Lee that he had made a religious accommodation request to wear a beard, and that his request was pending. *Id*. Superintendent Lee looked at Gleixner's name tag and said, in a mocking tone, "Gleixner . . . Muslim . . . yeah, okay," a comment that humiliated Gleixner. *Id*. ¶¶ 231-232. Superintendent Lee then told Gleixner, in a voice loud enough for other officers to hear, that he did not care about Gleixner's request for a religious accommodation and that he would have to shave like he was told. *Id*. ¶ 235.

Out of fear that he would be subject to disciplinary action and that his swap partner would also be disciplined if he were sent home during that officer's shift, Gleixner shaved his beard using an electric razor at the lowest setting. *Id*. ¶¶ 236-237. Out of fear that he and his swap partner would be disciplined if he grew his beard, Gleixner continued to shave his beard in that manner. *Id*. ¶ 238. After May 3, 2019, Gleixner observed other officers wearing beards during shifts that he worked. *Id*. ¶ 240. Those officers were not ordered to shave or otherwise disciplined. *Id*.

On or about May 13, 2019, Gleixner complained to the Anti-Discrimination Investigations Division of the New York State Governor's Office of Employee Relations ("GOER") about what he perceived as religious discrimination and harassment. *Id*. ¶ 241. On June 25, 2019, after Gleixner filed his complaint with GOER, DOCCS denied the religious accommodation in a letter stating that DOCCS "recognizes your right to request a religious accommodation for your sincerely held religious beliefs." *Id*. ¶¶ 242-243. The justifications for denial were substantially the same as those provided to Sughrim and Feliciano: that Gleixner's request to wear a beard "creates an

undue hardship on facility operations and impacts the safety and security within the facility." *Id*. ¶ 244.  Gleixner never had to wear a respirator during a regular shift, and, as described above, had passed a fit-test for a respirator while wearing a beard.  *Id*. ¶¶ 245-246.

On June 27, 2019, at the beginning of a shift that Gleixner was working for his swap partner—and even though Gleixner did not have a beard because he had been shaving with the electric razor—DSS Bertone directed him to shave.  *Id*. ¶ 248.  Gleixner was forced to use a state-issued razor that caused cuts, abrasions, and a rash on his face.  *Id*. ¶¶ 250-251.  Several other officers on duty that day had beards, none of whom had an accommodation from DOCCS to wear a beard or were ordered to shave.  *Id*. ¶ 249.  Gleixner was twice more pulled out of pre-shift briefings on account of his facial hair.  *Id*. ¶¶ 252-254.  Plaintiffs contend that DOCCS officials targeted Gleixner for religious reasons, and did not subject other officers who actually had beards and lacked accommodations to the same treatment.  *Id*. ¶¶ 255-256.

On or around August 20, 2019, Officer Gleixner submitted another discrimination complaint to GOER, detailing the above-cited conduct.  *Id*. ¶ 257.  Two days later, Captain Exner, then the acting Deputy Superintendent of Security at Eastern, told Gleixner that he was being targeted.  *Id*. ¶ 258.  Before Gleixner's second shift began that afternoon, Superintendent Lee berated Gleixner about his facial hair in front of other officers, and ordered him to sit in a conference room where he could be seen by other officers and facility employees.  *Id*. ¶¶ 259-260.  Several officers—including one who had a full beard but, Plaintiffs allege upon information and belief, no accommodation—came into the room to inquire about what was happening to Gleixner.  *Id*.

The following day, on August 23, 2019, Officer Gleixner received a Notice of Discipline from Shipley informing him that he was being suspended for thirty days without pay for failure to comply with an order to be clean shaven per Directive 3083. *Id*. ¶¶ 261-262.

### C.  DOCCS's Further Actions After Plaintiffs Filed This Lawsuit

On August 27, 2019, the day after this lawsuit was filed, Officer Gleixner received a letter from Shipley informing him that the NOD was withdrawn. *Id*. ¶ 263.  Gleixner also received a letter that day from Walton, advising him that his request for a religious accommodation to maintain a beard was now approved. *Id*. ¶ 264.  Gleixner's accommodation has the same limitations as that provided to Sughrim and Feliciano. *Id*. ¶ 265.  In his current position at Fishkill Correctional Facility, Gleixner is routinely assigned to designated clean-shaven posts, even though he has a beard and an accommodation to have a beard that limits him from swapping shifts with officers who work clean-shaven posts. *Id*. ¶ 266.  Gleixner remains concerned that if he changes posts or transfers to another facility and is required to submit a new religious accommodation request, DOCCS officials may deny that request. *Id*. ¶ 267.

## IV.  Officer Alshamiri

### A.  Background

Officer Alshamiri, who joined DOCCS in June 2016, is Muslim and his sincerely held religious beliefs require him to keep a modest beard. *Id*.¶¶ 269-271.  Alshamiri is currently stationed at Cayuga and assigned to a post in the law library, which is not a clean-shaven post. *Id*. ¶¶ 273-274.

### B.  Requests for Accommodation

Alshamiri requested a religious accommodation to maintain his beard shortly after he started at Cayuga. *Id*. ¶ 275.  Although many officers at Cayuga had beards, including some who worked clean-shaven posts, supervisors told Alshamiri several times a week that he needed to

15

shave. *Id*. ¶ 279.  DOCCS denied Alshamiri's accommodation request in July 2018, but Alshamiri did not learn about the denial until October 2018 because it was mailed to an old address. *Id*. ¶ 282.  The reason DOCCS gave for denying the request was that Alshamiri was required to shave as part of his periodic duties with the Marine Corps. *Id*. ¶ 283.

Julie Dennis in DOCCS's Office of Diversity Management told Alshamiri that he needed to submit additional evidence to confirm the sincerity of his religious beliefs. *Id*. ¶ 286.  In August 2019, after he received a letter from the Marine Chaplain affirming the sincerity of his faith, Alshamiri appealed the denial of his religious-accommodation request. *Id*. ¶ 287.  On September 9, 2019, Alshamiri received an email from Defendant Walton, who directed Alshamiri to complete a new form and return it to her if he wanted to reapply for a religious accommodation. *Id*. ¶ 288. Alshamiri promptly submitted the new form and Cayuga acknowledged receipt. *Id*. ¶ 289.

In November 2019, while Alshamiri's religious-accommodation request was still pending, a supervisor, Lieutenant Soto, told him that he would have to shave. *Id*. ¶ 290.  Soto apologized, in sum and substance, for the hypocrisy of directing Alshamiri to shave given that Soto himself had a beard. *Id*.  Upon request, Alshamari filled out a new form, which was eventually signed by Deputy Superintendent Napoli, the "Designee for Reasonable Accommodation" at Cayuga. *Id*. ¶¶ 291-295.  Napoli told Alshamiri that he would be suspended if he refused to shave. *Id*. ¶ 296. When Alshamiri again refused to shave, Napoli wrote him up for disobeying a direct order and told him to leave the facility. *Id*. ¶ 297.  Alshamiri went home and later received a call from a supervisor who told him, in sum and substance, that he should return to Cayuga and work until his religious accommodation request was decided. *Id*. ¶ 298.

### C.  DOCCS's Further Actions After Plaintiffs Filed This Lawsuit

On December 6, 2019, after the Court entered a temporary restraining order, DOCCS officials prepared a letter authorizing Alshamiri to wear a beard up to one inch in length and

requiring him to submit a new request upon a change in post.  *Id*. ¶ 300.  The letter was not mailed

until December 9, 2019.  *Id*.  Prior to receiving the letter, Alshamiri submitted a request to change

posts.   *Id*. ¶ 301.   Accordingly, Alshamiri will be required to submit a new religious-

accommodation request.  *Id*.  Given his experience to date, he is concerned that he will face

harassment and may be ordered to shave his beard while his new request is pending, and that

DOCCS may use pretextual reasons to deny his new request.  *Id*.

## V.   **Officer Sofo**

### A.  **Background**

Officer Sofo, who joined DOCCS in 2014, is a believer in a form of Asatru—a  traditional

Norse Pagan religion—that requires him to maintain a beard.[4]  *Id*. ¶¶ 302-304.  Sofo is currently

stationed at Cayuga and has worked there for most of his career at DOCCS.  *Id*. ¶ 305.  Many

officers at Cayuga have beards for non-religious reasons and, on information and belief, none of

those officers have faced consequences for not shaving.  *Id*.  ¶ 306.  For example, in November

2018, officers at Cayuga conducted a "No Shave November" fundraising campaign in which

participating officers donated money and refrained from shaving for a month.  *Id*. ¶ 307.  Over 100

officers participated and no supervisors or DOCCS officials expressed concerns.  *Id*.

### B.  **Request for Accommodation**

In October 2019, Sofo informed supervisors that he wanted to keep a beard because of his

religious beliefs.  *Id*. ¶ 308.  On or about November 15, 2019, Sofo's superiors announced that

DOCCS had circulated a memo directing all officers without religious accommodations to be clean

shaven.  *Id*. ¶ 309.  The day after Sofo requested a religious-accommodation form, a lieutenant

allegedly told him, in sum and substance, that he did not care what the law says and that Sofo had

---

[4] Plaintiffs contend that the United States Army and Air Force have granted religious accommodations
for Asatru believers to wear beards.  *Id*. ¶ 333.

to shave. *Id*. ¶¶ 310-311.  Sofo submitted his religious accommodation request after his shift that day, which explained that "letting the hair of the face grow is a symbol of honor, one of the Nine Virtues" of his faith and that "I believe I must honor the practice as part of what is essential in order to grow in my faith." *Id*. ¶ 321.

On November 23, 2019, a supervisor handed Sofo a letter denying his religious-accommodation request. *Id*. ¶ 313.  Sofo attempted to read the two-page denial letter while his supervisor stood over him berating him to "go shave." *Id*. ¶ 314.  The letter, signed by Defendant Walton, stated:

> Based on a review of material regarding your religion, as well as a consultation with the Division of Ministerial Family and Volunteer Services, it has been determined that wearing a beard is a personal preference and not a religious requirement of the Norse Pagan religion. Further, maintaining facial hair and/or beards is not an inflexible dogma of the religion, as demonstrated by the recognized exception made for individuals serving in law enforcement positions. As such, your specific request cannot be approved.

*Id*. ¶ 316.  Neither Walton nor any other DOCCS official had spoken to Sofo about his religious beliefs and practices before denying his religious-accommodation request. *Id*. ¶ 317.  DOCCS never explained and Sofo does not know what "material regarding [his] religion" was reviewed or what information the Division of Ministerial Family and Volunteer Services provided that led DOCCS to deny his request. *Id*. ¶ 319.  Accordingly, Sofo does not know how DOCCS determined that keeping a beard is only a "personal preference"—a determination that he maintains is wrong. *Id*. ¶ 320.

Although the denial letter stated that "this is an interactive process and you may submit comments or any additional information that you believe would more fully support your request," DOCCS made no effort to engage Sofo's request. *Id*. ¶ 318.  Sofo asked a lieutenant if he could appeal the denial of his request and complete his shift, but the lieutenant told him, in sum and

substance, that he had been instructed to direct Sofo to go home and shave immediately and if Sofo did not shave, he would be suspended from work. *Id*. ¶ 324.

Sofo left Cayuga and went home. *Id*. ¶ 326. Shortly after he arrived home, he was notified that if he did not shave and return to work, he would lose swap privileges and could be locked out. *Id*. Sofo was deeply concerned that if he refused to shave, the officer whose shift he was covering that day would be disciplined. *Id*. ¶ 327. Without the opportunity to challenge the denial of his accommodation request or even submit further information as the denial letter stated he had the right to do, Sofo felt forced to shave and return to work. *Id*. He later learned that the officer whose shift he was covering was docked vacation time for the time it took Sofo to travel to his house, shave, and return to the facility. *Id*. ¶ 329. When Sofo returned to Cayuga after shaving, he was forced to withstand the taunts and stares of other officers. *Id*. ¶ 330.

According to Plaintiffs, one or more officers with beards who joined DOCCS after 1990 and do not have a medical or religious accommodation worked at Cayuga on November 23, 2019 without being ordered to shave or disciplined. *Id*. ¶ 331. Since the Court issued the temporary restraining order in November 2019, Sofo has continued to face verbal harassment from supervisors regarding his beard. *Id*. ¶ 334.

## VI.   Experiences of Other DOCCS Security Staff

Plaintiffs contend that other DOCCS security staff whose religious beliefs mandate that they wear facial hair have requested and been denied accommodations at Fishkill, Eastern, Cayuga, Albion and other New York State correctional facilities, even though it would pose no undue hardship to DOCCS to grant the accommodations. *Id*. ¶¶ 335-36. Other DOCCS security staff who wear beards for religious reasons have been harassed and faced retaliation for wearing beards or requesting religious accommodations to wear beards. *Id*. ¶ 338. As a result, other DOCCS security staff who wear beards for religious reasons have been deterred from filing formal requests

for religious accommodation out of concern that their requests will be denied. *Id.* ¶ 337. Finally, some DOCCS security staff who would otherwise wear beards for religious reasons have refrained from doing so out of concern that they will face adverse employment actions, retaliation, and harassment. *Id.* ¶ 339.

## PROCEDURAL HISTORY

On August 26, 2019, Plaintiffs initiated this action. *See* Dkt 1. Subsequently, Sughrim, Feliciano, and Gleixner each filed class charges with the Equal Employment Opportunity Commission ("EEOC"). TAC ¶¶ 341-45.

On November 27, 2019, Plaintiffs filed a proposed order to show cause for a temporary restraining order and preliminary injunction. Dkts. 42-43. Judge Victor Marrero entered the proposed order that day and scheduled a hearing before this Court on December 6, 2019. Dkt. 53. The Order provided that "pending the hearing and determination of [the motion for a preliminary injunction], Defendants are restrained, enjoined, and stayed from taking any adverse action against Plaintiffs and any other DOCCS Correctional Officer because they wear a beard or requested an accommodation to wear a beard for religious reasons." *Id.* On December 4, 2019, the Court issued an Order stating that it would hold a hearing on December 6, 2019 on the validity and scope of the November 27, 2019 Order. Dkt. 66. Following the hearing, and on the consent of the parties, the Court issued an Order providing:

> On the consent of the parties, during the pendency of this action, Defendant New York State Department of Corrections and Community Supervision (NYS DOCCS) and Defendant Annucci, acting in his official capacity, agree not to retaliate against any corrections officer for requesting to wear a beard for religious reasons. In addition, Defendants NYS DOCCS and Annucci agree that pending the Court's ruling on Plaintiffs' motion for a preliminary injunction, any corrections officer may maintain a beard if the officer: 1) has filed a declaration in this action, or 2) has a pending religious accommodation request and is not assigned to a clean shaven post and does not regularly swap with an officer assigned to a clean shaving

20

post.   By this agreement, Defendants do not waive any jurisdictional or other arguments.

Dkt. 72.  As Plaintiffs' motion for a preliminary injunction is not yet fully briefed, the Court does not consider its merits here.  *See* Dkt. 190 (granting Plaintiffs' request to file their reply in support of the motion for a preliminary injunction by January 27, 2021).

Plaintiffs filed a First Amended Complaint on December 13, 2019.  Dkt. 82. Defendants moved to dismiss, Dkt. 93 ("MTD FAC"), which Plaintiffs opposed, Dkt. 100 ("Opp. MTD FAC"). Plaintiffs moved for, and the Court granted, leave to file a Second Amended Complaint ("SAC") to allege new facts regarding EEOC exhaustion, Dkt. 132, 144.

Plaintiffs filed the SAC on May 15, 2020.  Dkt. 145.  The SAC alleged that Plaintiffs' counsel received right-to-sue letters from the EEOC regarding Gleixner's and Sughrim's class charges on January 13, 2020 and January 21, 2020, respectively.  SAC ¶¶ 347-48.  It was unclear from the face of the SAC, however, whether Feliciano received a right-to-sue letter.  The SAC further alleged that Alshamiri and Sofo both filed class charges with the EEOC on March 12, 2020. *Id*. ¶¶ 349-50.

Defendants filed a motion to dismiss the SAC on May 29, 2020, Dkt. 148 ("MTD SAC"), Plaintiffs filed an opposition thereto on June 12, 2020, Dkt. 153 ("Opp. MTD SAC").  The Court held oral argument on Defendants' motion on June 25, 2020.  Plaintiffs filed the TAC—the operative complaint here—on November 19, 2020, with consent of the defendants.  Dkt. 200.  The TAC alleges that Feliciano received a right-to-sue letter dated August 24, 2020.   TAC ¶ 349.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id*.  In evaluating a motion to dismiss under

Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw

all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent

Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (internal quotation marks omitted).

The Court, however, need not credit "[t]hreadbare recitals of the elements of the cause of action,

supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiffs here bring four categories of claims: (1) claims against the DOCCS Officials in

their official capacities for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for

violations of the First and Fourteenth Amendments; (2) claims against the DOCCS Officials in

their individual capacities for damages pursuant to 42 U.S.C. § 1983 for violations of the First and

Fourteenth Amendments; (3) claims against the State of New York and DOCCS for damages,

injunctive relief, and declaratory relief, for violations of Title VII; and (4) state law claims against

the State of New York, DOCCS, and DOCCS Officials in their individual capacities for violations

of Article I §§ 3 and 11 of the New York Constitution as well as the New York Human Rights

Law.  The Court considers each category of claims in turn.  For the reasons that follow,

Defendants' motion to dismiss is granted in part and denied in part.

## I.   Plaintiffs' § 1983 Claims for Declaratory and Injunctive Relief

### A.  Plaintiffs Plausibly Allege a Constitutional Violation Under the First and Fourteenth Amendments

Defendants first argue that Plaintiffs have failed to plausibly allege any constitutional

violation under the First or Fourteenth Amendments.  The Court disagrees.

The Free Exercise Clause of the First Amendment, applied against the states by incorporation through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," U.S. Const. Amend. I.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

"As the Supreme Court has instructed, however, the Free Exercise Clause 'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Employment Division v. Smith*, 494 U.S. 872, 879 (1990)).  "Such laws are subject to rational basis review." *Id*.  "The teaching of *Smith* is that a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Id*. at 196 (citing *Smith*, 494 U.S. at 888).

Nonetheless, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral; and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533 (citations omitted).  "Facial neutrality is not determinative" of whether strict scrutiny applies, however, as "[t]he Free Exercise Clause . . . extends beyond facial discrimination" and "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Lukumi*, 508 U.S. at 534 (internal quotation marks omitted).  "Official action that targets religious conduct for

23

distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id*. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id*. A law may thus be found "not neutral in 'operation,' as assessed in 'practical terms.'" *Cent. Rabbinical Cong.*, 763 F.3d at 194 (quoting *Lukumi*, 508 U.S. at 535-36). That is so because the "effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535. The Supreme Court has thus found that an ordinance is not neutral when it operates as a "religious gerrymander" such that "the burden of the ordinance, in practical terms, falls on" a particular religious group "but almost no others." *Id*. at 535-36. Additionally, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884.

The general-applicability requirement further "prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.'" *Cent. Rabbinical Cong.*, 763 F.3d at 196 (quoting *Lukumi*, 508 U.S. at 543). "A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Id*. at 197.

Here, Plaintiffs argue that the grooming policy is neither facially neutral, because it treats officers who seek religious accommodation differently than secular officers who need not seek accommodations because they were appointed before January 25, 1990, nor neutral in application, because it is selectively enforced against officers who seek religious accommodations. *See* Opp. MTD FAC at 22; Opp. MTD SAC at 5-6.

The Court "need not decide whether [the grooming policy] is facially neutral, however, because it is abundantly clear that [as alleged, the policy] is not neutral in operation, as assessed

in practical terms." *Cent. Rabbinical Cong.*, 763 F.3d at 194 (internal quotation marks omitted). Here, Plaintiffs have asserted that Defendants repeatedly denied their requests for religious accommodations to wear beards and subjected them to discipline, whereas "countless corrections officers" who did not seek religious accommodations "wore beards freely without any formal permission form or objection by DOCCS." TAC ¶ 4. In other words, Plaintiffs contend that Defendants selectively applied Directive 3083 to those officers who seek to maintain beards for religious reasons, while overlooking clear violations of the directive by officers who wore beards for non-religious reasons. Under similar circumstances, another judge in this district granted summary judgment to a plaintiff of Orthodox Jewish faith who challenged the New York Police Department's ("NYPD") no-beard policy. *See Litzman v. NYPD*, No. 12 Civ. 4681 (HB), 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013) (applying strict scrutiny due to "evidence that the NYPD exercises discretion with respect to a facially neutral rule in a discriminatory fashion" where "de facto exemptions to the [policy] abound" and "the NYPD does not always enforce its personal appearance standards"). The Court thus finds that Plaintiffs have plausibly alleged that the policy is neither neutral in application nor generally applicable, as DOCCS has applied the policy to burden only conduct motivated by religious belief. *Cent. Rabbinical Cong.*, 763 F.3d at 196.

Accordingly, the DOCCS policy must be justified by a compelling interest and narrowly tailored to advance that interest. *See Lukumi*, 508 U.S. at 533. Plaintiffs argue that the policy is not narrowly tailored to Defendants' stated goal of ensuring that an adequate number of respirator-eligible officers are on duty. Viewing the facts in the light most favorable to Plaintiffs, the Court agrees. *See Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 806 (1996) ("Partial service of a compelling interest is not narrow tailoring."); *see also Litzman*, 2013 WL 6049066, at *4 (concluding that rule was not narrowly tailored because the defendants failed to

25

"provide a legitimate explanation as to why the one-millimeter rule is enforced unevenly throughout the department, i.e. why Plaintiff was terminated when other officers who have beards longer than one millimeter remain on the force without any exemption or why some temporary exemptions are permitted").

Three facts alleged in the Complaint animate the conclusion that the grooming policy is not narrowly tailored to serve the interest of ensuring that an adequate number of respirator-eligible officers are on duty:  (1) DOCCS does not conduct annual respirator-fit tests on all of its correction officers, (2) the number of clean-shaven posts in each facility is limited, and (3) DOCCS maintains only a limited number of respirators.  TAC ¶¶ 52-56.  Plaintiffs assert that at Fishkill, for example, only 68 out of 544 posts are clean-shaven posts, and DOCCS maintains less than twenty respirators.  Accordingly, Defendants could accomplish their stated goal through less discriminatory means.  Instead of requiring that all DOCCS officers be clean-shaven, Defendants could ensure that at any given moment, there are at least as many respirator-eligible officers on duty at each facility as there are available respirators.  As DOCCS maintains less than twenty respirators at Fishkill, DOCCS need only ensure that there are twenty clean-shaven or fit-tested officers available at any given moment.  Because the alleged facts indicate that DOCCS policy is not narrowly tailored to Defendants' stated goals, Plaintiffs have adequately pleaded a violation of the Free Exercise Clause.

Plaintiffs have also adequately pleaded a violation of the Fourteenth Amendment's Equal Protection Clause.  Defendants argue—in a single footnote that cites a single case from the Northern District of Illinois—that the Fourteenth Amendment provides Plaintiffs with no additional protection of religious freedom other than that afforded by the First Amendment.  *See* MTD FAC at 22 n.17 (citing *Filinovich v. Claar*, No. 04 C 7189, 2006 WL 1994580 (N.D. Ill.

July 14, 2006)); MTD SAC at 23 n.19 (same).   A number of judges in this district have analyzed Fourteenth Amendment religious accommodation claims separately from First Amendment claims.  *See, e.g.*, *Lloyd v. City of N.Y.*, 43 F. Supp. 3d 254, 261-63 (S.D.N.Y. 2014) (holding that Muslim inmates who alleged they were denied adequate worship space and religious materials in violation of the Free Exercise Clause of the First Amendment and Equal Protection Clause of the Fourteenth Amendment stated a claim under both amendments); *Perez v. Westchester Cnty. Dep't of Corr.*, No. 05 Civ. 8120 (RMB), 2007 WL 1288579 (S.D.N.Y. Apr. 30, 2007) (denying motion to dismiss Free Exercise Clause claims and Equal Protection Clause claims based on jail's alleged refusal to provide Halal meat to Muslim inmates as often as it provided Kosher meat to Jewish inmates), *judgment aff'd,* 587 F.3d 143 (2d Cir. 2009).  Defendants do not otherwise appear to contend that Plaintiffs have failed to state an Equal Protection Clause claim.

The Court holds that Plaintiffs have stated a plausible Equal Protection Clause claim.  "The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).  It "prohibits selective enforcement based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) (internal quotation marks omitted).  Plaintiffs have adequately pleaded an equal protection violation here based on their allegations that Defendants repeatedly denied their requests for accommodations to wear beards and subjected them to discipline, while allowing "countless corrections officers" who did not seek religious accommodations to "w[ear] beards freely without any formal permission form or objection by DOCCS."  TAC ¶ 4.  Plaintiffs have also alleged that Defendants acted with discriminatory intent by singling them out with the knowledge that shaving would violate their religious beliefs, and by

27

making derogatory remarks, such as the questioning of Gleixner's Muslim faith.  *Id*. ¶¶ 157, 173, 178, 182, 186, 231-35.

### B.  Plaintiffs Plausibly Allege an Ongoing Violation of Federal Law

Defendants next contend that the *Ex Parte Young* exception to Eleventh Amendment immunity, which applies only to violations of federal law that are ongoing, is inapplicable because Plaintiffs have received religious accommodations to maintain their beards.  *See* MTD FAC at 22-23.  Defendants similarly assert that this Court cannot issue a judgment declaring that they violated the law in the past.  *Id*. at 23-24.  The Court concludes the Plaintiffs have adequately pleaded a violation of federal law that is ongoing.

First, Plaintiffs have plausibly alleged that the accommodation provided to Feliciano does not, in fact, accommodate his religious beliefs because it prohibits him from wearing a beard longer than one inch.  TAC ¶ 206.  Similarly, Plaintiffs have also alleged that Alshamiri's accommodation has lapsed, as his last day on the post for which he was provided an accommodation was December 24, 2019.  *Id*. ¶ 300-301.

Second, and more importantly, the voluntary-cessation doctrine counsels against a finding of mootness here.  "The voluntary cessation of challenged conduct will not 'ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'"  *Am. Freedom Def. Initiative v. MTA*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).  "Accordingly, courts will find a case moot after a defendant voluntarily discontinues challenged conduct only if '(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur' and '(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Id*. (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

Here, it cannot "be said with assurance that there is no reasonable expectation that the alleged violation will recur." *Id*.  The DOCCS beard policy remains in place.  The accommodations granted to Plaintiffs are limited in scope.  Plaintiffs are not assured that they will be provided new accommodations after their current accommodations lapse, as allegedly occurred with Alshamiri.  TAC ¶¶ 300-01.  Moreover, absent an injunction, nothing will stop Defendants from denying accommodations to other members of the putative class.  Interim events have thus failed to "completely and irrevocably eradicate[] the effects of the alleged violation," *id*., and any equitable relief provided by this Court would be prospective in nature.  Accordingly, Eleventh Amendment immunity does not apply to Plaintiffs' claims for declaratory and injunctive relief.

### C.  Plaintiffs Plausibly Allege That Multiple DOCCS Officials Possess the Authority to Provide the Requested Declaratory and Injunctive Relief

Defendants contend that Acting Commissioner Annucci is the only official-capacity defendant who possesses authority to provide the requested relief.  *See* MTD FAC at 24-25.  "[U]nder the venerable doctrine of *Ex parte Young*, a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective injunctive relief from violations of federal law."  *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (internal citations and quotation marks omitted).  Plaintiffs "can rely on *Ex parte Young* only if the officials [they] sue[] have the authority to provide the requested relief."  *Ross v. State of New York*, No. 15-CV-3286 (JPO), 2016 WL 626561, at *4 (S.D.N.Y. Feb. 16, 2016) (internal quotation marks omitted); *see also CSX Transp., Inc. v. New York State Office of Real Prop. Servs.*, 306 F.3d 87, 99 (2d Cir. 2002) ("*Ex Parte Young* allows for jurisdiction over the Individual Defendants inasmuch as it is in the performance of their duties that there may be an ongoing violation of federal law.").

Plaintiffs allege that Annucci "has final decision-making authority for DOCCS and bears ultimate responsibility to oversee, authorize, and manage DOCCS employment policies, practices, and customs." TAC ¶ 29. They do not allege that any other DOCCS Official possesses such wide authority. *See id.* ¶¶ 30-35. Plaintiffs nonetheless contend that it would be premature for the Court to dismiss the prospective § 1983 claims against the other DOCCS Officials who were personally responsible for the relevant employment actions. *See* Opp. MTD FAC. at 27 n.27. Defendant Fields and Lee are superintendents with authority over their subordinates and their jails. Defendant Shipley is the Director of the Bureau of Labor Relations and administers DOCCS's employee-discipline program and signed Plaintiffs' NODs in that capacity. Defendant Walton is the Assistant Director of Labor Relations and signed the denials of Plaintiffs' religious-accommodation requests. The Court is persuaded by Plaintiffs' argument that it would be premature to dismiss their § 1983 claims for injunctive and declaratory relief before fact discovery clarifies which DOCCS Officials possess the authority to provide the requested relief. The Court thus denies Defendants' motion to dismiss Plaintiffs' § 1983 claims for injunctive and declaratory relief.

## II.   Plaintiffs' § 1983 Claims for Damages

Plaintiffs bring § 1983 claims for damages against all DOCCS Officials except for Defendant Annucci. Defendants maintain that the relevant defendants were not personally involved in the alleged violations or are qualifiedly immune.

### A.  Plaintiffs Fail to Plausibly Allege the Personal Involvement of Defendants Fields or Johnson

The Court finds that Plaintiffs fail to allege the personal involvement of Defendants Fields or Johnson in the denial of Plaintiffs' religious accommodations. *See* MTD FAC at 15-16.

"Proof of an individual defendant's personal involvement in the alleged wrong is . . . a prerequisite to his liability on a claim for damages under § 1983." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). The Complaint alleges that Defendants Fields and Johnson played a role in the denial of Sughrim and Feliciano's requests for *medical* accommodations, yet does not assert that either defendant was involved in the denial of their *religious* accommodations. *See* TAC ¶¶ 112-124. As Plaintiffs do not bring any claims for the denial of their request for medical accommodations, their § 1983 claims for damages against Fields and Johnson are dismissed for lack of personal involvement.

### B.  Defendants Are Not Entitled to Qualified Immunity

Defendants next contend that they are entitled to qualified immunity. *See* MTD FAC at 16-21. The Court disagrees.

State officials are qualifiedly immune from damages liability as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if the right was clearly established, a state official is entitled to qualified immunity in the Second Circuit if it was objectively reasonable for the officer to believe the conduct at issue was lawful. *See, e.g., Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). To determine whether qualified immunity is appropriate, courts thus "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (internal quotation marks omitted).

Qualified immunity is "an affirmative defense on which the defendant officials bear the burden of proof." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). "A defendant presenting an immunity defense on a motion to dismiss must therefore show not only that the facts supporting

31

the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (internal quotation marks omitted). "Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle . . . and is usually not successful.'" *Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

Defendants have failed to establish entitlement to qualified immunity at this early stage because the constitutional rights that Plaintiffs allege were violated were clearly established at the time of those violations. Defendants' principal argument—that "NYDOCC's long-standing religious accommodation process" does not violate clearly established law, *see* MTD FAC at 19—misapprehends the nature of Plaintiffs' § 1983 claims. The Complaint alleges not only that the policy itself violates Plaintiffs' constitutional rights, but also that the DOCCS Officials selectively enforced it against religious adherents for discriminatory reasons. Numerous courts have held that adverse employment actions based on the protected characteristics of public employees violate the Constitution. *See, e.g., Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 80 (2d Cir. 2015); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) (Alito, J.) (holding that requirement that police officers shave their beards in violation of their Muslim beliefs violated the Free Exercise Clause). Another judge in this district reached a similar conclusion in *Litzman v. New York City Police Dep't*, a case brought by an Orthodox Jewish police officer who sought to wear a beard as an expression of his religious beliefs. 2013 WL 6049066. These decisions follow from the Supreme Court's jurisprudence on the Free Exercise clause, including *Smith*, 494 U.S. 872 and *Lukumi*, 508 U.S. 520.

In sum, Plaintiffs' allegations that Defendants selectively enforced the grooming policy against them because of their religion suffice to plead a violation of clearly established law.   No officer would find it objectively reasonable to intentionally discriminate on the basis of religion. Defendants are thus not entitled to qualified immunity at this juncture.

III.   **Plaintiffs' Title VII Claims**

With respect to Plaintiffs' Title VII claims against the State of New York and DOCCS, Defendants argue that Plaintiffs have failed to exhaust their administrative remedies, that Eleventh Amendment immunity bars any claims for failure to accommodate, and that Plaintiffs have failed to plausibly allege disparate treatment, denial of accommodation, or retaliation.  *See* MTD FAC at 7-13.  Defendants do not expressly contest that Plaintiffs have plausibly alleged a claim for hostile work environment.  *See* TAC ¶¶ 374, 378; Opp. MTD FAC at 12-20.  The Court considers Defendants' various defenses in turn.

A.   **Eleventh Amendment Immunity Does Not Bar Plaintiffs' Title VII Accommodation Claim**

Although Defendants acknowledge the Supreme Court's holding that Congress abrogated state sovereign immunity when enacting Title VII's anti-discrimination provisions, they argue that the abrogation does not extend to claims for accommodation.  *See* MTD FAC at 7 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)).

Defendants bear the burden of establishing entitlement to Eleventh Amendment immunity. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.,* 466 F.3d 232, 239 (2d Cir. 2006).  They have not met that burden here.  Defendants rely on a 2003 case from the Court of Appeals for the Seventh Circuit which held that Title VII's "requirement of accommodation does not 'enforce' the free exercise clause" and therefore "may not be used to compel a state to defend in federal court a private suit seeking accommodation of a religious practice."  MTD FAC at 7-9 (citing *Holmes v.*

*Marion Cnty. Office of Family and Children*, 349 F.3d 914, 919, 922 (7th Cir. 2003)).  Plaintiffs

assert that the case is non-precedential because the Seventh Circuit vacated its opinion in *Holmes*

pending rehearing *en banc*, and the case settled before rehearing.  *See* Opp. MTD FAC at 16-17;

Opp. MTD SAC at 3-4; Addendum 2 to Opp. MTD FAC (docket in *Holmes*).  In any event, even

if the *Holmes* decision were precedential within the Seventh Circuit, it would not be here.

Defendants have identified no cases in this circuit which hold that the Eleventh

Amendment bars claims for reasonable accommodation brought under Title VII against the state

or one of its agencies.  In fact, in at least one case, albeit a non-precedential summary order, the

Court of Appeals for the Second Circuit reached the merits of a Title VII religious-accommodation

claim against a New York State agency.  *See Leifer v. New York State Div. of Parole*, 391 F. App'x

32, 33-24 (2d Cir. 2010).  Even though the Court of Appeals upheld summary judgment in favor

of the defendants on the accommodation claim, its adjudication of the merits suggests that courts

do have jurisdiction over such claims.  In light of *Fitzpatrick*'s recognition that Congress abrogated

the states' Eleventh Amendment immunity in enacting Title VII, and the absence of any controlling

authority limiting that holding, the Court declines to dismiss Plaintiffs' Title VII reasonable

accommodation claims on immunity grounds.

### B.  Alshamiri and Sofo—But Not Gleixner, Sughrim, and Feliciano—Failed to Exhaust

Defendants next argue that Plaintiffs' Title VII claims should be dismissed for failure to

exhaust administrative remedies.  *See* MTD SAC at 9-11.  For the reasons that follow, the Court

holds that equitable principles counsel against dismissing the claims brought by Sughrim,

Gleixner, and Feliciano because they have received right-to-sue letters from the EEOC.  The claims

brought by Alshamiri and Sofo, by contrast, are dismissed without prejudice.

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015). Before bringing suit, a Title VII plaintiff must file a charge with the EEOC and obtain a right-to-sue letter. *See* 42 U.S.C. § 2000e-5; *see also Williams v. N.Y. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006). "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Accordingly, "a plaintiff's failure to fully comply with the remedial administrative scheme envisioned by Title VII does not preclude judicial review" and can "be excused under certain doctrines." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018). "[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense." *Id.*

Gleixner and Sughrim received right-to-sue letters from the EEOC—on January 13 and January 21, 2020, respectively—after they filed the initial complaint in this action but before they filed the motion for leave to file the SAC. TAC ¶¶ 347-48. Feliciano received a right-to-sue letter on September 6, 2020, after which Plaintiffs filed the TAC. *Id.* ¶ 349. "Courts in this circuit have already held that where a plaintiff has received a 'right to sue letter subsequent to commencement of a Title VII action' and while the federal action is still pending, the statutory exhaustion requirements have been met 'based on . . . equitable principles.'" *Brunson-Bedi v. New York*, No. 15 CIV. 9790 (NSR), 2018 WL 2084171, at *4 (S.D.N.Y. May 1, 2018) (quoting *Benzo v. New York State Div. of Human Rights*, No. 95 CIV 5362 (LAP), 1997 WL 37961, at *9 (S.D.N.Y. Jan. 31, 1997)). Defendants nonetheless maintain that Gleixner and Sughrim's claims should be dismissed because they did not exhaust before filing suit. *See* MTD SAC at 10. The Court

addressed this argument in its May 14, 2020 oral ruling granting Plaintiffs' motion for leave to file the SAC, finding that the inclusion of new allegations regarding exhaustion would not prejudice Defendants.   The Court declines to revisit this conclusion, and applies the same principles to Feliciano.   Equitable principles counsel against dismissing their Title VII claims on the basis of failure to exhaust.

Alshamiri and Sofo, by contrast, have not yet exhausted their EEOC remedies.   Where a plaintiff has pleaded non-Title VII claims alongside a Title VII claim, he may file suit on the non-Title VII claims and then amend the complaint to include the Title VII claim after receiving a right-to-sue letter.   *See Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 41 (2d Cir. 1992).   This would have been the proper procedure for Alshamiri and Sofo to follow.   Accordingly, the Court dismisses the Title VII claims for damages brought by Alshamari and Sofo, albeit without prejudice.   If and when they receive right-to-sue letters, they may seek leave to amend the Complaint.

Finally, temporary injunctive relief is available on Title VII claims before a plaintiff receives a right-to-sue letter from the EEOC.   *See Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884-87 (2d Cir. 1982) ("[W]here a person has filed a Title VII charge with the EEOC, the court has jurisdiction to entertain a motion for temporary injunctive relief against employer retaliation while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter."); *see also Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 89 (2d Cir. 1983) ("An injunction pending state administrative proceedings is available prior to such exhaustion, but that is the only relief available prior to exhaustion." (citation omitted)).   In this case, the Court has already granted temporary injunctive relief that will protect Alshamiri and Sofo from retaliation during the pendency of this action and allow them to maintain beards.   *See* Dkt. 72.   These measures survive the dismissal without prejudice of their Title VII claims, because Alshamari and Sofo filed

declarations a week before the Court entered its December 6, 2019 order.  *See* Dkt. 48-49.  Pursuant

to the terms of that Order, Alshamari and Sofo may thus maintain their beards.

In sum, the Court denies Defendants' motion to dismiss with respect to the Title VII claims

brought by Gleixner, Feliciano, and Sughrim, yet grants the motion without prejudice with respect

to those of Alshamiri and Sofo.

### C.  Plaintiffs Plausibly Allege a Title VII Disparate Treatment Claim

Defendants next argue that Plaintiffs fail to plausibly allege a disparate treatment claim

under Title VII.  *See* MTD SAC at 11-12.  The Court disagrees.

"Under *Iqbal* and *Twombly* . . . in an employment discrimination case, a plaintiff must

plausibly allege that (1) the employer took adverse action against him and (2) his race, color,

religion, sex, or national origin was a motivating factor in the employment decision."  *Vega*, 801

F.3d at 86.   In a Title VII case, the plaintiff need not provide "substantial evidence of

discriminatory intent" at "the initial stage of the litigation."  *Littlejohn v. City of New York*, 795

F.3d 297, 311 (2d Cir. 2015).   Rather, the plaintiff needs to plausibly allege that he is a member

of a protected class, that he was qualified for the position, that he suffered adverse employment

action, and to "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory

motivation."  *Id.* (emphasis in original).

Defendants do not appear to dispute that Plaintiffs are members of a protected class and

that they are qualified for their positions.  They argue, however, that none of the Plaintiffs other

than Sofo suffered any adverse action.  The Court concludes that Plaintiffs have plausibly alleged

that they faced numerous adverse employment actions.  For example, Sughrim, Feliciano, and

Gleixner allege that they were subject to notices of discipline, escorted out of the facility, and

suspended.  TAC ¶¶ 156-197, 226-262.  Moreover, as discussed earlier, the policy pursuant to

which these Plaintiffs suffered adverse actions remains in place.  *See supra* Part I.B.  Accordingly,

other putative class members could face similar adverse actions, and the named Plaintiffs could be disciplined once again if and when their accommodations lapse. *Id*. The Court thus finds that Plaintiffs have plausibly alleged a disparate-treatment claim.

Defendants next contend that Plaintiffs have not plausibly alleged that any adverse action occurred "under circumstances giving rise to an inference of discrimination." Again, the Court disagrees. As the Court of Appeals for the Second Circuit has recognized, a plaintiff at the pleading stage is "not required to plead a prima facie case of discrimination as contemplated by the *McDonnell Douglas* framework," but instead has a "minimal burden of alleging facts suggesting an inference of discriminatory motivation." *Vega,* 801 F.3d at 84-85 (internal quotation marks omitted). Plaintiffs have met that burden here by alleging that they were singled out for discriminatory treatment and denied accommodations while "countless corrections officers working at DOCCS facilities across the State . . . wore beards regularly without repercussion." TAC ¶ 3; *see also id*. ¶¶ 139-143, 229, 240, 247, 249, 255-256, 306-307, 331. Defendants took these actions knowing that shaving would, in each case, violate the Plaintiffs' religious beliefs. TAC ¶¶ 157, 178, 186, 293-97, 231-235, 248-256, 131-136, 160-166, 173, 179-182, 224, 242, 261. In addition to these allegations of selective enforcement, Plaintiffs cite other examples in which a DOCCS official singled them out for abusive treatment. *See, e.g.,* TAC ¶¶ 231-232 (mockingly implying that Gleixner was not Muslim in front of his colleagues).

### D. Plaintiffs Plausibly Allege a Title VII Denial of Reasonable Accommodation Claim

Defendants also argue that Plaintiffs have failed to plausibly allege a Title VII denial-of-accommodation claim because four out of the five Plaintiffs eventually received an accommodation. *See* MTD SAC at 13. Defendants do not otherwise appear to dispute that Plaintiffs have plausibly alleged a failure to accommodate. The Court rejects this argument for

the same reasons it declined to dismiss Plaintiffs' Title VII claim for disparate treatment. To state a claim for failure to accommodate, plaintiffs must allege "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; . . . (3) they were disciplined for failure to comply with the conflicting employment requirement"; and (4) that they were not offered a reasonable accommodation. *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (internal quotation marks omitted).   The Complaint alleges that each Plaintiffs was subject to disciplinary action for failure to comply with the grooming policy. *See supra* Part III.C.  Plaintiffs allege that the accommodations are inadequate for numerous reasons, namely that they do not allow for beards longer than one inch, *see* TAC ¶¶ 206-207, they are limited in scope, and there is no assurance that they will be renewed upon their expiration.

### E.  Plaintiffs Plausibly Allege a Title VII Retaliation Claim

Finally, Defendants maintain that Plaintiffs failed to adequately plead retaliation because they did not allege that they engaged in any protected activity.  *See* MTD at SAC 13-14.  Once again, the Court disagrees.

As an initial matter, Defendants ignore Gleixner's allegation that he formally complained about religious discrimination.  *See* TAC ¶¶ 241-242 (alleging that Gleixner complained to GOER "about the religious discrimination and harassment he was experiencing," after which "DOCCS denied Officer Gleixner's religious accommodation request"); *id*. ¶¶ 257-258 ("Officer Gleixner submitted another discrimination complaint to GOER, detailing the harassment he had suffered during the previous months. . . . Two days later, . . . the acting Deputy Superintendent of Security at Eastern[] told Officer Gleixner that he was being targeted.").

The other Plaintiffs may base their claim for retaliation upon a request for a reasonable accommodation.  In *Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635, at *23 (S.D.N.Y. Sept. 27, 2013), for example, this Court held that the plaintiff's "repeated

discussions with her supervisors . . . regarding her need for religious accommodation suffice to establish her participation in a protected activity." *See also Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 149 (2d Cir. 2002) (stating that seeking reasonable accommodation qualifies as protected activity under the Rehabilitation Act and Americans with Disabilities Act); *Jenkins v. New York City Transit* Auth, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) (stating that "a claim for retaliation can be based upon a request for reasonable accommodation" of religious beliefs). Plaintiffs alleged that they repeatedly sought accommodations and that their requests were denied. The Complaint thus adequately pleaded engagement in protected activity.

## IV.   Plaintiffs' State Constitutional and Statutory Claims

Finally, Defendants move to dismiss Plaintiffs' claims against the State of New York, DOCCS, and DOCCS Officials in their individual capacities for violations of Article I §§ 3 and 11 of the New York Constitution as well as the New York Human Rights Law. *See* MTD SAC at 6-7, 14-15. For the reasons that follow, the Court dismisses these claims.

### A.   The State Law Claims Against the State of New York and DOCCS Are Dismissed on Consent of the Parties

In response to Defendants' argument that the Eleventh Amendment bars Plaintiffs' state claims against the State of New York and DOCCS, Plaintiffs ask the Court to dismiss those claims without prejudice to their right to pursue those claims in state court. *See* Opp. MTD FAC at 30. The Court hereby does so.

### B.   Corrections Law § 24 Provides Statutory Immunity

Defendants next argue that statutory immunity under New York Correction Law § 24 bars Plaintiffs' state law claims for damages against the DOCCS Officials in their individual capacities. *See* MTD SAC at 15-16. The Court agrees.

New York Correction Law § 24 provides that "[a]ny claim for damages arising out of any act done or the failure to perform any act *within the scope of the employment and in the discharge of the duties* of any officer or employee of [DOCCS] shall be brought and maintained in the court of claims as a claim against the state."  N.Y. Correction Law § 24 (emphasis added).  "The Second Circuit has held that this provision prevents federal courts from exercising pendent jurisdiction over state law claims appended to federal claims brought pursuant to 42 U.S.C. § 1983."  *Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) (citing *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996)).  According to the Second Circuit, "[t]his provision, by its plain terms, precludes the assertion of claims against corrections officers in any court, including the federal courts."  *Baker*, 77 F.3d at 15.

As Plaintiffs have failed to plausibly allege that the individual defendants acted outside the scope of their employment, the Court lacks jurisdiction over the state law claims brought against the DOCCS officials in their individual capacities.  *See Parker v. Miller*, 199 F.3d 1323 (2d Cir. 1999).  Plaintiffs contend that the New York Court of Appeals decision *Rivera v. State*, 34 N.Y.3d 383 (2019), limits the scope of Correction Law § 24.  *See* Opp. MTD FAC at 30-31.  The Court, however, finds *Rivera* distinguishable because it involved "gratuitous and utterly unauthorized use of force" that "was so egregious as to constitute a significant departure from the normal methods of performance of the duties of a correction officer as a matter of law," which led the New York Court of Appeals to conclude that the defendant-officers acted outside the scope of their employment.  34 N.Y.3d at 391.  Plaintiffs' allegations here do not rise to this level of "egregious" conduct that constitutes a "significant departure" from the duties of a correction officer.  The Complaint instead alleges discrimination, harassment, and retaliation by DOCCS Officials in the

41

course of their duties.  Finding *Rivera* inapplicable, the Court grants Defendants' motion to dismiss the state law claims against the DOCCS Officials.

### C.  The New York State Constitution Does Not Provide an Implied Private Right of Action Here Due to the Availability of Alternative Remedies

As an independent ground for dismissal, Defendants argue that the New York Constitution does not provide a private right of action in federal court when a plaintiff has an alternative remedy available under 42 U.S.C. § 1983.  *See* MTD SAC 14-15 (citing *Wahad v. FBI*, 994 F. Supp. 237 (S.D.N.Y. 1998)).  The Court agrees.

"New York courts will only imply a private right of action under the state constitution where no alternative remedy is available to the plaintiff."  *Bleiwas v. City of New York*, No. 15 CIV. 10046 (ER), 2017 WL 3524679, at *11 (S.D.N.Y. Aug. 15, 2017) (internal quotation marks omitted).  Plaintiffs argue that there is an implied cause of action available under the New York Constitution here, citing *Brown v. State*, 89 N.Y.2d 172 (1996).  *See* Opp. MTD FAC at 31.  But Defendants rightly point out that in *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 84 (2001), the New York Court of Appeals held that the remedy in *Brown* addressed "the private interest that citizens harmed by constitutional violations have an avenue of redress" where "neither declaratory nor injunctive relief was available."

Here, Plaintiffs seek declaratory and injunctive relief in addition to damages pursuant to § 1983.  Accordingly, the Court agrees with Defendants that Plaintiffs' state constitutional claim must be dismissed.

## CONCLUSION

For the reasons provided above, Defendants' motion to dismiss is granted in part and denied in part.  In summary:  (1) the Court denies Defendants' motion to dismiss Plaintiffs' § 1983 claims for injunctive and declaratory relief; (2) the Court grants Defendants' motion to dismiss Plaintiffs' § 1983 claim for damages against Defendants Fields and Johnson, but denies the motion with respect to the other DOCCS Officials who are sued in their personal capacities; (3) the Court denies Defendants' motion to dismiss Gleixner, Sughrim, and Feliciano's Title VII Claims; (4) the Court grants Defendants' motion to dismiss Alshamiri and Sofo's Title VII claims without prejudice such that they may seek leave to amend once they have exhausted their administrative remedies; (5) the Court grants Defendants' motion to dismiss Plaintiffs' state constitutional claims; (6) the Court grants Defendants' motion to dismiss Plaintiffs' New York State Human Rights Law claims; and (7) the Court denies Defendants' motion to dismiss on all other grounds.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Entry 93.

SO ORDERED.

Dated:      November 30, 2020
            New York, New York

                                        _____
                                        Ronnie Abrams
                                        United States District Judge