**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN SUGHRIM, et al.,<br><br>                    Plaintiffs,<br>     v.<br><br>STATE OF NEW YORK, et al.,<br><br>                    Defendants. | No. 19-CV-7977 (RA) (SDA) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT, PERMANENT INJUNCTION, AND PRELIMINARY INJUNCTIVE**

Joshua S. Moskovitz
THE LAW OFFICE OF JOSHUA MOSKOVITZ, P.C.
392 Central Avenue, # 7803
Jersey City, New Jersey 07307
(212) 380-7040

Ronald E. Cook
1317 Vassar Street
Houston, TX 77006

Jonathan C. Moore
Luna Droubi
Deema Azizi
Jeffrey F. Kinkle
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    DOCCS's Appearance Policy .....................................................4

    B.    DOCCS's Current "No-Shave" Rule ..........................................7

    C.    DOCCS's Beard Accommodation Policy ...................................8

    D.    The Plaintiffs ...............................................................................13

        i.    Brian Sughrim and David Feliciano ................................13

        ii.    Derek Gleixner ................................................................16

        iii.    Khaldoun Alshamiri ........................................................18

        iv.    Roland Sofo .....................................................................19

    E.    Experiences of Class Members ....................................................20

PROCEDURAL HISTORY ..................................................................................21

ARGUMENT .........................................................................................................23

    I.    PARTIAL SUMMARY JUDGMENT GRANTING DECLARATORY AND INJUNCTIVE RELIEF FOR THE RELIGIOUS REQUIREMENTS SUB-CLASS IS APPROPRIATE ........................................................23

        A.    Legal Standard ............................................................................23

        B.    Application of Law to Facts.........................................................23

            i.    DOCCS's practice violates the First Amendment..........24

            ii    DOCCS's practice violates the Equal Protection Clause .............27

            iii.    Title VII Disparate Treatment........................................28

**TABLE OF CONTENTS (cont'd)**

                                                                    **PAGE**

      iv.    Title VII Failure to Accommodate Claim ....................................29

    C.    A Declaratory Judgment is Appropriate ....................................................30

    D.    A Permanent Injunction is Appropriate ....................................................30

II.    PERMANENT INJUNCTIVE RELIEF IS WARRANTED ON THE PLAINTIFFS' INDIVIDUAL CLAIMS ..................................................................32

    A.    First Amendment ..................................................................33

    B.    Title VII Disparate Treatment..................................................35

    C.    Title VII Failure to Accommodate..............................................35

III.    CLASS-WIDE PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED TO ENJOIN THE DENIAL OF RELIGIOUS ACCOMMODATIONS ABSENT UNDUE HARDSHIP ..................................37

CONCLUSION..................................................................................39

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Baker v. The Home Depot,*
    445 F.3d 541 (2d Cir. 2006)................................................................29, 35, 37

*Beck v. Levering,*
    947 F.2d 639 (2d Cir. 1991)................................................................1, 23

*Bell & Howell: Mamiya Co. v. Masel Co. Corp.,*
    719 F.2d 42 (2d Cir. 1983)................................................................37

*Bell v. Hood,*
    327 U.S. 678 (1946)................................................................30

*Bentley v. AutoZoners, LLC,*
    935 F.3d 76 (2d Cir. 2019)................................................................35

*Bery v. City of N.Y.,*
    97 F.3d 689 (2d Cir. 1996)................................................................38

*Bronx Household of Faith v. Bd. of Educ.,*
    331 F.3d 342 (2d Cir. 2003)................................................................38

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940)................................................................24

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F.3d 30 (2d Cir. 2010)................................................................37, 39

*Cont'l Cas. Co. v. Coastal Sav. Bank,*
    977 F.2d 734 (2d Cir. 1992)................................................................23, 30

*Covino v. Patrissi,*
    967 F.2d 73 (2d Cir. 1992)................................................................37

*Dwyer v. Regan,*
    777 F.2d 825 (2d Cir. 1985)................................................................32, 38

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    575 U.S. 768 (2015)................................................................28, 36

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................31, 38

*Fifth Ave. Presbyterian Church v. City of New York,*
    293 F.3d 570 (2d Cir. 2002)................................................................38

**TABLE OF AUTHORITIES (cont'd)**

CASES                                                                    PAGE(S)

*Floyd v. City of N.Y.*,
  959 F. Supp. 2d 668 (S.D.N.Y. 2013) ...................................................23, 30, 31

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021)..........................................................................................33

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)...................................................................................37

*Grief v. Quay*,
  701 F. App'x 64 (2d Cir. 2017) ...........................................................................25

*Heckstall v. Metro. Transp. Auth.*, No. 19cv3566 (DLC),
  2021 U.S. Dist. LEXIS 63878 (S.D.N.Y. Apr. 1, 2021)...................................35

*Holt v. Hobbs*,
  574 U.S. 352 (2015)........................................................................................25, 26

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996)...................................................................................24

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) .....................................................................24, 32, 33

*Marria v. Broaddus*, No. 97-CV-8297 (NRB),
  2003 WL 21782633 (S.D.N.Y. July 31, 2003) .......................................... 24-25

*Mitchell v. Cuomo*,
  748 F.2d 804 (2d Cir. 1984)................................................................................37

*Mullins v. City of New York*,
  554 F. Supp. 2d 483 (S.D.N.Y. 2008) ..............................................................38

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)................................................................................38

*N.Y. State Nat'l Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989)..............................................................................31

*Patrick v. LeFevre*,
  745 F.2d 153 (2d Cir. 1984).................................................................................25

*Paulsen v. Cty. of Nassau*,
  925 F.2d 65 (2d. Cir. 1991).................................................................................38

## TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                    **PAGE(S)**

*Perez v. Westchester Cnty. Dep't of Corr.*, No. 05 Civ. 8120 (RMB),
    2007 WL 1288579 (S.D.N.Y. Apr. 30, 2007),
    *judgment aff'd*, 587 F.3d 143 (2d Cir. 2009) ...................................................................90

*Philbrook v. Ansonia Bd. of Educ.*,
    757 F.2d 476 (2d Cir. 1985)...............................................................................24

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990).............................................................................37

*Shapiro v. Cadman Towers, Inc.*,
    51 F.3d 328 (2d Cir. 1995)................................................................................37

*Sheehan v. Purolator Courier Corp.*,
    676 F.2d 877 (2d Cir. 1982)..........................................................................32, 38

*Statharos v. New York City Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999)...............................................................................37

*Sughrim v. New York*,
    503 F. Supp 3d. 68 (S.D.N.Y. 2020) ..................................................27, 29, 32, 33, 34, 35

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981).....................................................................................26, 27

*TWA v. Thurston*,
    469 U.S. 111 (1985).....................................................................................28, 35

*United States v. Seeger*,
    380 U.S. 163 (1965).......................................................................................8, 24

*USA v. Ehrlich*,
    98 F. Supp. 3d 637 (S.D.N.Y. 2015) ................................................................1, 23

*Young v. UPS*,
    575 U.S. 206 (2015)..........................................................................................28

**TABLE OF AUTHORITIES (cont'd)**

**STATUTES AND RULES**                                                      **PAGE(S)**

42 U.S.C. § 2000e-2.................................................................................................28

29 C.F.R. § 1910.134..............................................................................................4

29 C.F.R. § 1605.1................................................................................................25

Fed. R. Civ. P. 56............................................................................................23, 36

# TABLE OF ABBREVIATIONS

Pls.' 3d Am. Compl. .................Plaintiffs' Third Amended Class Action Complaint (Dkt. 199)

Defs.' Answer ..........................Defs.' Answer to Pls.' Third Am. Class Action Comp. (Dkt. 204)

Moskovitz Decl. ........................July 15, 2022 Declaration of Joshua Moskovitz (Dkt.

Sughrim 11/26/19 Decl. ............November 26, 2019 Declaration of Brian Sughrim (Dkt. 45)

Feliciano 11/26/19 Decl. ...........November 26, 2019 Declaration of David Feliciano (Dkt. 46)

Gleixner 11/27/19 Decl. ............November 27, 2019, Declaration of Derek Gleixner (Dkt. 47)

Alshamiri 11/27/19 Decl. ...........November 27, 2019 Declaration of Khaldoun Alshamiri (Dkt. 48)

Sofo 11/27/19 Decl. .................November 27, 2019 Declaration of Roland Sofo (Dkt. 49)

Szafranski Decl. ........................December 3, 2019 Declaration of Fred Szafranski (Dkt. 61)

Gleixner 7/12/22 Decl. ..............July 12, 2022 Declaration of Derek Gleixner (Dkt. 256)

Alshamiri 7/12/22 Decl. ............July 12, 2022 Declaration of Khaldoun Alshamiri (Dkt. 257)

Sofo 7/12/22 Decl. ...................July 12, 2022 Declaration of Roland Sofo (Dkt. 258)

Sughrim 7/13/22 Decl. ..............July 13, 2022 Declaration of Brian Sughrim (Dkt. 259)

Feliciano 7/14/22 Decl. .............July 13, 2022 Declaration of David Feliciano (Dkt. 260)

## PRELIMINARY STATEMENT

Plaintiffs—five New York State Department of Corrections and Community Supervision ("DOCCS") officers who were denied accommodations for their religious beliefs to wear beards—now move for partial summary judgment on (1) certain class claims for declaratory and permanent injunctive relief, (2) certain individual religious accommodation claims seeking permanent injunctive relief, and (3) preliminary injunctive relief for certain aspects of Plaintiffs' class claims.[1]

I.     Partial summary judgment for Plaintiffs is appropriate on their claims concerning DOCCS's policy of denying religious accommodations to "particular faiths or religions" because DOCCS "deems that maintaining a beard is not a tenet of their faith/religion." This policy plainly violates the First and Fourteenth Amendments and Title VII. Defendants have acknowledged that "this whole case is about [beard accommodation] requests that are religious in nature"; and yet, DOCCS has decided that some of these undisputedly religious requests do not meet DOCCS's test for true religious requirements. Applying this policy, DOCCS has treated and continues to treat certain religions and religious beliefs differently, and has denied numerous religious accommodation requests on grounds that violate the constitution and Title VII.

Given the clarity of these issues – and given that DOCCS does not dispute but embraces that it "determines" the required beliefs of certain religions – Plaintiffs move for partial summary judgment and request a declaratory judgment and permanent injunctive relief on behalf of the Religious Requirements Subclass. Specifically, Plaintiffs seek judgment declaring (1) that it is unconstitutional and a violation of Title VII for the State to treat certain religions differently, and

---

[1] "Courts may properly address declaratory actions through a motion for summary judgment, which are subject to the same Rule 56(a) standard as any other motion for summary judgment." *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 657 (S.D.N.Y. 2015). Likewise, "in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment" when Rule 56 is satisfied. *Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991).

(2) that it is unconstitutional and a violation of Title VII for the State to deny a religious accommodation because the State "determined" that the requirements or tenets of an officer's religion does not encompass wearing a beard. Plaintiffs also seek a permanent injunction enjoining the State from continuing this policy and requiring DOCCS to reconsider past beard accommodation requests that were denied based on this policy.

Absent a declaratory judgment and injunction, Plaintiffs and the Subclass will continue to suffer irreparable injury from the denial of their constitutional rights. The balance of hardships tilts squarely in favor of granting Plaintiffs' requested relief.

**II.**     Partial summary judgment should also be granted to Plaintiffs on their individual claims for injunctive relief arising under 42 U.S.C. § 1983 and Title VII. Specifically, Plaintiffs seek a permanent injunction requiring DOCCS to allow Plaintiffs to continue to wear their beards and to allow Plaintiff David Feliciano to maintain a beard up to four inches long.

The material facts not in dispute, and Plaintiffs are entitled to judgment as a matter of law. After years of arguing that a legitimate operational hardship justified the denial of the Plaintiffs' requested accommodations, DOCCS has finally conceded that "no Plaintiff remains without an accommodation due to any hardship." It would be difficult to argue otherwise given that DOCCS has allowed thousands of officers to wear beards for secular reasons for more than six months now pursuant to its new, "no shave" policy. This new policy has caused no problems the Commissioner knows of – and, in fact, the Commissioner testified that he has no objection to doing away with the existing "no beard" policy altogether. There is no genuine dispute about the sincerity of the named Plaintiffs' religious beliefs (as opposed to the *verity* of those beliefs, which DOCCS cannot legally second-guess). And while this litigation was pending, DOCCS granted accommodations to four of the plaintiffs without raising a concern about the sincerity of their beliefs.

Since there is no dispute about the material facts of the Plaintiffs' individual religious accommodation claims, and the Plaintiffs would suffer irreparable injury if their constitutional rights were further infringed, and because DOCCS has disclaimed any hardship from accommodating Plaintiffs' religious practices, Plaintiffs are entitled to partial summary judgment on their individual religious accommodation claims, and the Court should grant a permanent injunction for the individual Plaintiffs.

**III.**     Finally, it is appropriate for the Court to now enter a class-wide preliminary injunction enjoining DOCCS from denying religious beard accommodations absent an undue hardship. Title VII requires DOCCS to provide reasonable accommodations for officers' religious beliefs <u>absent an undue hardship</u>. Yet, DOCCS has denied numerous religious beard accommodations without any potential hardship. Indeed, DOCCS has granted *medical* beard accommodations in the midst of previously claiming that granting beard accommodations to the Plaintiffs would cause staffing problems. Now, DOCCS has allowed *thousands* of officers to have beards without any accommodation or reason.

The evidence demonstrates a strong likelihood that Plaintiffs will succeed in proving that DOCCS maintains a practice of denying accommodations in the absence of a hardship, which violates Title VII and treads on those officers' religious freedoms. Since there are important civil rights at stake, and no hardship to the State, the Court should grant a preliminary injunction enjoining DOCCS from continuing to deny religious accommodations absent an undue hardship and requiring DOCCS to attempt to identify reasonable accommodations when reviewing officers' religious requests to wear beards.

## STATEMENT OF FACTS[2]

### A.    DOCCS's Appearance Policy

DOCCS Directive 3083 establishes an appearance policy for "uniformed employees," also known as "security staff" or corrections officers. Pls.' 56.1 ¶ 2. On its face, Directive 3083 discriminates between facial hair allowed for junior and senior officers: "[s]ecurity staff appointed after January 25, 1990 are not permitted to wear beards or goatees," while "[s]ecurity staff appointed prior to January 25, 1990 may wear beards or goatees provided they are kept neatly trimmed within one inch." Pls.' 56.1 ¶ 10-12.[3]

As Directive 3083 makes clear, DOCCS does not maintain an across-the-board "clean-shaven" policy. Pls.' 56.1 ¶ 9.[4]  The only generally applicable prohibition on facial hair mentioned in Directive 3083 is when "the Department requires an employee to wear a respirator." Pls.' 56.1 ¶ 8. Those situations are governed by Directive 4068, DOCCS's "Respiratory Protection Program" policy.[5] Pls.' 56.1 ¶ 44.

---

[2]  The undisputed material facts are listed in Plaintiffs' accompanying Local Civil Rule 56.1 Statement of Material Facts (cited as "Pls.' 56.1"). Unless noted otherwise, all exhibits referenced in this memorandum are attached to the accompanying July 15, 2022 Declaration of Joshua Moskovitz (Dkt. 264).

[3]  Directive 3083 is facially discriminatory in other ways. For instance, it allows female officers, but not male officers, to wear hair that falls over their ears and eyebrows. *Id*. at 10-12. Commissioner Annucci testified that having "different standards for men and women" was "**appropriate**" because, "**[b]iologically they are different and styles are slightly different**." Pls.' 56.1 ¶ 4-7.

[4]  In opposing Plaintiffs' earlier injunction motion, Defendants characterized DOCCS's grooming policy as a "clean-shaven" policy. *See* Defs.' Resp. to Pls.' Mot. for Prelim. Injunction (Dkt. 106) at 5.

[5]  Directive 4068 is based on 29 C.F.R. § 1910.134, OSHA's standard for "respiratory protection." *See* Ex. 3. That standard does not mention "beards"; instead, it says, "[t]he employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have: Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function." 29 C.F.R. § 1910.134(g)(1)(i)(A). This standard treats beards, mustaches, and sideburns the same for respirator fit tests. *See* 29 C.F.R. § 1910.134, App. A ¶ 9 (a fit test "shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface, such as stubble beard growth, beard, mustache or sideburns which cross the respirator sealing surface"). Thus, Directive 3083's prohibition on beards and goatees but allowance for mustaches and sideburns is inconsistent with the governing OSHA standard.

Directive 4068 does not mention "beards" or "goatees." Pls.' 56.1 ¶ 45. Instead, it says: "Any employee (or contracted personnel) who is required to wear a tight-fitting respirator must not have facial hair that comes between the sealing surface of the face piece and the face or that interferes with respirator valve function." Pls.' 56.1 ¶ 46. Thus, beards and goatees are not *per se* inconsistent with respirator use.[6] Instead, only hair that comes between the sealing surface and the face or that interferes with valve function of a respirator is prohibited by Directive 4068.

Commissioner Annucci gave three reasons for DOCCS's no-beard policy: (1) historical, (2) "esprit de corps," and (3) safety/security. Pls.' 56.1 ¶ 18. The historical reason was that past commissioners had maintained the policy. *Id.* With respect to "esprit de corps," he stated: "we expect our staff, especially our security staff, to look professional." *Id*. The Commissioner agreed, however, that "beards that are trimmed and kept neatly within one inch are consistent with that grooming standard." Pls.' 56.1 ¶ 20.

Commissioner Annucci described the safety/security rationale as three-fold. First, when there is an altercation between an officer and an incarcerated individual, "if there is a beard of excessive length, that would present a means for the combatant to grab and possibly disadvantage the officer." Pls.' 56.1 ¶ 19. Commissioner Annucci also acknowledged that Directive 3083 allows officers to wear their hair longer than one inch. Pls.' 56.1 ¶ 24.

Commissioner Annucci next explained that "if you are compromised staff or so amenable to bring either drugs or weapons into a correctional facility that can be secreted in a beard." Pls.' 56.1 ¶ 29. But neither the Commissioner nor the Executive Deputy Commissioner was aware of

---

[6] In 2016, DOCCS argued at an arbitration that its policies and OSHA standards required officers to be clean shaven to wear respirators. The arbitrator rejected this argument and concluded that OSHA's standards and DOCCS's directives did not require officers to be "clean-shaven" to wear respirators. Ex. 132. Instead, the arbitrator held that officers "who have facial hair are to be permitted to work certain 'clean shaven' posts if they can pass the necessary 'fit test.'" *Id.*

any officer who had used his beard to transport contraband. Pls.' 56.1 ¶ 30. It would be nearly impossible to transport contraband in a one-inch beard. Martuscello acknowledged that a one-inch beard would satisfy his concerns about altercations and transporting contraband. Pls.' 56.1 ¶ 22.

Finally, Commissioner Annucci said *any* facial hair presents a problem for using respirators. Pls.' 56.1 ¶ 25.[7] Yet, the Commissioner acknowledged *he* was successfully fitted with a respirator with a mustache. Pls.' 56.1 ¶ 26. [Annucci 56:12-25]. This is consistent with the experiences of two of the plaintiffs who have passed respirator fit tests with beards. Pls.' 56.1 ¶ 27. [Alshamiri Dep. 63:22-64:4; Nov. 26, 2019 Decl. of Derek Gleixner ¶ 7 (Dkt. 47) ("Gleixner 11/26/19 Decl.")]. Having some facial hair work with a respirator is also consistent with Directive 4068 and the governing OSHA standard, which prohibit facial hair only to the extent that it comes between the sealing surface of the facepiece and the face, or interferes with valve function.

DOCCS has designated "clean shaven posts" where the need to wear a tight-fitting respirator may exist. Pls.' 56.1 ¶ 51. The number of clean shaven posts in each facility is limited. Pls.' 56.1 ¶ 63. At Fishkill Correctional Facility ("Fishkill"), for instance, approximately 15% of posts are designated clean shaven posts. *Id.* That leaves more than 360 posts where officers are not expected to use respirators, and therefore, there is no need for them to be clean-shaven. *Id.* Likewise, the number of tight-fitting respirators kept in each facility is only a fraction of the number of officers who work there. For instance, at Fishkill, there are 100 tight-fitting respirators for a staff of 1,078. *Id.*

---

[7]  The Commissioner also testified that the no-beard policy was adopted in 1990 because of a concern about tuberculosis. Ex. 108 at pp.109-112. But the Commissioner acknowledged he could not recall a tuberculosis outbreak in the past two decades. *Id.* 112. He also acknowledged that the only connection between beards and the spread of tuberculosis was tied to using respirators. *Id.* at 110. As described above, beards are not *per se* inconsistent with the safe use of respirators. *See* 29 C.F.R. § 1910.134(g)(1)(i)(A). And more importantly, as discussed below, DOCCS does not fit-test all officers for respirator use, and it does not maintain respirators in its facilities for every officer.

Consistent with the fact that DOCCS does not require all officers to be clean-shaven and does not expect all officers to be able to use tight-fitting respirators, DOCCS does not fit test every officer for respirator use. In some facilities, less than half of officers are fit tested. *See id.* For the three facilities that DOCCS provided statistics, the percentage of officers who were fit tested for respirator use was 41%, 45%, and 69%. Pls.' 56.1 ¶ 56.

DOCCS does not consistently enforce its no-beard rule, in general or for clean shaven posts. In April 2021, the Superintendent of Fishkill sent an email stating: "Because of ongoing litigation," "it has been discovered that Officers have been routinely assigned to posts that they are not qualified to work, particularly posts that required the Officer to be clean shaven (tower, transportation..etc)." Pls.' 56.1 ¶ 59. Two plaintiffs have been assigned to work clean shaven posts when they had beards. Pls.' 56.1 ¶ 60. And the plaintiffs have seen other officers with beards be assigned to clean shaven posts. Pls.' 56.1 ¶ 62 Also, DOCCS has granted a beard accommodation to an officer assigned to a transportation detail, which is a clean shaven post. Pls.' 56.1 ¶ 61.

### B.   DOCCS's Current "No-Shave" Rule

On November 2, 2021, Commissioner Annucci issued an operations memo entitled, "No Shave November," which allowed all officers not assigned to clean shaven posts to wear beards up to one-inch long. Pls.' 56.1 ¶ 31-32. The reason for the directive was "to promote morale." Pls.' 56.1 ¶ 263. Before issuing the memo, DOCCS did not conduct a study or analysis to determine whether allowing thousands of uniformed staff to wear beards would cause an operational hardship. Pls.' 56.1 ¶ 33.   Commissioner Annucci testified he would not knowingly issue a directive that would put the lives or safety of officers at risk. Pls.' 56.1 ¶ 34.

On November 23, 2021, the Commissioner issued another memo allowing all officers who are vaccinated against COVID-19 and who are not assigned to clean shaven posts to wear beards

up to one inch long. Pls.' 56.1 ¶ 35. The November 23 memo stated that its purpose was "to protect the hard-working employees of this department." *Id.* As a result of the current "no shave" rule, thousands of officers are allowed to wear beards for secular reasons. Pls. 56.1 ¶ 38. The Commissioner and Executive Deputy Commissioner are not aware whether there are any ongoing efforts to enforce DOCCS's no-beard rule since the Department adopted the no-shave rule in November 2021. Pls.' 56.1 ¶ 43. Nor are they aware of any problem caused by thousands of officers being allowed to wear beards over the past six months. Pls.' 56.1 ¶ 40.

Commissioner Annucci acknowledged that the Department is considering relaxing its no-beard policy. Pls.' 56.1 ¶ 41. He testified that he was aware of no problems with amending Directive 3083 to allow all officers (who are not assigned to clean shaven posts) to have a neatly trimmed beard up to one inch. Pls.' 56.1 ¶ 42. Commissioner Annucci was not aware of any specific concerns within his executive team about revising Directive 3083 to allow one-inch beards for non-clean-shaven post officers. Pls.' 56.1 ¶ 264.

## C.   DOCCS's Beard Accommodation Policy

When considering religious accommodation requests, officials in the Office of Diversity and Inclusion ("ODI"), which administers DOCCS's reasonable accommodation policies, *sometimes* decides whether the requested accommodation would impose an operational hardship, *see* Ex. 46, and sometimes "determines" whether wearing a beard is a "requirement" of the officer's religion. ODI makes the second determination concerning religious "requirements" for "some particular faiths or religions, but not others." Pls.' 56.1 ¶ 117; *see also* Ex. 114 at 309-13.[8]

ODI officials determine the requirements of certain religions by asking applicants to provide religious texts to support their beliefs. Pls.' 56.1 ¶ 96. But they do not make such a demand

---

[8]  Although *United States v. Seeger*, 380 U.S. 163 (1965), permits the State to question the sincerity of an applicant's religious beliefs, DOCCS does *not* consider the sincerity of beliefs. Pls.' 56.1 ¶ 267.

of every applicant. *Id.* ODI officials understand that not all religions have religious texts, but it has still denied requests from applicants who do not provide texts when requested. Pls.' 56.1 ¶ 97, 117.

ODI officials then interpret the applicant's religious texts to determine whether the text "satisfy[ies]" ODI that the officer's religion requires wearing a beard. Ex. 114 at 313. An example of this inquiry is contained in emails between ODI Assistant Director Na-Kia Walton (who processed religious accommodation requests) and Assistant Counsel Nancy Steuhl concerning a religious accommodation request. Referring to an applicant who had submitted a several-pages-long email explaining his religious beliefs, Walton wrote to Steuhl: "He seems to make a compelling argument, to me." Pls.' 56.1 ¶¶ 104-05. The applicant had written, in part:

> Odinists don't have the kind of religion in which gods require all their followers to follow commandments in order to achieve a proper afterlife. Wearing religious beards, clothing, weapons, and so forth are part of what we call the folkway. The folkway is a way of life based not on holy scriptures but on how ancestors lived, in a similar way that some Native American tribes do not cut their hair and carry medicine bags, and the folkway is a combination of traditional practices that survived Christianity and were passed down continuously, plus revived practices based on pre-Christian cultures, such as wearing beards.

Pls.' 56.1 ¶ 265. Responding to Walton's assessment that the officer had made "a compelling argument," Assistant Counsel Steuhl wrote:

> No, I don't agree that he makes a good argument, he states that it is not required for attaining the afterlight [sic] and that "most Odinist men have a beard and long hair when they can get away with it" and that it is a cultural identifier, not a religious requirement. Which to me signifies an understanding that it is not a requirement of the religion/belief, it is a preference not a requirement. We do not have to accommodate preferences. I would send his email to [DOOCS Counsel Cathy Sheehan] and see what she thinks, but I say no, it can be denied.

Pls.' 56.1 ¶ 106.[9]

---

[9]   Walton responded to Steuhl: "what about the part about the allowance of Native Americans and/or Muslims to maintain their hair as a practice, not necessarily a requirement?" and Steuhl responded: "I don't care what he is asserting with regards to other religions, the decision turns on the tenets of his religion, not other religions." Pls.' 56.1 ¶¶ 107-08.

In some cases, DOCCS has denied religious accommodation requests based on material the applicant had never seen and never said was a part of his belief system. This was the case for Plaintiff Roland Sofo. His religious accommodation request stated: "The traditional practitioners of Asatru, the Norse Pagan faith, believe that letting the hair of the face grow is a symbol of honor, one of the Noble Virtues. I believe I must honor this practice as part of what is essential in order to grow in my faith." Pls.' 56.1 ¶ 233.

DOCCS denied Sofo's request because, "[b]ased on a review of material regarding your religion . . . it has been determined that wearing a beard is a personal preference and not a religious requirement of the Norse Pagan religion," and "maintaining facial hair and/or beards is not an inflexible dogma of the religion, as demonstrated by the recognized exception made for individuals serving in law enforcement positions." Pls.' 56.1 ¶ 228. The "material" that was reviewed about Asatru, states, in relevant part:

> Asatru has no central authority, and so different groups and individuals vary in their practices. One group may wear beards while another group does not. . . .
>
> **Wearing religious beards . . . are part of what we call the folkway.** The folkway is a way of life based not on holy scriptures but on how our ancestors lived, and **the folkway is just as important to traditionalist Asatruars as the worship of our gods**. . . . Different groups within Asatru developed different folkways from each other. . . . . In some traditionalist sects of Asatru, men wear beards and women do not cut their hair. . . .
>
> There are exceptions to the no-cutting rule even among the most traditional groups in Asatru. . . . Professional warriors, including military, police, mercenaries, etc. retain warriors' honor even if they cut their hair and shave their beards. . . . [However, some Asatruars are] member[s] of a heathen sect that looks to Norse sources only, not to Germanic sources, so [their] group does not acknowledge that exception. . . . .
>
> **Each Asatru organization, kindred, or individual determines for themselves whether to adopt folkways and, if so, which ones.**

Pls.' 56.1 ¶ 233 (emphases added).

From this material, never seen by Officer Sofo, DOCCS concluded that wearing a beard was "not a religious requirement of the Norse Pagan religion," because there is a "recognized exception made for individuals serving in law enforcement positions." Pls.' 56.1 ¶ 228. DOCCS did not ask Sofo if he ascribed to what it said; Sofo does not believe in a beard-shaving "exception" for law enforcement officers. Pls.' 56.1 ¶ 266.

DOCCS routinely applied this practice to officers who identify as Norse Pagan such as Asatru, Forn Sidr, Odinism, or Heathenry, as well as applicants who identify as Christian. DOCCS has denied religious beard accommodation requests of more than 70 officers based on its "determination" that these officers' religions did not, as the officers' themselves believed, require wearing a beard. Pls.' 56.1 ¶ 129. DOCCS has also denied at least 50 religious accommodation requests submitted by officers to wear beards as part of their Norse Pagan religions based on DOCCS's own determination that wearing a beard is only a personal preference for all of these officers. Pls.' 56.1 ¶ 102.

That these RFAs were based on beliefs that are religious is not disputed: **Defendants acknowledge that "this whole case is about requests that are religious in nature."** Pls.' 56.1 ¶ 90. Commissioner Annucci testified that the Department not only *can* question whether the belief is a legitimate tenet of the religion, but the Department "has to" make that determination. Pls.' 56.1 ¶ 88. Executive Deputy Commissioner Martuscello agreed. *Id.*

Officials in the Office of Diversity and Inclusion, however, understood this practice was unlawful, and they sent their concerns to the highest levels of DOCCS's administration. In September 2020, ODI Director Maria Herman and ODI Assistant Director Na-Kia Walton drafted an email that Deputy Commissioner Osbourne McKay, who oversees ODI, sent to DOCCS

Counsel Cathy Sheehan, copying EDC Martuscello[10] expressing ODI's concern about DOCCS's

practice of questioning the tenets of some religions:

> [W]e are concerned about the past and continued practice of denying requests to maintain facial hair as a religious accommodation, for some particular faiths or religions, but not others, due to the fact that we deem that maintaining a beard is not a tenet of their faith/religion. . . .
>
> ODI is concerned that the Department has established a practice of using the tenets of a religion, or lack thereof, as a reason for denying a religious accommodation request, instead of proof of undue hardship. . . . It is our belief that if the Department continues to deny these requests, then not only are we operating unlawfully, but we also risk further litigation.

Pls.' 56.1 ¶ 117-18.

Sheehan's response did not question or contradict McKay's description of DOCC's "past

and continued practice of denying requests to maintain facial hair as a religious accommodation,

for some particular faiths or religions, but not others." Instead, Sheehan advised: "Because of the

pending law suit, we have provided ODI guidance in consultation with our outside law firm. I will

revisit the concerns you raise and get back to you. Meanwhile, ODI should continue to follow the

directions for beard exemption requests that counsel's office has provided to them over the past

10 months." Pls.' 56.1 ¶ 119.[11]

---

[10] EDC Martuscello is second in command to Commissioner Annucci. Martuscello testified in his deposition that "we," meaning he and Annucci, "run the agency." Ex. 111 at 256.

[11] Sheehan later sent another email advising that the recent amendment to the state Human Rights Law – which added express protections for religious facial hair, *see* N.Y. Exec. Law § 296(10)(a) – *required* DOCCS to determine the requirements of an employee's religion. *See* Ex. 79 ("The first prong is an analysis to determine if maintaining a beard is a practice/requirement of the employee's religion."). Of course, no part of the state Human Rights Law requires an employer to decide, *for itself*, the requirements of an employee's religion (as opposed to accepting the employee's assessment of the requirements of his religion, which is what the First Amendment requires). It is difficult to under how DOCCS Counsel could reasonably think that an amendment to the state Human Rights Law, which was meant to expand protections for religious rights, in fact *limited* those protections. *See* Ex. 8 ¶ 18 ("In endorsing this new law, Governor Cuomo stated: "As New Yorkers we celebrate our diversity and we champion freedom of religious expression in all places, including the workplace. This law will protect people from discriminatory employment practices based on religious attire or facial hair and makes it crystal clear to anyone who may still have doubts that New York has zero tolerance for bigotry of any kind.").

ODI Director Herman forwarded Sheehan's email to ODI staff and wrote: "Cathy's response means that **ODI has to continue to deny religious accommodations for certain religions/faiths**." Pls.' 56.1 ¶ 120 (emphasis added); *see also id.* ¶¶ 121-24.

**D.      The Plaintiffs**

Plaintiffs are DOCCS corrections officers. All five have sincere religious beliefs in wearing beards and all five submitted requests to DOCCS for religious accommodations. DOCCS initially denied all five requests, later granting four accommodation requests because of this lawsuit.

**i.      Brian Sughrim and David Feliciano** are both correction officers at Fishkill. Pls.' 56.1 ¶ 160. Neither has ever had to wear a respirator at work. Sughrim 7/13/22 Decl. ¶ 4; Feliciano ¶ 4. They submitted requests for a religious accommodation to wear a beard in accordance with their Muslim faith: Feliciano on April 11, 2019, and Sughrim on April 26, 2019. Pls.' 56.1 ¶ 165-66. Both submitted documentation from religious leaders attesting to their sincerely held Muslim beliefs. *Id.*

After being asked to submit additional information, Officer Feliciano submitted the requested form, stating: "I do not work any clean shaven posts, nor do I swap with any officers on clean shaven posts. . . . I am not required to wear personal protective safety equipment. . . ." Pls.' 56.1 ¶ 167. Officer Feliciano also clarified that "[a]ccording to the interpretation of Islam that I adhere to, . . . I must grow [my beard] to at least a fist full or approximately 4 inches from the chin." Pls.' 56.1 ¶ 168; *see also* Feliciano 11/26/19 Decl. ¶ 3. While Feliciano and Sughrim's requests were pending, no one at DOCCS talked with either of them about their requests, their religious beliefs, or any alternative means for addressing their requested accommodations. Pls.' 56.1 ¶ 173; Sughrim 11/26/19 Decl. ¶ 6; Feliciano 7/13/22 Decl. ¶ 6.

On August 5, 2019, Sughrim and Feliciano received nearly identical letters from Defendant

Na-Kia Walton denying their accommodation requests:

> Uniform Staff need to be clean shaven. Excusing employees from shaving inhibits them from performing the essential functions of their positions. . . .

> Security staff being unable to properly fit a respirator or safety equipment places an undue hardship and burden on facility operations, as having an insufficient amount of clean shaven security staff affects the facility's ability to respond quickly and efficiently to emergency or routine situations, which ultimately breaches the security of the facility….

> After careful review, it was determined that your facility has 68 essential posts that are considered clean shaven posts. . . . Your request creates an undue hardship on facility operations and impacts the safety and security within the facility.

Pls.' 56.1 ¶ 169-70.

During the period from April 11 to August 5, 2019, when Officer Feliciano's religious accommodation request was pending, DOCCS granted beard accommodations to **seven** other officers at Fishkill for **medical** reasons; five of those were granted while Officer Sughrim's religious accommodation request was pending. Pls.' 56.1 ¶ 171. In the two months after Feliciano's and Sughrim's requests were denied (for "having an insufficient amount of clean shaven security staff"), DOCCS granted medical beard accommodations for **seven** more officers. Pls.' 56.1 ¶ 172.

At the end of 2019, Fishkill had 1,078 officers to cover 434 posts, 68 of which were clean-shaven. Pls.' 56.1 ¶ 63. Of those 1,078 officers, 446 were fit tested for a respirator, and 10 had beard exemptions; meaning 622 officers at Fishkill were not fit tested for respirator use. *Id.*

Because they refused to shave pursuant to their religious beliefs, Officers Sughrim and Feliciano were suspended on August 10, 2019 and August 14, 2019, respectively; they were locked out of their facilities, and given Notices of Discipline that stated they would be terminated, which would have forfeited their pensions. Pls.' 56.1 ¶ 174-182. No steps were taken by DOCCS for the next two weeks to reconsider or otherwise review these decisions. Pls.' 56.1 ¶ 183.

On August 26, 2019, thirty minutes after she was told this lawsuit had been filed, Deputy

Commissioner and Counsel Sheehan alerted Commissioner Annucci, Executive Deputy Commissioner Martuscello, and others about the lawsuit. Pls.' 56.1 ¶ 238-39.STATE002884-86. DOCCS's senior officials decided to reverse the Sughrim and Feliciano denials due, in part, to this lawsuit. Pls.' 56.1 ¶ 240; *see also* Moskovitz Decl. ¶¶ 29-32.

Precipitated by the lawsuit, Martuscello assigned Deputy Commissioner McKay to review the religious accommodation requests that DOCCS had denied in 2019. Pls.' 56.1 ¶¶ 248, 255. McKay had not previously been involved in reviewing requests for accommodation ("RFAs"). Pls.' 56.1 ¶ 250. No work had been done by ODI to review these denials and Annucci was unaware of any additional steps taken to conduct such reviews before this lawsuit was filed. Pls.' 56.1 ¶ 253-54. Other than reviewing the files of RFAs that had been denied in 2019, McKay did not review any new information in deciding to grant the accommodations and reverse the earlier determinations that it would cause "an undue hardship on facility operations" for Sughrim and Feliciano to have beards. Pls.' 56.1 ¶ 251.

As a result of the "secondary reviews," at least nine RFAs that had been denied were immediately reversed and granted. Pls.' 56.1 ¶ 252. From the day the lawsuit was filed though January 3, 2022, DOCCS has granted all 78 of the religious accommodation requests from Muslim applicants. Pls.' 56.1 ¶ 257.

On August 27, 2019, the day after this lawsuit was filed, Walton sent identical letters to Sughrim and Feliciano reversing the denials. Pls.' 56.1 ¶ 243. Neither letter addressed the safety and security concerns upon which DOCCS had based its previous denials nor expressed any concern about the sincerity of Sughrim's or Feliciano's religious beliefs. Both letters granted Sughrim and Feliciano accommodations to wear beards up to one inch in length. When Deputy Commissioner McKay was asked why the one-inch length restriction was imposed on Officer

Feliciano—who had requested a four-inch beard—McKay testified that it is "the agency's policy." Ex. 112 at 208. But McKay acknowledged that there are officers within DOCCS who have been approved to wear beards longer than one-inch. *Id.* at 218.

      **ii.**    **Derek Gleixner** has worked for DOCCS since June 2016. In 2019, he was assigned to Eastern Correctional Facility ("Eastern") where, for two years, he was a member of the Correctional Emergency Response Team ("CERT"). Gleixner 11/26/19 Decl. ¶¶ 1, 6. During that time, he usually wore a short beard, which never interfered with his responsibilities or duties on the CERT team. *Id.* ¶¶ 6-7. These duties included being fit tested for a respirator, which he passed with a beard. *Id.* ¶ 7. Officer Gleixner was subject to various trainings, including being exposed to tear gas while he wore a respirator, all while he had a beard, and he suffered no negative consequences. *Id.*

      Officer Gleixner submitted a religious accommodation request on March 28, 2019, seeking to wear a beard in accordance with his Muslim faith. Pls.' 56.1 ¶ 189. During the three months that Gleixner's request was pending, no one at DOCCS talked to him about any alternative means for addressing his requested accommodation. *See* Ex. 123 at 13 ("A request for religious accommodation may be addressed through various means, including but not limited to, voluntary substitutions or swaps, job reassignments, or modification of workplace policies, practices and procedures."); Gleixner 7/12/22 Decl. ¶ 5. While his request was pending, Gleixner was mocked by the Superintendent of Eastern for being Muslim and the Superintendent ordered him to shave. Gleixner 11/26/19 Decl. ¶¶ 11-13.

      On June 25, 2019, a month after Gleixner complained of religious discrimination to the Governor's Office of Employee Relations, DOCCS denied Gleixner's religious accommodation request. Pls.' 56.1 ¶ 196; Gleixner 11/26/19 Decl. ¶¶ 16-17. The denial letter stated:

Working in a correctional facility is an environment where a tight-fitting respirator must be worn. Security staff are exposed to an atmosphere that is immediately dangerous to life or health . . . . In these situations, a tight-fitting pressure demand respirator is required. Wearing a respirator that is less protective could pose a grave danger not only to the worker who is wearing it, but also to other workers who might be called on to rescue him from the [immediate danger to life and health] atmosphere. Preventing unnecessary risks is a compelling governmental interest that justifies DOCCS' decision not to provide a religious exemption from the respirator standard, especially as there is no less restrictive way to provide this protection. . . . .

You [sic] request creates an undue hardship on facility operations and impacts the safety and security within the facility.

Pls.' 56.1 ¶ 197.

The denial letter did not address the fact that Gleixner had passed a fit test for a respirator with facial hair, which is consistent with Directive 4068 and the OSHA standard. Two months before Gleixner submitted his religious accommodation request, DOCCS granted a *medical* accommodation to another officer at Eastern to wear a beard; and three months after DOCCS denied Gleixner's religious accommodation request, DOCCS granted another *medical* accommodation for an officer at Eastern to wear a beard. Ex. 45 (ID 3349, 3681).

At the end of 2019, Eastern had 518 officers covering 187 posts, 45 of which were clean-shaven posts. Pls.' 56.1 ¶ 63. Of those 518 officers, 232 were fit tested for respirator use, 10 had beard exemptions, and 276 officers were not fit tested for respirator use. *Id.* DOCCS has produced no document that explains why it was an undue hardship for Gleixner to have a beard, even though he was fit tested for respirator use, while 276 officers at Eastern were not. *Id.*

After his religious accommodation request was denied, Gleixner was forced to shave to keep his job; he was berated by the Superintendent about his facial hair in front of other officers. Gleixner 11/27/19 Decl. ¶¶ 21-31. On one occasion, he was given a flimsy, state-issued razor and ordered to shave, which resulted in cuts and abrasions to his face that required treatment in the

17

medical unit at Eastern. *Id.* ¶¶ 25-26. On August 23, 2019, Gleixner was given a Notice of Discipline stating that he was being suspended for 30 days without pay. *Id.* ¶ 32.

On August 27, 2019 (the day after this lawsuit was filed), Walton informed Gleixner that his previously denied religious accommodation request was granted. Pls.' 56.1 ¶ 203. Walton's letter did not address the undue hardship or adverse impact on safety that just two months prior, DOCCS had determined would ensue if Gleixner's religious beliefs were accommodated.

      **iii.**      **Khaldoun Alshamiri** works at Cayuga Correctional Facility ("Cayuga") and has worked for DOCCS since 2016. Pls.' 56.1 ¶ 106. He has served in the U.S. Marine Corps and is in the Marine Corps reserves. *Id.* On June 15, 2018, Alshamiri submitted a religious accommodation request to wear a beard in accordance with his Muslim faith. *Id.* DOCCS denied Alshamiri's request on July 12, 2018. Pls.' 56.1 ¶ 208. The denial letter stated:

> [A]s a United States Marine Corps (USMC) Reservist, you shave on a regularly scheduled basis to conform with the USMC grooming standards; however, your request does not reconcile the apparent discrepancy between your request to the Department versus your stated ability to comply with the military's grooming standard. It should be noted that the Department is a paramilitary organization.

Pls.' 56.1 ¶ 209.

No one from DOCCS talked to Alshamiri about his religious beliefs before this denial Pls.' 56.1 ¶ 210. Alshamiri believes that he is not prohibited from shaving for life threatening reasons, such as periodic trainings with the Marines where he is exposed to toxic gases. Pls.' 56.1 ¶ 111. Alshamiri has applied for a religious accommodation with the Marines and is awaiting a response. *Id.* Alshamiri's work with DOCCS has never required him to don a respirator. Alshamiri 7/12/22 Decl. ¶ 4.

After his accommodation request was denied, Alshamiri was told that he needed to submit additional information and a new form to have his request reconsidered; he did so in September

2019. Pls.' 56.1 ¶ 213; Alshamiri 11/27/19 Decl. ¶¶ 9-11. While that request was pending, Alshamiri was ordered to shave. Alshamiri 11/27/19 Decl. ¶¶ 13-17. Alshamiri submitted another religious accommodation request on November 21, 2019. Pls.' 56.1 ¶ 214. Nonetheless, he was told he was suspended for not shaving and was sent home. Alshamiri 11/27/19 Decl. ¶¶ 17-19.

On November 27, 2019, Alshamiri submitted a declaration in this case asking the Court to order DOCCS not to take adverse actions against him or other officers who have a sincere religious belief in wearing beards. Pls.' 56.1 ¶ 217; *see* Dkt. 48. On December 6, 2019, nine days after Alshamiri submitted that declaration, DOCCS granted his religious accommodation request. Pls.' 56.1 ¶ 218. That same day, the Court was conducting a hearing concerning the continuation of the temporary restraining order. *See* Dkt. 72.

> **iv.** **Roland Sofo** has worked for DOCCS as a corrections officer since 2014. Sofo 11/27/19 Decl. ¶ 1. He is assigned to Cayuga, where he has worked for most of his career. *Id.;* Pls.' 56.1 ¶ 222.

On November 6, 2019, Roland Sofo submitted a request for religious accommodation seeking to grow a beard in accordance with his Norse Pagan beliefs. Pls.' 56.1 ¶ 221. Sofo attached detailed information to his application that explained the religious nature of his request, and included religious text. Pls.' 56.1 ¶ 224. Sofo's request was received by DOCCS on November 21, 2019. Pls.' 56.1 ¶ 225 It was denied the next day, along with the requests of fifteen other Norse Pagan officers. Pls.' 56.1 ¶ 226.[12]  The denial letter sent to Sofo was signed by Na-Kia Walton and stated:

> Based on a review of material regarding your religion, as well as a consultation

---

[12]  When Walton sent the sixteen RFAs to EDC Martuscello for approval, he asked why they were being denied; Walton responded, "maintaining a beard is a personal preference and not a requirement of the [Norse Pagan] faith. Employers are required to accommodate religious requirement (barring undue hardship), but not cultural practices or personal preferences." Pls.' 56.1 ¶ 227.

with the Division of Ministerial Family and Volunteer Services, it has been determined that wearing a beard is a personal preference and not a religious requirement of the Norse Pagan religion. Further, maintaining facial hair and/or beards is not an inflexible dogma of the religion, as demonstrated by the recognized exception made for individuals serving in law enforcement positions. As such, your specific request **cannot be approved.**

Pls.' 56.1 ¶ 227-28 (emphasis in original).

DOCCS did not determine that Officer Sofo's beliefs were insincere or that Cayuga's management could not comply with its staffing and safety requirements if Sofo's request was approved. Pls.' 56.1 ¶ 229. No one from DOCCS spoke to Sofo about his religious beliefs and practices, nor engaged his request in any way, for instance, to determine whether Sofo believed in a beard-shaving "exception" for individuals serving in law enforcement. Sofo 11/27/19 Decl. ¶ 15; Sofo 7/12/22 Decl. ¶¶ 13-14. Had Sofo been asked about this, he would have explained that his beliefs do not encompass such an exception. Sofo 11/27/19 Decl. ¶ 14.

The materials Officer Sofo attached to his request did not suggest a purely secular basis for his request. Instead, Sofo's request form and the attachments he included described his beliefs as rooted in his "faith": "I believe I must honor the practice as part of what is essential in order to grow in my faith," and "as part of my path to a stronger faith." Pls.' 56.1 ¶ 234. Sofo submitted quotes from religious texts (Ex. 22) and explained that "the Eddas, ancient texts of stories and lessons, reinforce the need for a beard." Pls.' 56.1 ¶ 235.

Nonetheless, DOCCS "determined" that wearing a beard was merely "a personal preference" for Sofo and not a "requirement of the Norse Pagan religion." Pls.' 56.1 ¶¶ 227-28.

E.     **Experiences of Class Members**

DOCCS has denied religious accommodations to wear beards to more than **seventy** officers based on the same determination made for Officer Sofo's request: that DOCCS had "determined," contrary to the officers' beliefs, that these officers' religions did not require them to wear a beard

and that wearing a beard was merely a personal preference. Pls.' 56.1 ¶ 129. Applying this same analysis, DOCCS has denied the religious accommodation requests of an ordained minister and a Norse Pagan whose family had practiced its religion for many generations. Pls.' 56.1 ¶¶ 144-49. DOCCS deemed the religions of these officers did not include a belief in wearing a beard – even though both officers had advised DOCCS that they believed their religions included this belief. *Id.*

DOCCS routinely grants beard accommodations to Jewish officers who cite Leviticus 19:27 as the basis for their belief. Pls.' 56.1 ¶ 94. But it routinely *denies* religious accommodations to Christian or non-denominational officers who cite **the same line** of Leviticus 19:27 as the basis for *their* belief in wearing a beard. Pls.' 56.1 ¶ 95.

## PROCEDURAL HISTORY

Plaintiffs filed this action August 26, 2019. *See* Dkt 1. "On November 27, 2019, Plaintiffs filed a proposed order to show cause for a temporary restraining order and preliminary injunction." Dkt. 202, at 20 (citing Dkts. 42-43). District Judge Victor Marrero entered the proposed order that day. Dkt. 53; *see also* Dkt. 202, at 20. After a hearing on December 6, 2019, the Court continued the temporary restraining order as follows:

> On the consent of the parties, during the pendency of this action, Defendant New York State Department of Corrections and Community Supervision (NYS DOCCS) and Defendant Annucci, acting in his official capacity, agree not to retaliate against any corrections officer for requesting to wear a beard for religious reasons. In addition, Defendants NYS DOCCS and Annucci agree that pending the Court's ruling on Plaintiffs' motion for a preliminary injunction, any corrections officer may maintain a beard if the officer: 1) has filed a declaration in this action, or 2) has a pending religious accommodation request and is not assigned to a clean shaven post and does not regularly swap with an officer assigned to a clean shaving post. By this agreement, Defendants do not waive any jurisdictional or other arguments.

Dkt. 72; *see* Dkt. 202, at 20-21.

On December 13, 2019, Plaintiffs filed their First Amended Complaint. Dkt. 82.

Defendants moved to dismiss. Dkt. 93. Plaintiffs amended their complaint twice more to add that they had received right-to-sue letters from the EEOC for Plaintiffs Sughrim, Feliciano, and Gleixner; and to add that Officers Alshamiri and Sofo had both filed class charges with the EEOC. *See* Dkt. 202, at 21.

On November 30, 2020, the Court issued its Opinion and Order largely denying Defendants' motion to dismiss. *Sughrim v. New York*, 503 F. Supp 3d 68 (S.D.N.Y. 2020). The Court rejected Defendants' argument that the accommodations granted to Plaintiffs (after this lawsuit was filed) mooted their claims for declaratory and injunctive relief. *Id.* at 91. The Court also rejected Defendants' arguments for dismissing Gleixner, Sughrim, and Feliciano's Title VII claims, *id.* at 94-98. Plaintiffs have moved for relief under Fed. R. Civ. P. 60(b) from the portion of the Court's Order the dismissed Alshamiri's and Sofo's Title VII claims "without prejudice," because they have now equitably exhausted their administrative remedies. Dkt. 249.

While the motion to dismiss was pending, the parties engaged in preliminary discovery on Plaintiffs' motion for a preliminary injunction and anticipated motion for class certification. Dkt. 81.[13]  The parties have exchanged thousands of pages of discovery and completed depositions of the named plaintiffs and Acting Commissioner Annucci; Executive Deputy Commissioner Martuscello; Deputy Commissioner McKay; and the former Assistant Director of ODI, Na-Kia Walton. This evidence established the foregoing facts and supports the following arguments.

---

[13]  Following the Court's decision, the parties agreed to mediation. Dkt. 205. The case was referred to the Court-annexed Mediation Program, Dkt. 209, and proceedings were stayed, Dkt. 211. That mediation was unsuccessful. Dkt. 220. With the Court's approval, the parties attempted a private mediation, Dkt. 221; but that mediation was also unsuccessful, Dkt. 225. The case was restored to an active docket, and the parties conducted additional discovery related to Plaintiffs' injunctive claims and motion for class certification. Dkt. 227, 231, 234, 236.

**ARGUMENT**

I. **PARTIAL SUMMARY JUDGMENT GRANTING DECLARATORY AND INJUNCTIVE RELIEF FOR THE RELIGIOUS REQUIREMENTS SUB-CLASS IS APPROPRIATE**

Because the material facts are undisputed and judgment as a matter of law is warranted for Plaintiff Roland Sofo, and members of the class who have had their RFAs denied based on DOCCS's unconstitutional religious requirements test or who will apply for RFAs in the future, are entitled to partial summary judgment on certain of Plaintiffs' claims for declaratory and injunctive relief. *See Bank Leumi USA*, 98 F. Supp. 3d at 657; *Beck*, 947 F.2d at 642.

A. **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992). A permanent injunction requires plaintiffs to demonstrate:

> (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Floyd v. City of N.Y.*, 959 F. Supp. 2d 668, 671-72 (S.D.N.Y. 2013) (citing *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160-61 (2d Cir. 2012)).

B. **Application of Law to Facts**

DOCCS maintains a practice of "determining" the requirements of some, but not other,

religions. *See* Pls.' 56.1 ¶¶ 117. The practice of determining what beliefs are requirements of a religion violates bedrock First Amendment and Title VII law, and selectively applying that test to certain religions, but not others, violates the Fourteenth Amendment.

i.       **DOCCS's practice violates the First Amendment**

"In providing religious accommodations, a government employer must abide by the First Amendment." *Kane v. De Blasio*, 19 F.4th 152, 175 (2d Cir. 2021).[14]  It is undisputed that DOCCS "has established a practice of using the tenets of a religion, or lack thereof, as a reason for denying a religious accommodation request, instead of proof of undue hardship." Pls.' 56.1 ¶ 117. DOCCS's practice of determining what it considers to be the true or proper requirements of officers' religions is contrary to long-settled law. For over half a century, courts have consistently interpreted the First Amendment to mean that the government may not question the validity or verity of religious beliefs. *See United States v. Seeger*, 380 U.S. 163, 184-85 (1965) ("The validity of what he believes cannot be questioned."). When beliefs are religious in nature, the only inquiry the government may make is to determine whether the beliefs are sincerely or truly held. *Id.*

The Second Circuit has explained that the government may assess the "subjective good faith of a claimant's beliefs," but it may ***not*** "ask whether a particular belief is appropriate or true— however unusual or unfamiliar the beliefs may be." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996); *see also Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481-82 (2d Cir. 1985) ("it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity – as opposed, of course, to the verity – of someone's religious beliefs"); *Marria v. Broaddus*, No. 97-CV-8297 (NRB), 2003 U.S. Dist. LEXIS 13329, *26, 2003 WL 21782633 (S.D.N.Y. July 31,

---

[14]  The First Amendment is applicable here through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

2003) (citing *Int'l Soc'y for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981)).

In *Patrick v. LeFevre*, 745 F.2d 153 (2d Cir. 1984), the court explained that "the judiciary has steadfastly refused to become the arbiter of scriptural interpretation" and recognized "the judiciary's limited competence in addressing issues that originate in the spiritual realm." *Id.* at 154-55. Further, the court noted "the limited function of the judiciary in determining whether beliefs are to be accorded First Amendment protection" and then held that the "freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Id.* at 157 (citing *United States v. Ballard*, 322 U.S. 78, 86 (1944)). The court noted that its competence extended only to deciding "*whether the beliefs professed by [claimant] are sincerely held and whether they are, in his own scheme of things, religious.*" *Id.* (emphasis added) (citing *Seeger*, 380 U.S. at 185); *see also Grief v. Quay*, 701 F. App'x 64, 65 (2d Cir. 2017) ("[W]e conclude that the district court erred in deciding that Grief's belief regarding stuffed animals could not plausibly constitute a religious belief.").

This is reflected in EEOC regulations that state: "The fact that no religious group espouses [certain] beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee." 29 C.F.R. § 1605.1 (citing *Seeger*, 380 U.S. 163, and *Welsh v. United States*, 398 U.S. 333, 343 (1970) (upholding petitioner's beliefs as religious in nature although his church did not teach those beliefs)).

The fact that some adherents of a religion follow certain practices while others do not, does not alter the fact that a belief is religious in nature and protected by the First Amendment. In *Holt v. Hobbs,* 574 U.S. 352 (2015), the Supreme Court criticized the lower court's consideration of the fact that "not all Muslims believe that men must grow beards" in analyzing a Muslim person's

religious belief in wearing a beard. 574 U.S. at 862-63. The Supreme Court rejected this argument, noting that even if the petitioner's belief was idiosyncratic, "the guarantee of the Free Exercise Clause, is 'not limited to beliefs which are shared by all of the members of a religious sect.'" *Id.* at 362 (citing *Thomas v. Review Bd.,* 450 U.S. 707 (1981)).

In *Thomas*, the Supreme Court held that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." 450 U.S. at 715-16. "Interfaith differences" in beliefs "are not uncommon among followers of a particular creed, and the *judicial process is singularly ill equipped to resolve such differences* in relation to the Religious Clauses." *Id.* at 715 (emphasis added). "[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Id.* at 716.

The foregoing cases forbid the government from deciding whether a belief that is religious in nature is correctly considered a belief of a religion. These cases also reject using conflicts in religious doctrine to make religious verity decisions. But this is precisely what DOCCS admits it does with religious accommodation requests: it weighs the merits of the applicant's religious beliefs by consulting religious texts and scholars, and it ultimately "determines" whether a particular belief is a "tenet" or "requirement" of the applicant's stated religion. *See* Pls.' 56.1 ¶ 93 ("the Department has established a practice of using the tenets of a religion, or lack thereof, as a reason for denying a religious accommodation request, instead of proof of undue hardship").

This unconstitutional practice is on full display with Officer Sofo. The denial letter given to Sofo asserted that Norse Paganism recognizes an exception to wearing beards for law enforcement officers, so DOCCS concluded that wearing a beard "is not an inflexible dogma of the religion." Pls.' 56.1 ¶ 228. This conclusion, of course, simply accepted the beliefs of one group

of Norse Pagans while ignoring the different beliefs of other Norse Pagans. Moreover, Officer Sofo testified that he does not maintain a belief in such an exception. Pls.' 56.1 ¶ 266. In effect, DOCCS resolved a religious dispute by accepting the beliefs of some Norse Pagans as true. Given the number of officers who have sought beard accommodations to practice their Norse Pagan faith (more than fifty), that practice cannot be characterized as idiosyncratic. But even if it is, their practice is protected by the First Amendment. *Thomas*, 450 U.S. at 716.

Defendants admit, as they must, that "this whole case is about requests that are religious in nature." Pls.' 56.1 ¶ 90. That admission concedes the unconstitutionality of DOCCS's practice of "determining" the requirements or tenets of officers' religious beliefs.

### ii.     DOCCS's practice violates the Equal Protection Clause

"'The equal protection clause directs state actors to treat similarly situated people alike.'" *Sughrim v. New York*, 503 F. Supp 3d. 68, 90 (S.D.N.Y. 2020) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)). Intentionally treating religious practices differently violates this rule. *See, e.g.*, *Perez v. Westchester Cnty. Dep't of Corr.*, No. 05 Civ. 8120 (RMB), 2007 U.S. Dist. LEXIS 32638, 2007 WL 1288579 (S.D.N.Y. Apr. 30, 2007) (denying motion to dismiss Equal Protection Clause claims based on jail's refusal to provide Halal meat to Muslim inmates as often as it provided Kosher meat to Jewish inmates), *judgment aff'd*, 587 F.3d 143 (2d Cir. 2009). Plaintiffs' equal protection claims are analyzed in tandem with their Title VII claims (addressed below). *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (plaintiff's "equal protection claim parallels his Title VII claim" because "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together"). It is undisputed that DOCCS has a "past and continued practice of denying requests to maintain facial hair as a religious accommodation, for some particular faiths or religions, but not others, due to the fact that we deem

that maintaining a beard is not a tenet of their faith/religion." Pls.' 56.1 ¶ 117. As a result, Plaintiff Sofo and the members of the class like him are entitled to summary judgment on their Equal Protection claims.

### iii.   Title VII Disparate Treatment

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* prohibits an employer from "limit[ing], segregate[ing], or classify[ing] his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. §2000e-2(a). The elements of a Title VII disparate treatment claim are well established: "a plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*." *Young v. UPS*, 575 U.S. 206, 213 (2015). Although, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *TWA v. Thurston*, 469 U.S. 111, 121 (1985).

Here, thousands of DOCCS officers are now authorized to wear beards for the secular reason of getting vaccinated against COVID-19. Meanwhile, Plaintiff Roland Sofo and members of the class continue to have their RFAs to wear beards denied on the basis of DOCCS's determination that maintaining a beard is not a tenet of their religion. This determination on its face is direct evidence that DOCCS's "workplace policy, practice, or decision relies expressly on a protected characteristic" namely, religion. DOCCS has also plainly favors secular reasons over religious ones. But Title VII demands the inverse: "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, (2015).

The class has plainly "met that burden here by alleging that they were singled out for discriminatory treatment." *Sughrim*, 503 F. Supp. 3d at 97.

iv.     **Title VII Failure to Accommodate Claim**

Title VII protects "all aspects of religious observance and practice, as well as belief" and obligates employers to make reasonable accommodations for the religious practices of their employees. 42 U.S.C. § 2000e(j). The Second Circuit has explained: "In brief, it is 'an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'" *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (quoting *Trans World Airlines*, 432 U.S. at 74).

Each Plaintiff and member of the class has presented an application for an accommodation of their religious practice of wearing a beard. Plaintiff Sofo and the members of the class like him have had that accommodation request denied on the basis of DOCCS's unlawful determination that the requirements or tenets of an officer's religion do not encompass wearing a beard.

There is no evidence that DOCCS would suffer undue hardship if it accommodated Sofo's and these class members' religious practices. First, DOCCS does not maintain a consistent no-facial-hair policy: "[s]ecurity staff appointed prior to January 25, 1990 may wear beards or goatees provided they are kept neatly trimmed within one inch" and moustaches are allowed. Pls.' 56.1 ¶ 9. Second, most DOCCS officers do not work in clean shaven posts and thus, there is no articulated reason that having a beard negatively impacts their jobs in any way. Pls.' 56.1 ¶ 63; *see also id.* ¶¶ 13, 70. Third, DOCCS regularly grants exemptions to wear beards for medical reasons. *See* Pls.' 56.1 ¶¶ 70, 164, 171. Fourth, DOCCS instituted a "No Shave November" in 2021, during which all officers not assigned to clean shaven posts were allowed to wear beards up to one-inch long in order "to promote morale." Pls.' 56.1 ¶¶ 31-32. Fifth, DOCCS has been allowing all

29

officers vaccinated against COVID-19 and not assigned to clean shaven posts to wear beards up to one inch long since November 2021. Pls.' 56.1 ¶ 35.

Thus, it is clear that Sofo and the class members like him have suffered a violation of Title VII's reasonable accommodation requirement.

### C.      A Declaratory Judgment is Appropriate

A declaratory judgment is appropriate. Declaring that DOCCS's practice of rejecting the religious beliefs of certain officers is unconstitutional and violates Title VII will serve a useful purpose by affording relief from the uncertainty, insecurity, and controversy caused by DOCCS's uneven application of a test to officers' religious accommodation requests. *See Cont'l Cas. Co.*, 977 F.2d at 737. As a result, Plaintiffs request that the Court issue a declaratory judgment holding: (1) DOCCS's practice of determining the requirements of the religions of officers who have submitted religious accommodation requests to wear beards violates the First Amendment and Title VII; and (2) DOCCS's practice of applying this practice to some religions violates the Fourteenth Amendment and Title VII.

### D.      A Permanent Injunction is Appropriate

"Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood,* 327 U.S. 678, 684 (1946). "Plaintiffs seeking a permanent injunction must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Floyd*, 959 F. Supp. 2d at 671-672.

"Plaintiffs may satisfy the first two factors" for a permanent injunction, *viz.*, irreparable injury and no remedy at law, "by demonstrating that they are likely to be deprived of their constitutional rights in the future by the acts they seek to have enjoined." *Floyd*, 959 F. Supp. 2d at 672. This is the case here. Officer Sofo and all of the class members have suffered the same deprivation of their constitutional rights. Accordingly, they have established irreparably injury with no remedy at law. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 374 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (deprivation of constitutional rights "cannot be compensated by money damages").

The third factor, balance of hardships, "tilts strongly in favor of granting a permanent injunction" because "the burden on the plaintiff class of continued" unconstitutional religious accommodation denials "far outweighs the administrative hardships that [DOCCS] will face in correcting its unconstitutional practices." *Floyd*, 959 F. Supp. 2d at 672. "Ensuring that people are not" deprived of their religious freedoms "is an important interest meriting judicial protection." *Id.* The record indicates that DOCCS would suffer no miniscule hardship to accommodate Plaintiffs' request for religious accommodations. *See* Pls.' 56.1 ¶ 70.

Finally, the public interest would not be disserved by a permanent injunction. No public interest would be served by allowing DOCCS to continue to deny religious accommodation requests based on an unconstitutional standard. *See Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."). And for the reasons articulated above, the record does not indicate that the DOCCS policy furthers *any* legitimate goal.

Conversely, there are twin public interests that would be well-served by a permanent

injunction: the free exercise of religion – as reflected in the First Amendment – and the right to practice one's religious beliefs free from discrimination and retaliation in the workplace – as reflected in Title VII. *See Kane*, 19 F.4th at 172 ("To the extent Plaintiffs were denied religious accommodations pursuant to a concededly 'constitutionally suspect' process, the public interest favors affording them an opportunity for reconsideration.").

## II.   PERMANENT INJUNCTIVE RELIEF IS WARRANTED ON THE PLAINTIFFS' INDIVIDUAL CLAIMS

Summary judgment is also appropriate for the Plaintiffs' individual claims of religious discrimination. The facts and law support issuing a permanent injunction requiring DOCCS to accommodate Plaintiffs' religious beliefs by: (1) allowing Plaintiffs to wear their beards at work, and (2) allowing Officer Feliciano to maintain a beard up to four inches long.

The Court has jurisdiction to grant equitable relief against the State and DOCCS on Plaintiffs' claims arising under Title VII, *see Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 878 (2d Cir. 1982); and against the individual defendants in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908) on Plaintiffs' § 1983 claims, *see Dwyer v. Regan*, 777 F.2d 825, 835-37 (2d Cir. 1985).

As explained in this Court's prior Order, Plaintiffs' individual claims for injunctive relief have not been mooted by the current accommodations that DOCCS has granted Plaintiffs:

> First, Plaintiffs have plausibly alleged that the accommodation provided to Feliciano does not, in fact, accommodate his religious beliefs because it prohibits him from wearing a beard longer than one inch. Similarly, Plaintiffs have also alleged that Alshamiri's accommodation has lapsed, as his last day on the post for which he was provided an accommodation was December 24, 2019.

> Second, and more importantly, the voluntary-cessation doctrine counsels against a finding of mootness here. . . . [I]t cannot "be said with assurance that there is no reasonable expectation that the alleged violation will recur." The DOCCS beard policy remains in place. The accommodations granted to Plaintiffs are limited in scope. Plaintiffs are not assured that they will be provided new accommodations

> after their current accommodations lapse, as allegedly occurred with Alshamiri. Moreover, absent an injunction, nothing will stop Defendants from denying accommodations to other members of the putative class. Interim events have thus failed to "completely and irrevocably eradicate[] the effects of the alleged violation," and any equitable relief provided by this Court would be prospective in nature.

*Sughrim*, 503 F. Supp. 3d at 91 (citations omitted) (alterations in original) (quoting *Am. Freedom Def. Initiative v. MTA*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979))).

A.     **First Amendment**

"Laws and government policies that are either non-neutral or not generally applicable . . . are subject to 'strict scrutiny,' meaning that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Kane*, 19 F.4th at 164 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)); *see Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) ("A government policy can survive strict scrutiny under the First Amendment's Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests.").

"'A law is . . . not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.'" *Sughrim*, 503 F. Supp. 3d at 89 (quoting *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014)); *see also Kane*, 19 F.4th at 165 ("A law may not be generally applicable under [*Employment Division v. Smith*, 494 U.S. 872, 879 (1990)] . . . 'if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions'; or . . . 'it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" (quoting *Fulton*,

141 S. Ct. at 1877)).

DOCCS's no-beard policy is neither facially neutral nor generally applicable. Directive 3083 discriminates on its face by permitting beards for secular reasons, *i.e.*, seniority.[15] Also, DOCCS's current beard policy permits individual exemptions, *and* it prohibits beards for officers who have religious reasons for wearing a beard, while allowing thousands of officers to wear beards for secular reasons. *See Sughrim*, 503 F. Supp. 3d at 89 ("a law is . . . not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it" (quotation marks omitted)).

Applying strict scrutiny, DOCCS's no-beard policy is unconstitutional as applied to the individual Plaintiffs because it is not narrowly tailored. As this Court previously concluded:

> Three facts alleged in the Complaint animate the conclusion that the grooming policy is not narrowly tailored to serve the interest of ensuring that an adequate number of respirator-eligible officers are on duty: (1) DOCCS does not conduct annual respirator-fit tests on all of its correction officers, (2) the number of clean-shaven posts in each facility is limited, and (3) DOCCS maintains only a limited number of respirators.

*Id.* at 90. These facts are no longer allegations, but undisputed facts. Defendants acknowledge that: (1) DOCCS does not conduct annual respirator-fit tests on all of its correction officers, Pls.' 56.1 ¶¶ 55-56; (2) the number of clean-shaven posts in each facility is limited, Pls.' 56.1 ¶¶ 54, 63; and (3) DOCCS maintains only a limited number of respirators at each facility, Pls.' 56.1 ¶ 63.

Therefore, the Court may decide as a matter of law that DOCCS's no-beard policy is not narrowly tailored.

---

[15]    Directive 3083 also facially discriminates between the sexes by requiring different hair styles for men and women because, according to Commissioner Annucci, "[b]iologically they are different and styles are slightly different." Pls.' 56.1 ¶ 6.

### B.    Title VII Disparate Treatment

As explained above, "[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *TWA v. Thurston*, 469 U.S. 111, 121 (1985). Here, the Plaintiffs have plainly done so. *See supra*. The material evidence is undisputed that DOCCS treated each of the Plaintiffs differently than officers who had secular reasons for wearing beards.

Nevertheless,    Plaintiffs    have    also    established    a    prima    facie    case of disparate treatment under *McDonnell-Douglas*. Each Plaintiff is a member of a protected class and was qualified for the job at issue, *Bentley v. AutoZoners, LLC,* 935 F.3d 76, 88 (2d Cir. 2019); and each Plaintiff has plainly suffered an adverse employment action, *Sughrim*, 503 F. Supp. 3d at 96. "If a prima facie showing is made, 'the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action." *Heckstall v. Metro. Transp. Auth.*, No. 19cv3566 (DLC), 2021 U.S. Dist. LEXIS 63878, at *7-8 (S.D.N.Y. Apr. 1, 2021). DOCCS cannot do so. Defendants concede—as they must, since DOCCS now allows thousands of officers to wear beards for secular reasons—that "no Plaintiff remains without an accommodation due to any hardship." Pls.' 56.1 ¶ 13. Defendants also concede that none of the plaintiffs' beards has caused a problem. Pls.' 56.1 ¶ 70.

### C.    Title VII Failure to Accommodate

The Second Circuit has explained that "it is an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Baker*, 445 F.3d at 546 (quotation marks omitted); *see also Sughrim*, 503 F. Supp. 3d at 97 ("To state a claim for failure to accommodate, plaintiffs must allege '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; . . . (3) they were disciplined for

failure to comply with the conflicting employment requirement'; and (4) that they were not offered a reasonable accommodation.'" (quoting *Baker*, 445 F.3d at 546)).

There is no dispute that the Plaintiffs maintain bona fide religious beliefs in wearing beards, and that Officer Feliciano has a bona fide religious belief in wearing a beard up to four inches. None of the Plaintiffs was denied a religious accommodation based on a doubt about the sincerity of his religious belief; and none of defense counsel's "probing" deposition questions adduced a genuine dispute about the bona fides or sincerity of Plaintiffs' religious beliefs.[16] Accordingly, the Court need not conduct a hearing to determine the sincerity of the Plaintiffs' beliefs. *See* Fed. R. Civ. P. 56(a).[17] Nor is there a dispute that Plaintiffs informed Defendants about their beliefs, were disciplined for failing to comply with DOCCS's no-beard policy, and were not offered reasonable accommodations.[18]

"The rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773-74 (2015).

---

[16] In Plaintiffs' depositions, Defendants asked irrelevant questions and made inappropriate remarks about Plaintiffs' religions. For instance, Defendants' counsel asked Mr. Sughrim, "why is it that the Muslim teaching center that you got your Shahada certificate from . . . had a barbecue?" CITE. When Mr. Sughrim asked, "Did they specify what type of meat they barbecued?," defendants' counsel said: "it looked like pork to me." *Id.* Instead of disavowing this conduct, DOCCS's Acting Commissioner testified in his deposition that he would characterize it as a "probing" question "which may or may not have been proper." CITE. In a similar vein, Defense counsel asked Mr. Feliciano, Mr. Glexiner, and Mr. Sofo if they had Christmas trees in their homes. When Mr. Sofo responded "yes," defense counsel asked, "Are you aware that the Christmas tree is a Christian symbol?"   Mr. Sofo – who practices a religious tradition that pre-dates Christianity – answered, correctly, "It is not." Defendants' attacks on Plaintiffs' religious beliefs adduced nothing that creates a genuine dispute about the sincerity of Plaintiffs' religious beliefs.

[17] Should the Court decide that a hearing is necessary, Plaintiffs stand ready and willing to testify about the sincerity of their beliefs. Among other things, Officer Feliciano will testify about how he took Haj nearly twenty years ago; and Officers Sughrim, Gleixner, Alshamiri, and Sofo will testify about choosing to endure abuse and ridicule at work in order to exercise their sincere beliefs.

[18] *See* Pls.' 56.1 ¶¶ 116-67, 173, 176-82, 194-95, 198-201, 216, 224, 230, 233, 237.

Since accommodating Plaintiffs' sincere religious beliefs presents no hardship, Title VII requires DOCCS to accommodate those beliefs. *See Baker*, 445 F.3d at 546.

## III.   CLASS-WIDE PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED TO ENJOIN THE DENIAL OF RELIGIOUS ACCOMMODATIONS ABSENT UNDUE HARDSHIP

A court may issue a preliminary injunction under Federal Rule of Civil Procedure 65(a) when the moving party demonstrates "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010). District courts have "wide discretion in determining whether to grant a preliminary injunction." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, (2d Cir. 2007) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005)).

Irreparable harm is "the single most important requirement with regard to the granting of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *Bell & Howell: Mamiya Co. v. Masel Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983). "To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent,' and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).

When it comes to the deprivation of a constitutional right, courts generally do not require any further showing of irreparable harm. *See, e.g.*, *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). Moreover, where claims of irreparable harm

concern violations of First Amendment rights, courts have consistently held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *accord Bery v. City of N.Y.*, 97 F.3d 689, 693-94 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction. . . . By the very nature of their allegations, then, appellants have met the first prong of the test.").[19]

The Court has jurisdiction to grant equitable relief against the State and DOCCS for Plaintiffs' claims arising under Title VII. *See Sheehan*, 676 F.2d at 878. The Court also has jurisdiction to grant equitable relief against the individual defendants in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908). *See Dwyer*, 777 F.2d at 835-37.

"In determining whether a plaintiff has demonstrated a likelihood of success on the merits of 'his ultimate case, a court is not called upon to decide the merits of the controversy. It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief." *Mullins v. City of New York*, 554 F. Supp. 2d 483, 487 (S.D.N.Y. 2008) (quoting *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F. Supp. 131, 137 (S.D.N.Y. 1982)).

As noted above, "it is an unlawful employment practice" under Title VII "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Baker*, 445 F.3d at 546 (quotation marks omitted).

Here, the evidence demonstrates that the Plaintiff Class will suffer irreparably harm if their

---

[19]   The Second Circuit has repeatedly followed the Supreme Court's reasoning in *Elrod*. *See, e.g.*, *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013); *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003); *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002); *Paulsen v. Cty. of Nassau*, 925 F.2d 65, 68 (2d. Cir. 1991).

religious beliefs are not accommodated according to Title VII. Additionally, Plaintiffs have established a likelihood of success on the merits of their Title VII failure-to-accommodate claim DOCCS has acknowledged that it denies religious accommodation requests absent undue hardship. CITE. Since there is no imposition on DOCCS to grant these accommodations, which concededly prose no hardship, the balance of hardships tips "decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc.*, 598 F.3d at 35.

Accordingly, it would be within the Court's discretion to issue a preliminary injunction pending resolution of this case enjoining the State of New York and DOCCS from denying any beard accommodation requests based on sincere religious beliefs absent an actual undue hardship.

## CONCLUSION

For the foregoing reasons, the Court should: (1) grant partial summary judgment on Plaintiffs' claims concerning DOCCS's policy/practice of determining the verity of the religious beliefs of some religions, (2) enter a declaratory judgment on behalf of the Religious Requirements Subclass that this policy/practice is unconstitutional and a violation of Title VII, (3) permanently enjoin DOCCS from continuing to apply this policy/practice in the future; (4) grant partial summary judgment on Plaintiffs' individual claims for injunctive relief and permanently enjoin DOCCS from accommodating their religious beliefs; and (5) grant preliminary injunctive relief for the whole Plaintiffs' Class enjoining DOCCS from denying accommodations for sincere religious beliefs in wearing beards absent an actual undue hardship.

Dated: July 15, 2022

Joshua S. Moskovitz
Ronald E. Cook
Luna Droubi
Jonathan C. Moore
Deema Azizi
Jeffrey F. Kinkle