UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN SUGHRIM, DAVID FELICIANO, ROLAND SOFO, DEREK GLEIXNER, and KHALDOUN ALSHAMIRI, *individually and on behalf of all others similarly situated*,<br><br>                                   Plaintiffs,<br><br>                    v.<br><br>STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPPERVISION, ANTHONY J. ANNUCCI, JOHN A. SHIPLEY, NA-KIA WALTON, STEPHEN URBANSKI, ALAN WASHER, WILLIAM LEE, MICHAEL BERTONE, and THOMAS NAPOLI,<br><br>                                   Defendants. | 19-cv-7977 (RA) (SDA)<br><br><u>OPINION & ORDER</u> |

RONNIE ABRAMS, United States District Judge:

        This case involves a challenge by New York State correction officers who claim that the

State's prison system and its officials have violated, and continue to violate, their constitutional

and statutory rights by denying their requests to wear beards as an expression of their religious

beliefs. Plaintiffs David Feliciano, Roland Sofo, Derek Gleixner, and Khaldoun Alshamiri (the

"Individual Plaintiffs")[1] have sued the State of New York, the New York State Department of

Corrections and Community Supervision ("DOCCS"), and eight individual defendants—Anthony

J. Annucci, the Acting Commissioner of DOCCS; John A. Shipley, the Director of Labor Relations

of DOCCS; Na-Kia Walton, the Assistant Director of Labor Relations; Stephen Urbanski, the

---

[1] Plaintiff Brian Sughrim retired from his position as a DOCCS correction officer after Plaintiffs' motion for partial summary judgment was filed, and has accordingly withdrawn his request for declaratory and injunctive relief. Dkt. 307.
.

Deputy Superintendent for Security Services at Fishkill ("Fishkill"); Alan Washer, a Corrections Captain at Fishkill; William Lee, the Superintendent of Eastern Correctional Facility ("Eastern"); Michael Bertone, Deputy Superintendent of Security at Eastern; and Thomas Napoli, Deputy Superintendent and Designee for Reasonable Accommodation at Cayuga Correctional Facility ("Cayuga").

Each of the Individual Plaintiffs asserts that he observes a religious faith—Feliciano, Gleixner and Alshamiri are Muslim, and Sofo is a believer in Asatru, a kind of Norse Paganism—that requires him to wear a beard.[2] Each requested the right to wear a beard at work, and each was denied that right, either for safety reasons, or because Defendants did not believe his religion required him to wear a beard as a tenet of his faith. Plaintiffs have moved for partial summary judgment, seeking permanent and preliminary injunctive relief as well as declaratory relief, and have moved to certify a class of correction officers. The primary question the Court confronts is whether, and in what circumstances, Defendants must grant them the right to wear beards in accordance with their religious faiths, while also maintaining their ability to carry out the demanding, and often dangerous, mission of operating New York State's prisons.

For the reasons that follow, Plaintiffs' motion for partial summary judgment is granted with respect to their claim that Defendants have an unconstitutional practice of denying requests for religious accommodations based on a determination that wearing a beard is not a tenet of a believer's faith. Gleixner, Alshamiri and Sofo's motions are granted on their Title VII claims, but Feliciano's motion is denied. Plaintiffs' motion for class certification pursuant to Rule 23(b)(2) is granted. Finally, the motion for preliminary injunctive relief is denied.

---

[2] Norse Paganism encompasses a number of different faiths discussed in this Opinion, including Asatru, Odinism and Forn Sidr.

The Court notes at the outset that the relief it grants today is limited in nature. As a result of intervening circumstances at DOCCS, most of the class members who wish to wear beards are already able to do so, so the conditions at DOCCS's facilities should not be significantly altered by this Opinion. Nevertheless, the Court concludes that Plaintiffs' claims are not moot, and that equitable relief is warranted.

## FACTUAL BACKGROUND[3]

The following facts, construed in the light most favorable to Defendants, are undisputed unless otherwise noted. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

### I.      DOCCS's Appearance Policies

DOCCS sets forth its appearance policy for "uniformed employees," which includes all correction officers, in an order titled Directive 3083. Pl. 56.1 ¶ 2. Among other requirements regarding personal grooming for security staff, Directive 3083 prohibits security staff appointed after January 25, 1990 from wearing beards or goatees. *Id.* ¶ 12; Pl. Ex. 116. For security staff appointed before January 25, 1990, beards or goatees are permitted "provided they are kept neatly trimmed within one inch." Pl. 56.1 ¶ 10. Officers are also permitted to wear mustaches and sideburns, provided they are neatly trimmed. *Id.* ¶ 11, Pl. Ex. 116. Employees that are required to wear a respirator during the course of their employment, however, are prohibited from wearing "facial hair which would prevent a proper seal between face and mask (e.g., beard/goatee)[.]" Pl. Ex. 116 at 12. DOCCS's facial hair policy is further delineated in its "Respiratory Protection Program" policy, or Directive 4068, which prohibits any employee who is required to wear a tight-

---

[3] These facts are drawn from the parties' submissions in connection with the instant motion, including the Rule 56.1 statements submitted by Plaintiffs ("Pl. 56.1"), and Defendants' Counterstatement ("Def. 56.1"). Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only by way of conclusory statement without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)–(d).

fitting respirator from wearing facial hair that "comes between the sealing surface of the face piece and the face or that interferes with respirator valve function." Pl. 56.1 ¶ 46.

DOCCS designates certain post assignments as "clean shaven" posts where it is possible that security staff will need to use a respirator. *Id.* ¶ 51. A DOCCS policy memo issued on November 26, 1996 states "that when a respirator is worn, the employee must be clean shaven. Certain posts and assignments will require that security staff be clean shaven at all times." *Id.* ¶¶ 52, 53. The number of "clean shaven" posts at the three facilities where Plaintiffs worked was, as of August 1, 2019, a minority of the total number of posts, ranging from 68 clean shaven posts out of 434 total posts at Fishkill to 45 out of 187 total posts at Eastern. *Id.* ¶ 63. The percentage of officers who were fit-tested for respirator use was 41% at Fishkill, 45% at Eastern, and 69% at Cayuga. *Id.* ¶ 56. Plaintiffs assert, and Defendants dispute, that DOCCS does not consistently enforce its no-beard rule, including at clean shaven posts. *Id.* ¶ 59. For example, Edward Burnett, the Superintendent of Fishkill, circulated a memo dated April 1, 2021, stating that "it has been discovered that Officers have been routinely assigned to posts that they are not qualified to work, particularly posts that required the Officer to be clean shaven (tower, transportation, etc.)[.]" Pl. Ex. 124. Two of the Individual Plaintiffs, Alshamiri and Gleixner, asserted that they had been assigned to clean shaven posts when they had beards, though Defendants dispute that occurred. Pl. Ex. 107 at 95:7–96:14; Pl. Ex. 4 ¶ 7.

DOCCS has articulated several explanations for its facial hair policy in Directive 3083, including (1) the safety of officers in the event of a struggle where a combatant could grab a beard of excessive length; (2) ensuring that officers can properly wear masks in the event a chemical agent is used; and (3) preventing officers from carrying drugs or weapons into a facility that could be hidden in a beard. Pl. 56.1 ¶ 19; Pl. Ex. 108 at 97:11–98:13. In addition, Commissioner Annucci

testified that DOCCS's grooming standards are important for the "esprit de corps." Pl. Ex. 108 at 97:8. Defendants' expert, William Bechtold, warden for the Franklin County Jail in Chambersburg, Pennsylvania, declared that "[e]ven a small amount of [facial hair] growth can significantly decrease the effectiveness of the seal on the mask" and subject "the officer to potentially dangerous chemicals and increases the probability of the officer succumbing to chemical agents or smoke." Dkt. 286, Bechtold Decl. ¶ 9. Bechtold also stated that "beards longer than one (1) inch can and do cause safety and security problems" because "[d]uring an altercation, an inmate can grab a longer beard, thereby gaining control of the correctional officer's head movements." *Id*. ¶ 11.

## II.    Beard Accommodation Policy

Directive 3083 states that uniformed employees may request a reasonable accommodation "based on their sincerely held religious beliefs" from DOCCS's grooming and appearance requirements. Pl. Ex. 116 § 10. On October 10, 2019, DOCCS issued Directive 2609, which states that where a religious accommodation is not resolved "informally" between the employee and their supervisor, written requests for accommodation must be made to DOCCS's Office of Diversity and Inclusion ("ODI") on one of several standardized forms. Pl. Ex. 119 § 4. Directive 2609 states that "[a]ccommodation of sincerely held practices of the individual's religion, or wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, must be granted unless the accommodation would create a specific concern, such as a safety concern or an undue hardship." *Id.* It defines "undue hardship" to mean "an accommodation requiring significant expense or difficulty," including "significant interference with the safe or efficient operation of the work place[.]" *Id*. § 3. Directive 2609 sets forth several factors to consider in weighing undue hardship, including the "identifiable cost of the accommodation" and the "costs of loss of

productivity," the "number of individuals who will need the particular accommodation to a sincerely held religious observance or practice," and whether the accommodation "will result in the inability of an employee to perform the essential functions of the position in which he or she is employed." *Id.* When ODI determines that a request for an accommodation should be denied, ODI "must consult with the agency's Deputy Commissioner and Counsel" and "[i]f the [Deputy Commissioner and Counsel] agrees with ODI that the request should be denied, ODI must send the request and reason(s) for denial to the Executive Deputy Commissioner for final determination." *Id.* § IV; Pl. 56.1 ¶ 76. DOCCS Executive Deputy Commissioner Martuscello, however, testified that since October 10, 2019, he did not recall ever overturning ODI's recommendation of a denial of a request for a religious accommodation. Pl. Ex. 111 at 111:6–8, 112:20–113:9.

Starting in July 2019, then-ODI Assistant Director Na-Kia Walton processed and decided requests for accommodations. Pl. 56.1 ¶ 82. Walton testified in her deposition that she was not aware of any Department policy on "determining if someone's belief is a sincere belief or not." Pl. Ex. 114 at 129:15–19. In an email to another DOCCS employee, Walton stated that "[u]nfortunately, we cannot question the sincerity of one's beliefs or the level at which they actually practice the religion. We just have to monitor approvals to ensure no operational hardship." Pl. Ex. 60. In her deposition, she further stated that that email meant that "I can't question sincerity if folks are saying now I believe this – he's being told by other staff they're saying hey, this guy doesn't even practice this. I'm saying I can't question it. If you come and say that this is my belief, then the burden is on you to show that, document that, show where it's documented that your belief is based on religious texts." Pl. Ex. 114 at 310:3–11. She went on to testify that she distinguishes between "a religious belief versus a personal preference," and that

she made determinations "[b]ased on the religious text, based on documentation that's submitted. So, if there's documentation that supports the request, then that's what we're basing it on." *Id*. at 311:17–21.

On November 21, 2019, Walton emailed Martuscello recommending the denial of sixteen requests for religious accommodations to wear beards "by staff of the Odinist/Heathenry/Norse Pagan/Forn Sidr faith[.]" Pl. Ex. 99. When Martuscello asked for the basis of the denials, Walton said, "[e]ssentially, maintaining a beard is a personal preference and not a religious requirement of the faith." Pl. Ex. 99. Martuscello responded, "I support the denials," and forwarded the email correspondence to Commissioner Annucci. *Id*. On January 16, 2020, Walton emailed DOCCS Counsel Adam Silverman recommending that DOCCS deny religious accommodation requests for fifteen more officers seeking to wear beards, stating that "[n]one have provided documentation that indicates growing a beard is a requirement of the faith." Pl. Ex. 106. And on February 3, 2020, Walton emailed Martuscello recommending that DOCCS deny accommodations requests for six additional officers seeking to wear beards because "growing a beard appears to be more of a personal preference than a sincerely-held religious belief." Pl. Ex. 49. Silverman responded, stating, "Proceed." *Id*.

In individual instances, DOCCS considered whether an applicant's request to wear facial hair was a requirement of their religious beliefs, in part by examining the applicant's religious texts. For example, when considering a request by one applicant who professed he was an Odinist, DOCCS Assistant Counsel Nancy Steuhl advised denying the application, stating:

> [H]e states that [a beard] is not required for attaining the afterlight [sic] and that "most Odinist men have a beard and long hair when they can get away with it" and that it is a cultural identifier, not a religious requirement. Which to me signifies an understanding that it is not a requirement of the religion/belief, it is a preference not a requirement. We do not have to accommodate preferences.

7

Pl. 56.1 ¶ 106. In a subsequent email about the same applicant, Steuhl insisted that his application

be denied, saying that "the decision turns on the tenets of his religion." *Id*. ¶ 108.

On September 24, 2020, ODI Director Maria Herman and ODI Assistant Director Na-Kia

Walton drafted an email that Deputy Commissioner Osbourne McKay sent to DOCCS Deputy

Commissioner and Counsel, Cathy Sheehan, copying Executive Deputy Commissioner

Martuscello. Pl. 56.1 ¶¶ 117, 118. The email raised concerns about DOCCS's review of

accommodation requests, stating:

> [W]e are concerned about the past and continued practice of denying requests to
> maintain facial hair as a religious accommodation, for some particular faiths or
> religions, but not others, due to the fact that we deem that maintaining a beard is
> not a tenet of their faith/religion. … ODI is concerned that the Department has
> established a practice of using the tenets of a religion, or lack thereof, as a reason
> for denying a religious accommodation request, instead of proof of undue hardship.

Pl. Ex. 80; Pl. 56.1 ¶ 117. In response to that email, Counsel Sheehan directed ODI "to continue

to follow the directions for beard exemption requests that counsel's office has provided to them

over the past 10 months." *Id*. ¶ 119; Pl. Ex. 83. ODI Director Herman forwarded Sheehan's email

to ODI staff, adding, "Cathy's response means that ODI has to continue to deny religious

accommodations for certain religions/faiths." Pl. 56.1 ¶ 120. On October 12, 2020, Counsel

Sheehan wrote to McKay and Herman saying that, when considering applications for

accommodations, ODI would need to determine "if maintaining a beard is a practice/requirement

of the employee's religion." *Id*. ¶ 121. Her email stated that new legislation signed into law by

then-Governor Andrew Cuomo on August 9, 2019, which amended the New York Human Rights

Law, "has two prongs" in considering a religious exemption for facial hair. Pl. Ex. 79. She

explained as follows:

> [T]he first prong is an analysis to determine if maintaining a beard is a
> practice/requirement of the employee's religion. Counsel's Office, in consultation
> with outside counsel, has determined that this does not include personal or cultural

> preferences. If after performing the appropriate analysis and engaging in the appropriate interaction with the requester, ODI determines a Beard is not a practice/requirement of the employee's religion, there is no need to move to prong two, undue hardship.

*Id*. ODI's files also contain material regarding Norse Paganism that Walton reviewed when she was gathering information about Asatru and beards, including a passage that states, "Asatru has no central authority, and so different groups and individuals vary in their practices. One group may wear beards while another group does not […] Wearing religious beards […] are part of what we call the folkway. The folkway is a way of life based not on holy scriptures but on how our ancestors lived, and the folkway is just as important to traditionalist Asatruars as the worship of our gods." Pl. 56.1 ¶¶ 154, 155; Pl. Ex. 41.

Annucci testified that DOCCS can question whether an applicant's belief "is a legitimate tenet [of a religion] and a sincerely held belief." Pl. 56.1 ¶ 92, Pl. Ex. 108 at 184:8–10. He further stated that in some circumstances, DOCCS could tell an individual that "[y]our claimed tenets of your religion are not supported by religious scholars in that religion." *Id*. at 187:15–19. When asked whether DOCCS was allowed to determine that a practice or belief is a personal preference and not a requirement of a particular religion, Annucci testified, "My view is that is a determination that the Department has to do." *Id*. at 191:23–24. Walton testified that an applicants' religious belief must be "based on the tenet, the text, the religious texts, the text of the religion. So you believe it based on the text of your faith." Pl. Ex. 114 at 308:20–23. Plaintiffs assert, and Defendants dispute, that "[s]ince this lawsuit was filed, DOCCS has denied at least seventy-three (73) religious beard RFAs because it 'determined' that wearing a beard was not a 'requirement' or 'tenet' of the applicants' religions." Pl. 56.1 ¶ 129.

### III.    The Individual Plaintiffs

#### A.    David Feliciano

David Feliciano is a correction officer at Fishkill. Pl. 56.1 ¶ 160. He has worked at DOCCS since 2000. *Id.* ¶ 162. He has never been required to wear a respirator at work. *Id.* ¶ 163. Although he previously had a medical accommodation from DOCCS to wear a beard, he submitted a request for a religious accommodation to wear a beard in accordance with his Muslim faith on April 11, 2019. *Id.* ¶¶ 164–65. When asked for additional information, Feliciano submitted a request form stating, "I do not work any clean shaven posts, nor do I swap with any officers on clean shaven posts … I am not required to wear personal protective safety equipment[.]" *Id.* ¶ 167. He also asserted that "[a]ccording to the interpretation of Islam that I adhere to … I must grow [my beard] to at least a fist full or approximately 4 inches from the chin." *Id.* ¶ 168. On August 5, 2019, Feliciano received a denial letter from ODI Assistant Director Walton, which stated in relevant part:

> Uniformed Staff need to be clean shaven. Excusing employees from shaving inhibits them from performing the essential functions of their positions. … Security staff being unable to properly fit a respirator or safety equipment places an undue hardship and burden on facility operations, as having an insufficient amount of clean shaven security staff affects the facility's ability to respond quickly and efficiently to emergency or routine situations, which ultimately breaches the security of the facility. After careful review, it was determined that your facility has 68 essential posts that are considered clean shaven posts.… Your request creates an undue hardship on facility operations and impacts the safety and security within the facility. As such, your specific request cannot be approved.

Pl. Ex. 122. Feliciano refused to shave after receiving his denial letter from ODI, and on August 13, 2019, Director of Labor Relations John Shipley sent Feliciano a suspension notice stating that he would be suspended for 30 days and lose any accrued leave if he failed to file a disciplinary grievance within fourteen days. Pl. Ex. 39. The following day, Fishkill Superintendent Leroy Fields sent Feliciano a suspension notice stating this his "continued presence on the job represents

a potential danger to persons or property or would severely interfere with operations" given that he was "not in compliance with Directive #3083." Pl. Ex. 37. And on August 19, 2019, he received a notice dismissing him from state service unless he filed a grievance within fourteen days. Pl. Ex. 38.

On August 27, 2019, the day after this action was filed, DOCCS reversed its denial of Feliciano's application, sending him a letter permitting him to wear a beard up to one inch—shorter than the four inches he had requested. Pl. 56.1 ¶ 185. The letter stated that "if you change your post or bid assignment, or transfer to another facility, you must submit a new request for a reasonable accommodation." Pl. Ex. 18.

### B.   Derek Gleixner

Derek Gleixner, then assigned to Eastern, sought a religious accommodation to wear a beard in accordance with his Muslim faith on March 28, 2019. Pl. 56.1 ¶¶ 189–90. Gleixner asserts that he "usually wore a short beard" during the two years before he was assigned to Eastern, and that, while his accommodation request was pending, he wore a "modest beard, and that he was also assigned to clean shaven posts during that period," Pl. Ex. 4 ¶¶ 6–8, an assertion Defendants dispute, Def. 56.1 ¶¶ 192, 193. On May 6, 2019, he complained to ODI about the length of time it had taken to receive a response on his accommodation request, saying "[i]t is now Ramadan and in my household we are currently fasting as well as complying with other rules … I am quite sincere about my chosen faith which I have contemplated converting to for over 2 years with my fiancé." Pl. Ex. 53. On May 13, 2019, Gleixner sent an email to the New York State Governor's Office of Employee Relations concerning his treatment, stating:

> I was then Ridiculed by the Superintendent (warden) after he asked me my name then looked at my name tag and said sarcastically "Gleixner … Muslim huh … yeah ok!" In front of several supervisors and officers. He then humiliated me further when he paraded me down a hallway full of my coworkers and into the crowded

front lobby where I was ordered to sit and wait…. When he returned he told me very loudly "I don't care what any of these papers say just go home and shave like you were told"… I am very frustrated and don't know where else to turn. … [M]y household is currently observing Ramadan the best we can despite being forced to choose [DOCCS] over my religion for fear of losing my job.

Pl. Ex. 59. Defendants dispute that Gleixner was ever harassed on account of his faith and assert that Annucci and McKay had no knowledge of any alleged harassment. Def. 56.1 ¶ 195.

On June 26, 2019, DOCCS denied Gleixner's religious accommodation request, stating:

Wearing a respirator that is less protective could pose a grave danger not only to the worker who is wearing it, but also to other workers who might be called on to rescue him from the IDHL [immediate danger to life and health] atmosphere. Preventing unnecessary risks is a compelling governmental interest that justifies DOCCS' decision not to provide a religious exemption from the respirator standard, especially as there is no less restrictive way to provide this protection.… You [sic] request creates an undue hardship on facility operations and impacts the safety and security within the facility.

Pl. Ex. 20. On August 23, 2019, Gleixner received a notice from Shipley suspending him for 30 days without pay. Pl. 56.1 ¶ 201. Gleixner states that he was forced to shave to keep his job after his accommodation request was denied. Pl. Ex. 4 ¶ 13.

On August 27, 2019, the day after this lawsuit was filed, Gleixner again requested an accommodation and informed ODI that he had contacted Plaintiffs' counsel in this action. Pl. Ex. 61. That same day, ODI informed Gleixner that his previously denied religious accommodation request would be granted, permitting him to wear a beard up to one inch in length, and informing him that he would be required to submit a new request for an accommodation if he changed his post or transferred to another facility. Pl. 56.1 ¶¶ 203–04.

### C.   Khaldoun Alshamiri

Khaldoun Alshamiri, an officer at Cayuga and a Marine Corps reservist, Pl. Ex. 5, submitted a religious accommodation request on June 15, 2018 to wear a beard in accordance with his Muslim faith, Pl. Ex. 16. In his application, he indicated that he sought to wear a beard that

12

does not "exceed[] the amount that may be grasped in the first" but that "the religion doesn't state an exact dimension." *Id*.  He has never been required to wear a respirator during the course of his work at DOCCS. Dkt. 257, Alshamiri Decl. ¶ 4. DOCCS denied his request on July 12, 2018, stating that "as a United States Marine Corps (USMC) Reservist, you shave on a regularly scheduled basis to conform with the USMC grooming standards" and that his request for an accommodation "d[id] not reconcile the apparent discrepancy" between his "request to the Department versus" his "stated ability to comply with the military's grooming standard." Pl. Rule 56.1 ¶¶ 208–09. On October 16, 2019, ODI Assistant Director Walton emailed Alshamiri and instructed him that he could reapply for an exemption, which he did on November 21, 2019. *Id*. ¶¶ 213–14. While Alshamiri's request was pending, he was ordered to shave. *Id.* ¶ 216. He was told that he would be suspended if he refused to do so, and when he did not, was told to leave the facility. Pl. Ex. 5 ¶ 18.

On November 27, 2019, Alshamiri submitted a declaration in this action, requesting that the Court order DOCCS "not to take adverse actions against any corrections officers, like myself, who wear or want to wear a beard for religious reasons." *Id*. ¶ 24. Nine days later, on December 6, 2019, DOCCS granted his religious accommodation request, but only authorized him to wear a beard up to one inch in length, and prohibited him from working clean shaven posts, and informed him that he would be required to submit a new request for an accommodation if he changed his post or transferred to another facility. Pl. 56.1 ¶ 218.

### D.    Roland Sofo

Roland Sofo has worked as a correction officer since 2014 and is assigned to Cayuga. Pl. 56.1 ¶ 222. On November 6, 2019, Sofo submitted a request for a religious accommodation seeking authorization to grow a beard in accordance with his Norse Pagan religious beliefs. Pl. Ex. 23. In

his personal statement in support of his request, Sofo stated that "I believe I must honor the practice as part of what is essential in order to grow in my faith," and that growing a beard is "part of my path to a stronger faith." *Id.* He also asserted that his "religious path is one that is based upon honoring the origins of my faith by living by the virtues, customs, and practices of the ancestors when Asatru, the Norse Pagan faith, was created." *Id*. Sofo's statement in support of his request stated that a "bearded man is known to be free, trustworthy, honorable, and often a hero," and indicated that wearing a beard is a practice that is "essential in order to grow in my faith." *Id*.

DOCCS received Sofo's request on November 21, 2019 and denied it the next day, along with the requests of fifteen other correctional officers who asserted they were Norse Pagans. Pl. 56.1 ¶ 226. ODI's denial letter to Sofo, signed by Assistant Director Walton, stated:

> Based on a review of material regarding your religion, as well as a consultation with the Division of Ministerial Family and Volunteer Services, it has been determined that wearing a beard is a personal preference and not a religious requirement of the Norse Pagan religion. Further, maintaining facial hair and/or beards is not an inflexible dogma of the religion, as demonstrated by the recognized exception made for individuals serving in law enforcement positions. As such, your specific request cannot be approved.

Pl. Ex. 24. Sofo asserts that when he arrived at work on November 23, 2019 to work a scheduled swap shift for another officer, he was ordered to leave work, and threatened with "los[ing] swap privileges and could be locked out" if he refused to shave. Pl. Ex. 6 ¶ 17. He "felt forced to shave and return to work," and asserts that the "experience was deeply humiliating to me[,] and I feel that I was forced to violate one of my religious beliefs." *Id*. ¶ 18. The officer whose shift Sofo was covering was docked vacation time for the time Sofo was gone from the facility. *Id*. ¶ 19.

### IV.    Changes in Policy

On November 2, 2021, Commissioner Annucci issued a memo to uniformed staff entitled "No-Shave November." Pl. 56.1 ¶ 31. The memo allowed all security staff—except those assigned

14

to posts that "have the potential for the donning of a respirator"—to wear one-inch-long beards. *Id.* ¶ 32. The memo stated that "No-Shave November is a month-long campaign to raise awareness and funding for cancer prevention, research and education," and announced that the purpose of the month-long shaving exemption was part of "an effort to boost morale." Pl. Ex. 131. The policy was set to lapse on December 1, 2021. *Id.*

On November 23, 2021, Commissioner Annucci issued another memo allowing all uniform staff who had been vaccinated for COVID-19 to wear a one-inch beard. Annucci's memo stated in relevant part:

> In an effort to protect the hard-working employees of this Department, all uniform staff who are fully vaccinated or become fully vaccinated by January 1, 2022, will be allowed, henceforth, to wear a beard, provided it is kept neatly trimmed within one inch, regardless of their initial date of hire. However, those uniform staff who are assigned to posts as clean-shaven posts, or have the potential for the donning of a respirator (e.g. N95, AVON C-50), and those uniform staff with any special units/assignments, such as CERT members, fire/emergency responders (FSO, Deputy FSO), are excluded.

Pl. Ex. 130. Annucci and Martuscello testified that, as of May 2022, they were not aware of any problem caused by allowing officers to have beards because of the No-Shave November or vaccine incentive programs. Pl. 56.1 ¶ 40.

## PROCEDURAL HISTORY

Feliciano and correction officer Brian Sughrim initiated this action on August 26, 2019, alleging that DOCCS improperly denied their religious accommodations. On November 27, 2019, District Judge Victor Marrero entered a temporary restraining order and preliminary injunction enjoining Commissioner Annucci and DOCCS from retaliating against any officer for requesting to wear a beard for religious reasons and ordering Defendants to show cause why further injunctive relief should not be granted. Dkt. 53. After a hearing on December 6, 2019, this Court continued the temporary restraining order. Dkt. 72. Defendants subsequently moved to dismiss. Dkt. 92. On

November 19, 2020, Plaintiffs amended their Complaint to include claims on behalf of Individual

Plaintiffs Gleixner, Alshamiri, and Sofo. Dkt. 199.

On November 30, 2020, the Court granted in part and denied in part Defendants' motion

to dismiss. *Sughrim v. New York*, 503 F. Supp. 3d 68 (S.D.N.Y. 2020). The Court denied

Defendants' motion to dismiss Plaintiffs' Free Exercise, Equal Protection, and Title VII claims,

concluding that Plaintiffs claims for declaratory and injunctive relief were not mooted by

Defendants' approval of their requests for religious accommodations after this case was filed. The

Court granted, however, Defendants' motion to dismiss Alshamiri and Sofo's Title VII claims

without prejudice, concluding that they had not yet exhausted their administrative remedies with

the EEOC. On August 17, 2022, the Court granted Plaintiffs' motion for leave to amend the

Complaint and add Alshamiri and Sofo's Title VII claims, and the next day, Plaintiffs filed a Fourth

Amended Complaint.

Several motions are now pending before the Court. Plaintiffs move to certify a class

pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), consisting of:

> DOCCS security staff whose religious accommodation requests to wear beards
> were not granted after August 26, 2016, and all DOCCS security staff who will in
> the future submit requests for religious accommodations to wear beards.

Dkt. 266 at 3. Plaintiffs also moved to certify a subclass consisting of:

> officers who since August 26, 2016 were denied religious accommodations based
> on DOCCS's policy of determining the tenets or requirements of some religions,
> but not others (the "Religious Requirements Subclass").

*Id*. Magistrate Judge Aaron has issued a Report & Recommendation (the "R&R") recommending

that that Plaintiffs' motion for certification of the proposed class be granted, and that their motion

for certification of the proposed subclass be denied. Defendants timely objected to the R&R. *See*

Dkt. 300. Plaintiffs also move for partial summary judgment and injunctive relief on their First

Amendment, Equal Protection, and Title VII claims, seeking permanent injunctive relief on their individual claims and on behalf of the Religious Requirements Subclass, as well as preliminary injunctive relief on behalf of the class. *See* Dkt. 255.

## LEGAL STANDARDS

### I.     Summary Judgment

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

### II.    Review of a Magistrate Judge's Report and Recommendation

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A court must undertake

a *de novo* review of those portions of a report to which specific objections have been made. *Id.;* Fed. R. Civ. P. 72(b)(3). However, "when a party makes only conclusory or general objections, or simply reiterates his original arguments," the court reviews the report and recommendation strictly for clear error. *Wallace v. Superintendent of Clinton Corr. Facility*, 2014 WL 2854631, at *1 (S.D.N.Y. June 20, 2014). "In addition, new arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) (internal citation and quotation marks omitted). "A magistrate judge's decision is clearly erroneous only if the district court is left with the definite and firm conviction that a mistake has been committed." *Stenson v. Heath*, 2015 WL 3826596, at *2 (S.D.N.Y. 2015) (citation omitted). The court may adopt those portions of the report and recommendation to which no objection is made "as long as no clear error is apparent from the face of the record." *Oquendo v. Colvin*, 2014 WL 4160222, at *2 (S.D.N.Y. Aug. 19, 2014) (citation omitted).

## DISCUSSION

The Court addresses the pending motions as follows. First, it considers Plaintiffs' motion for partial summary judgment. Next, it considers Judge Aaron's R&R and Defendants' objections with respect to certification. Finally, it considers the equitable relief that Plaintiffs seek.

## I.   Summary Judgment

Plaintiffs' motion for partial summary judgment and for corresponding injunctive relief is premised on two separate bases. First, Plaintiffs challenge what they describe as Defendants' policy of denying religious accommodations to certain faiths based on an impermissible inquiry into the tenets of their faith (the "Religious Requirements Claim"). They seek an injunction on behalf of the proposed Religious Requirements Subclass enjoining Defendants from enforcing that

alleged policy. Second, they argue that Defendants' failure to grant religious accommodations to Individual Plaintiffs Feliciano, Sofo, Gleixner and Alshamiri violated Title VII and the First Amendment, and seek an injunction requiring Defendants to permit each of them to wear a beard of the length they have each requested.

A.   **Whether Defendants Engage in an Unlawful Practice of Denying Religious Accommodations Based on an Inquiry into the Tenets of an Applicant's Faith**

Plaintiffs first move for summary judgment on their Religious Requirements Claim, challenging Defendants' alleged practice of denying religious accommodations to believers of certain faiths when they conclude that maintaining a beard is not a tenet of the faith or religion. The motion with respect to that policy is granted.

1.   **Applicable Law**

The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore diverse religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984). The definition of religion is not only subjective but also "expansive," and includes "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Id*. at 158 (quoting W. James, *The Varieties of Religious Experience* 31 (1910)). Indeed, for a belief to be religious, it is not necessary that it "contemplate an orthodox or traditional God." *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988). It is sufficient that the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Id*. (citation omitted); *see also* 29 C.F.R. § 1605.1 (labor regulation defining "religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views").

The guarantees of the Free Exercise Clause, moreover, are "not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 715–16 (1981). The relevant inquiry in determining whether a particular religious belief is entitled to free exercise protection is not whether the belief is, "as an objective matter," "accurate or logical." *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (citation omitted). Inquiries into "the truth" of an adherent's "concepts" of their religious faith are "foreclosed to Government." *United States v. Seeger*, 380 U.S. 163, 184 (1965); *see also* 29 C.F.R. § 1605.1 ("The fact that no religious group espouses [certain] beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee."). Courts must be vigilant to "avoid any test that might turn on the factfinder's own idea of what a religion should resemble." *Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 482 (2d Cir.1985) (citation and internal quotation marks omitted), *aff'd and remanded*, 479 U.S. 60 (1986). This is because courts are "singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs." *Patrick*, 745 F.2d at 157.

Consistent with these principles, "an individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (quoting *Seeger*, 380 U.S. at 185). A "[s]incerity analysis seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick,* 745 F.2d at 157. It "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," and requires a factfinder "to delve into the claimant's most veiled motivations and vigilantly separate the issue of sincerity from the factfinder's

20

perception of the religious nature of the claimant's beliefs." *Id.* An inquiry into the sincerity—as opposed to the verity—of an adherent's beliefs, may involve, for example, a determination as to whether they acted in a manner inconsistent with their beliefs, or if there is evidence that the adherent "materially gains by fraudulently hiding secular interests behind a veil of religious doctrine," *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981), or an evaluation of the consistency of an individual's past statements about their beliefs, *see Jackson*, 196 F.3d at 322.

"Title VII protects more than … [the] practices specifically mandated by an employee's religion." *Reyes v. New York State Office of Children and Family Servs.,* 2003 WL 21709407, at *6 (S.D.N.Y. July 22, 2003); *see also Rivera v. Choice Courier Sys., Inc.*, 2004 WL 1444852, at *7 (S.D.N.Y. June 25, 2004) ("A court's limited role in determining whether a belief is 'religious' is the same under Title VII as it is under the Free Exercise Clause of the First Amendment."). Both the Free Exercise clause and Title VII prohibit a verity, as opposed to a sincerity analysis. *See Philbrook*, 757 F.2d at 481–82 ("We see no reason for not regarding the standard for sincerity under Title VII as that used in free exercise cases.").

## 2.   Application

Plaintiffs have demonstrated that there is no triable issue of fact as to Defendants' practice of denying requests to wear beards based on its own assessment as to whether a beard is a tenet or requirement of an applicant's faith. Because that practice plainly runs afoul of the First Amendment and Title VII's prohibition on determining "the objective truth of [Plaintiffs'] beliefs," *Jackson*, 196 F.3d at 320 (citation omitted), they are entitled to summary judgment on that claim.

The record shows that DOCCS repeatedly denied requests for religious accommodations to wear beards because, in its view, wearing a beard was not a "requirement" of the applicant's

faith—and in particular, of Norse Paganism.[4] Indeed, Defendants fail to meaningfully address, much less refute, the extensive evidence in the record that they employed a practice of denying accommodations for facial hair based on their own interpretation of what the tenets of an applicant's faith are—that is, the verity of the religious belief.

It is well established, however, that "[d]enying an individual a religious accommodation based on someone else's publicly expressed religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that 'it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). A long line of cases makes that clear. In *Thomas v. Review Board of Indiana Employment Security Division*, for example, an Indiana state agency decision denied a Jehovah's Witness unemployment benefits after he quit a job working at a weapons factory because, in his view, his faith forbade him from producing weapons. *See* 450 U.S. 707, 715–16 (1981). The Court held that whether some Jehovah's Witnesses considered the production of armaments consistent with their faith was irrelevant to the question of whether that belief was entitled to the protection of the Free Exercise Clause, explaining that "[c]ourts are not arbiters of scriptural interpretation." *Id.* at 716. Rather, the Supreme Court held, the relevant inquiry was simply whether the plaintiff had quit his job "because of an honest conviction that such work was forbidden by his religion." *Id.*

Similarly, in *Jackson v. Mann*, an African-American prison inmate who self-identified as Jewish challenged his denial of an accommodation to eat a Kosher diet after the prison rabbi opined

---

[4] Defendants do not dispute that the requests from officers asserting that they are Norse Pagans were religious in nature. As Defendants acknowledge in their brief in opposition, DOCCS "denied requests from several purported Norse Pagans … not because [DOCCS] deemed their faith untrue[.]" Opp. at 16.

that he was not objectively Jewish because "a Jew is one who was born Jewish or has formally converted." 196 F.3d at 319. In reversing the district court's decision granting summary judgment for the defendants, the Second Circuit explained that the inmate's Free Exercise claim that he was entitled to kosher meals turned on whether his beliefs were "sincerely held"—not on the "'ecclesiastical question' whether he is in fact a Jew under Judaic law." *Id*. at 321. While the prison officials could "assure themselves that [the inmate's] religious beliefs are sincerely held, they need not—indeed cannot—determine the objective truth of [his] beliefs" by relying on the opinions of religious authorities. *Id.* at 320 (citations omitted).

So too, in *Ford v. McGinnis*, the Second Circuit vacated a district court's determination that, even though a prison inmate had a sincerely held belief in Islam that he thought required him to participate in an Eid al Fitr feast, he was not entitled to receive the feast because his belief that the feast was mandated "did not comport with 'Islam's actual requirements.'" 352 F.3d at 590 (citation omitted). The Circuit held that "[b]y looking behind Ford's sincerely held belief, the district court impermissibly confronted what is, in essence, the ecclesiastical question of whether, under Islam, the postponed meal retained religious meaning." *Id*. at 590 (internal quotation omitted).

Other decisions to the same effect as *Kane*, *Thomas*, *Jackson*, and *Ford* fill scores of pages in federal reporters. *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (holding that prison's denial of inmate's request to wear a beard violated Religious Land Use and Institutionalized Persons Act, and noting that lower court "went astray when it relied on [] testimony that not all Muslims believe that men must grow beards"); *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989) ("Undoubtedly, membership in an organized religious denomination, especially one with a specific tenet forbidding members to work on Sunday, would simplify the problem of

identifying sincerely held religious beliefs, but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."); *Martinelli v. Dugger,* 817 F.2d 1499, 1505 (11th Cir.1987) ("Although appellants may be correct in arguing that [hair length and kosher diet] are optional practices in the Greek Orthodox religion, there is no requirement that a belief be held by a majority of the believers in a particular religion."), *cert. denied,* 484 U.S. 1012 (1988) *superseded by statute on other grounds as stated in Harris v. Chapman*, 97 F.3d 499, 503 (11th Cir. 1996); *Hickey v. State Univ. of New York at Stony Brook Hosp*., 2012 WL 3064170, at *6 (E.D.N.Y. July 27, 2012) (denying defendants' motion for summary judgment where "there [was] evidence in the record to support the conclusion that [the plaintiff] believed that the 'I ♥ Jesus' lanyard was a necessary expression of his religion").

Defendants' practices are similarly impermissible. There are numerous instances in the record demonstrating that Defendants, and the Office of Diversity and Inclusion in particular, denied religious accommodations based on improper considerations. For example, on November 21, 2019, in an email recommending the denial of sixteen officers submitted "by staff of the Odinist/Heathenry/Norse Pagan/Forn Sidr faith," including Sofo, ODI Assistant Director Walton provided a single reason for such denial: "[e]ssentially, maintaining a beard is a personal preference and not a religious requirement of the faith. Employers are required to accommodate religious requirements (barring undue hardship), but not cultural practices or personal preferences." Pl. 56.1 ¶ 227; Pl. Ex. 99.  In response, Executive Deputy Commissioner Martuscello responded, "I support the denials." *Id*. Walton emailed DOCCS Counsel Silverman on January 16, 2020, recommending that DOCCS deny religious accommodation requests for fifteen officers seeking to wear beards because "[n]one have provided documentation that indicates growing a

beard is a requirement of the faith." Pl. 56.1 ¶ 134. In the letter denying Plaintiff Sofo's request,

Walton stated, "it has been determined that wearing a beard is a personal preference and not a

religious requirement of the Norse Pagan religion. Further, maintaining facial hair and/or beards

is not an inflexible dogma of the religion, as demonstrated by the recognized exception made for

individuals serving in law enforcement positions." Pl. Ex. 24. Sofo's denial letter further stated

that ODI's decision was "[b]ased on a review of material regarding your religion, as well as a

consultation with the Division of Ministerial Family and Volunteer Services[.]" *Id*. ODI's files

indicate that officials consulted material regarding Norse Paganism that appear to have been

gathered from Internet sources. Pl. 56.1 ¶ 154; Pl. Ex. 41. In total, the record establishes that ODI

denied dozens of religious accommodation requests between November 2019 and April 2021 at

least in part because Defendants determined there was no indication that growing a beard was a

requirement of the officers' faith. Pl. Exs. 49, 72, 92, 95, 96, 126, 127, 128.

Communications between DOCCS officials further make clear that the agency articulated

a policy of denying applications based on the purported tenets of an applicants' faith. In an October

12, 2020 email to DOCCS Executive Deputy Commissioner Martuscello, ODI Director Herman

and Deputy Commissioner McKay, Counsel Sheehan wrote that the legislation passed in August

2019 amending the State's Human Rights Law requires an analysis that has "two prongs":

> [T]he first prong is an analysis to determine if maintaining a beard is a
> practice/requirement of the employee's religion[.] … If after performing the
> appropriate analysis and engaging in the appropriate interaction with the requester,
> ODI determines a Beard is not a practice/requirement of the employee's religion,
> there is no need to move to prong two, undue hardship.

Pl. Ex. 82. Indeed, even DOCCS officials raised concerns about the practice's legality. In

September 2020, Walton and ODI Director Herman had written an email about DOCCS's review

of accommodation requests that DOCCS Deputy Commissioner Osbourne McKay then sent to the

Counsel Sheehan, stating that

> [W]e are concerned about the past and continued practice of denying requests to
> maintain facial hair as a religious accommodation, for some particular faiths or
> religions, but not others, due to the fact that we deem that maintaining a beard is
> not a tenet of their faith/religion. … ODI is concerned that the Department has
> established a practice of using the tenets of a religion, or lack thereof, as a reason
> for denying a religious accommodation request, instead of proof of undue hardship.
> We know that not all religions have tenets and instead many religions have
> traditional practices, which are covered under this law. It is my understanding that
> it has been verified by your office that only a select number of job posts are required
> to be clean shaven; and, to date, facilities have not expressed that they are
> experiencing undue hardship due to the amount of beard approvals. … It is our
> belief that if the Department continues to deny these requests, then not only are we
> operating unlawfully, but we also risk further litigation.

Pl. 56.1 ¶ 117; Pl. Ex. 80. Nevertheless, even in response to those concerns, Sheehan directed ODI

in an email "to continue to follow the directions for beard exemption requests that counsel's office

has provided to them over the past 10 months," an email that Herman forwarded to ODI staff,

writing that "Cathy's response means that ODI has to continue to deny religious accommodations

for certain religions/faiths." Pl. Ex. 77.

The deposition testimony of DOCCS officials responsible for considering accommodations

requests or setting practices governing accommodations confirms that, well after the

commencement of this lawsuit, DOCCS viewed a determination of the relevant tenets of an

applicant's faith as necessary to deciding whether an accommodation would be granted. For

instance, while Walton told another DOCCS employee in May 2020 that "we cannot question the

sincerity of one's beliefs," Pl. Ex. 60, she later explained in her December 2020 deposition that an

applicant for an accommodation has a "burden … to show that, document that, show where it's

documented that your belief is based on religious texts." Ex. 114 at 310:9–11. She further testified

that DOCCS distinguishes between a religious belief and a personal preference "based on the

religious text, based on documentation that's submitted," and "based on consultation with either ministerial staff or counsel's office." *Id.* at 311:10–21. Notably, DOCCS Commissioner Annucci testified in August 2022 that "the Department can question whether an applicant's belief is a legitimate tenet [of a religion] and a sincerely held belief," Pl. 56.1 ¶ 92; Ex. 108 at 184:8–10, and that in certain circumstances, the Department could tell an individual that "[y]our claimed tenets of your religion are not supported by religious scholars in that religion." *Id.* at 187:15–19. According to Annucci, DOCCS "has to" determine whether a practice or belief is a tenet of particular religion. *Id.* at 191:3–25.

Defendants do not dispute that DOCCS denied applications for accommodations to wear beards based on its own interpretation of the tenets of applicants' stated beliefs.[5] Instead, they assert that they "may evaluate the sincerity of any Plaintiff's or putative class member's purported religious belief before deciding whether to grant a religious accommodation." Opp. at 14. According to Defendants, they were entitled to deny requests that were based on "matters of personal preference rather than sincere religious beliefs," which they say DOCCS viewed "as attempts to 'game the system' rather than sincere religious beliefs." Opp. at 16.

Defendants are correct that evaluating the *sincerity* of an applicant's religious beliefs is permissible when considering requests for religious accommodations. *See Philbrook*, 757 F.2d at 481 ("[I]t is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity—as opposed, of course, to the verity—of someone's religious beliefs[.]"). The Court is sympathetic, moreover, to Defendants' concern that DOCCS received "a particular explosion" in religious accommodation requests in the months after this lawsuit was filed that cited Norse Pagan faiths or the requirements of Leviticus 19, causing the agency to doubt the sincerity of those

---

[5] At oral argument, Defendants' counsel several times asserted that "you can evaluate what the tenets of the religion are." Arg. Tr. 56:9–11.

requests. Opp. at 15; Dkt. 107 (stating that between January 1, 2018 and August 25, 2019, DOCCS received eight requests citing Norse Paganism or Leviticus 19, while between August 26, 2019 and January 10, 2020, DOCCS received seventy-seven Norse Paganism or Leviticus 19 requests); *see also* Pl. Ex. 97 (October 24, 2019 email from Deputy Counsel Sheehan explaining that the "Fishkill [facility] is getting killed with beard requests – Heinous Viking, Odinist, single practitioner religions"). Defendants insist that they viewed these requests to maintain beards to be "based upon a personal preference rather than a sincerely-held belief." Pl. 56.1 ¶ 150; Pl. Ex. 69. An internal email from ODI Assistant Director Walton explaining her recommendation of five denials because "growing a beard appears to be more of a personal preference than a sincerely-held religious belief," Pl. Ex. 92, supports this position.

But the record does not support the contention that Defendants confined their review of applications to questioning the sincerity of officers' beliefs. Indeed, in an email to another DOCCS employee, Walton said "we *cannot* question the sincerity of one's beliefs or the level at which they actually practice the religion." Pl. Ex. 60 (emphasis added). To the contrary, as described above, DOCCS Counsel Sheehan, in an email instructing ODI on the policy for considering accommodations, articulated "two prongs," stating that "the first prong is an analysis to determine if maintaining a beard is a practice/requirement of the employee's religion," and "[i]f … ODI determines a Beard is not a practice/requirement of the employee's religion, there is no need to move to prong two, undue hardship."

*   *   *

In sum, the record amply demonstrates that Defendants repeatedly denied requests for religious accommodations based on their own independent determination that wearing a beard was not a requirement of a believer's faith. Well-settled law, however, makes clear that such inquiry

that DOCCS undertakes to deny religious accommodations—that is, an inquiry into "the truth" of an individual's "concepts" of their religious faith—is "foreclosed to Government," *Seeger*, 380 U.S. at 184, and is inconsistent with both the Free Exercise Clause of the First Amendment and Title VII.

To be clear, the Court's conclusion here is a limited one. DOCCS may lawfully deny an application for a religious accommodation if it determines that the applicant does not have a *sincerely* held religious belief, or as discussed below, when granting a request would impose undue hardship on DOCCS. And nothing in the Court's opinion should be read to suggest that DOCCS is required to grant every application for a religious accommodation that it receives. Undoubtedly, many applications for accommodations may contain evidence suggesting that the request is not, in fact, borne out of a sincere religious belief. For example, on April 26, 2021, Walton emailed Director Herman regarding three officers "who were previously denied religious accommodations to grow beards according to their Odinist faith" and "are now claiming to practice Islam or Sikhism" in support of their requests. Pl. Ex. 84. While the Court does not express any view as to the sincerity of those individual officers' beliefs based on this record, in reviewing their applications, DOCCS would have been entitled to consider whether a swift change in the officers' professed religious faiths after being denied accommodations—or any potential recent inconsistencies in their purported views, for that matter—suggested a lack of sincerity.

The Court recognizes as well that an analysis of "sincerity" in the religious exercise context is "exceedingly amorphous," *Patrick*, 745 F.2d at 157, and that courts have suggested that such an analysis "may understandably appear to overlap with the test for what is 'religious' inasmuch as that test examines the private and subjective," *United States v. Manneh*, 645 F. Supp. 2d 98, 111 (E.D.N.Y. 2008). *See also Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996) ("While it is a delicate

task to evaluate religious *sincerity* without questioning religious *verity,* our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions."); *Barber*, 650 F.2d at 441 ("[I]t is frequently difficult to separate [a sincerity] inquiry from a forbidden one involving the verity of the underlying belief."). Two courts of appeals—although, notably, not the Second Circuit—have even explained that while "sincerity[,] rather than orthodoxy[,] is the touchstone," a prison weighing an accommodation request by a prison inmate "still is entitled to give *some* consideration to an organization's tenets," because "the more a person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held." *Haight v. Thompson*, 763 F.3d 554, 567 (6th Cir. 2014) (quoting *Vinning–El v. Evans,* 657 F.3d 591, 594 (7th Cir.2011)) (emphasis in original). Without endorsing that view here, the Court notes that courts in the Second Circuit have considered a variety of factors in determining the sincerity of an individual's religious beliefs. *See, e.g., Barber*, 650 F.2d at 441 (explaining that courts may consider whether an individual acted inconsistently with their purported beliefs, and if they stood to materially gain by professing a given religious belief). In *Jackson v. Mann,* for example, the Second Circuit held that a prison inmate seeking an accommodation to eat kosher meals in accordance with his professed Jewish faith was not entitled to summary judgment where he made "numerous conflicting statements" about how long he had practiced Judaism. 196 F.3d at 322. And in *United States v. Manneh*, a district court in this Circuit rejected a criminal defendant's claim that she imported bushmeat for consumption as an expression of her sincerely-held religious beliefs after an evidentiary hearing, in part because of the defendant's "calculation and dissembling … on the witness stand," and because the incompatibility of her religious claims with other elements of her defense made clear that her invocation of religion was "purely pretextual." 645 F. Supp. 2d at 113; *see Philbrook*, 757 F.2d at 481 ("'[T]he religion's size and history' is relevant to

the sincerity determination.") (citation omitted). In the Title VII context, another district judge awarded summary judgment to a defendant employer where a plaintiff claiming to have a bona fide religious belief that he was required to observe "the Muslim Sabbath day" made inconsistent statements about his willingness to work on Fridays. *Bob v. Madison Sec. Grp., Inc.*, 2016 WL 6952259, at *8 (S.D.N.Y. Nov. 28, 2016). DOCCS thus has tools at its disposal to grant only those accommodations based on a sincerely held religious belief. It may not, however, deny accommodations based on its own view of "the validity of [the officers'] interpretations of [their] creeds." *Kane*, 19 F.4th at 168 (citation omitted).

### B.     The Individual Plaintiffs' Title VII and First Amendment Claims

Next, the Individual Plaintiffs move for summary judgment on their First Amendment and Title VII claims, arguing that they are entitled to a permanent injunction requiring DOCCS to allow them to continue to wear beards, and to grant Feliciano an accommodation to maintain a beard up to four inches long. The Court grants summary judgment to Gleixner, Alshamiri and Sofo, but not Feliciano.

#### 1.     Gleixner and Alshamiri are Entitled to Summary Judgment on their Title VII Failure to Accommodate Claim

Title VII of the Civil Rights Act makes it unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006); 42 U.S.C. § 2000e(j). A plaintiff who seeks to make out a prima facie case of religious discrimination must show that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546 (citation omitted). "Courts have found that a 'threat of disciplinary action' is sufficient to establish the third element of a

*prima facie* failure to accommodate case." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 243 (S.D.N.Y. 2021) (citation omitted); *see also Ahmad v. New York City Health & Hosps. Corp.*, 2021 WL 1225875, at *19 (S.D.N.Y. Mar. 31, 2021). Once the employee informs an employer of a bona fide religious belief, the employer "must offer [them] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Cosme v. Henderson,* 287 F.3d 152, 158 (2d Cir. 2002). As the Supreme Court recently clarified in *Groff v. Dejoy*, an accommodation presents an undue hardship when the "accommodation would result in substantial increased costs in relation to the conduct of [the employer's] particular business." 143 S. Ct. 2279, 2295 (2023).

It is undisputed that Gleixner and Alshamiri each have a bona fide religious belief that conflicts with DOCCS's requirement that officers be clean-shaven. Nor do Defendants dispute that they both informed DOCCS of their beliefs in each of their applications for religious accommodation, Pl. Ex. 16; Pl. Ex. 21, and that both were disciplined as a result of their failure to comply with Directive 3083: Gleixner received a notice of discipline suspending him for 30 days without pay, Pl. 56.1 ¶ 201, and Alshamiri was told he would be suspended if he did not shave, and then "told to leave the [Cayuga] facility" after he refused to do so, Pl. Ex. 5. ¶ 18. Neither was initially offered an accommodation.

DOCCS justified its June 26, 2019 denial of Gleixner's request by asserting that allowing him to wear a beard would impose an "undue hardship on facility operations" because security staff needed to be able to "properly fit a respirator or safety equipment" in emergencies. Defendants, of course, do not now take that position, nor could they: DOCCS's COVID-19 vaccine incentive policy—which permits every officer who has been vaccinated and is not assigned to a clean shaven post to wear a one-inch beard—renders its past justification for Gleixner's denial

unpersuasive. The same is true for DOCCS's "No Shave November" policy, which in November 2019 allowed all security staff, except those assigned to posts that "have the potential for the donning of a respirator," to wear one-inch beards. Given those policies, there is simply no basis to conclude that granting Gleixner and Alshamiri's requests to wear one-inch beards poses, or would pose, an undue hardship. DOCCS's original justification for denying Alshamiri's accommodation request on July 12, 2018—that "modest facial hair growth can have a significant adverse impact on the protection" of a respirator—is similarly unconvincing given that Alshamiri was never required to wear a respirator on duty and that his request was ultimately granted. Pl. Ex. 13. The State's only argument opposing summary judgment for Gleixner and Alshamiri is that their accommodations have already been granted, and that their claims are therefore moot. But, as explained below, the vaccine incentive policy may lapse, and both may be in the position of needing to reapply for accommodations if they change posts. *See infra* at 44.

In sum, because no reasonable juror could conclude that DOCCS has experienced, or will experience, undue hardship by continuing to allow Gleixner and Alshamiri to wear one-inch beards at non-clean shaven posts, summary judgment is granted as to their Title VII claims for failure to accommodate. Accordingly, the Court declines to consider their claims under the First Amendment. *See Mullins v. City of New York*, 626 F.3d 47, 55–56 (2d Cir. 2010) ("Principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case.").

### 2.    Sofo is Entitled to Summary Judgment on His Failure to Accommodate Claim

To prevail on his Title VII claims for failure to accommodate, Sofo must satisfy the same requirements as Alshamiri and Gleixner. While the sincerity of Alshamiri and Gleixner's religious beliefs were not in dispute, Sofo's is: Defendants assert that he does not have a bona fide religious

belief. But because they have failed to present any evidence raising a genuine dispute of material fact—indeed any evidence at all—that Sofo's beliefs are not sincere, his motion is granted.

Starting with the first prong of his prima facie case under Title VII, Sofo has presented evidence he has a bona fide religious belief that his Asatru faith requires him to wear a beard. According to Sofo, in 2018, he "began to consider religion in [his] life and after researching several religions, discovered that Asatru aligned with [his] own views." Pl. Ex. 6 ¶ 3. In his request for a religious accommodation, Sofo asserted that his "religious path is one that is based upon honoring the origins of my faith by living by the virtues, customs, and practices of the ancestors when Asatru, the Norse Pagan faith, was created," and that "it is my intention to grow my facial hair as part of my path to a stronger faith." Pl. Ex. 23. He also stated that a "bearded man is known to be free, trustworthy, honorable, and often a hero," and indicated that wearing a beard is a practice that is "essential in order to grow in my faith." *Id*.

Defendants' only argument that Sofo is not entitled to summary judgment is that "[a] reasonable factfinder could certainly conclude that Sofo never possessed a sincere religious belief in wearing a beard[.]" Opp. at 12. Had Defendants presented any factual support for their assertion that Sofo's religious beliefs are not sincerely held, the Court might have been inclined to agree. As the Second Circuit has explained, an analysis of a believer's sincerity "require[s] the factfinder to delve into the internal operations of the claimant's mind," a determination not well-suited to summary judgment. *Patrick*, 745 F.2d at 158, 159 (vacating district court decision awarding summary judgment to defendant because material dispute of fact existed as to whether plaintiff's religious beliefs were sincerely held).

But Defendants have cited no evidence whatsoever in the record that puts Sofo's assertion of sincerity in genuine dispute. First, they assert that Sofo testified in his deposition that, although

34

a man without a beard is not honorable, his cousin, who practices Norse Paganism, does not have a beard, and he does not consider his cousin dishonorable. Opp. at 12. The excerpt of Sofo's deposition that Defendants cite to in opposition to Plaintiffs' motion, however, does not include that exchange, *see* Def. Ex. 7, and the Court therefore has no basis to credit it. *See Arline v. Potter*, 404 F. Supp. 2d 521, 527 (S.D.N.Y. 2005) ("[T]he party opposing the summary judgment motion has the obligation to point to admissible evidence in the record in support of any claim that there is a disputed issue of material fact."); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that district courts in the Southern and Eastern Districts of New York have "interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion"). Second, Defendants argue that Sofo did not recall when he decided to wear a beard for religious reasons, and only requested an accommodation after DOCCS circulated memos informing officers they could seek an accommodation. Opp. at 12. Again, the excerpted deposition testimony does not support the first assertion, and Defendants fail to explain why this fact, even if established, would be relevant to the sincerity of Sofo's beliefs.[6]

Notwithstanding the "difficulty of assessing the sincerity of an individual's religious beliefs," Defendants are still bound by "the traditional requirement on summary judgment that the non-moving party actually present evidence putting a fact in dispute." *Singh v. Goord*, 520 F. Supp. 2d 487, 500 (S.D.N.Y. 2007) (granting plaintiff's motion for summary judgment on Free Exercise claim in part and concluding his religious beliefs were sincere where defendant failed to present

---

[6] At oral argument, Defendants' counsel asserted that Sofo's deposition testimony makes clear that he "now subscribes to a religious belief group Forn Sidr, which is a sect of Norse Paganism that has a whole separate set of beliefs," Arg. Tr. at 41:2–3, and that that purported inconsistency raises questions about the sincerity of Sofo's religious beliefs. Once again, however, nothing in the excerpts of Sofo's deposition testimony submitted to the Court supports that assertion. *See* Def. Ex. 7.

evidence disputing plaintiff's evidence of sincerity). Given that Sofo has presented evidence in support of his assertion that his beliefs are sincerely held, and Defendants have failed to present any evidence to the contrary, he is entitled to the conclusion that his beliefs are sincere. *See, e.g., Gardner-Alfred v. Fed. Reserve Bank of New York*, 2023 WL 253580, at *18 (S.D.N.Y. Jan. 18, 2023) (noting that "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions" (quoting *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013)); *Hickey*, 2012 WL 3064170, at *6 ("[Title VII] leaves little room for a party to challenge the religious nature of an employee's professed beliefs.").

Defendants do not dispute that Sofo has established the other elements of a prima facie claim. And, for the reasons stated above, no reasonable juror could conclude that DOCCS will face any undue hardship by granting Sofo's request to wear a one-inch beard. Accordingly, Sofo is granted summary judgment on his Title VII claim for failure to accommodate.[7]

### 3. Feliciano's Motion for Summary Judgment to Wear a Four-Inch Beard is Denied

In contrast to the other Individual Plaintiffs, Feliciano seeks an accommodation for a four-inch beard, asserting that his interpretation of Islam requires him to grow a beard "to at least a fist full" or "4 inches from the chin." Pl. 56.1 ¶ 168; Pl. Ex. 11. Because there are disputed issues of material fact with respect to Feliciano's individual claims, his motion for summary judgment is denied.

---

[7] As with the other Individual Plaintiffs, the Court declines to reach Sofo's constitutional claims. *See Mullins*, 626 F.3d at 55–56.

###### a.       Feliciano's Title VII Failure to Accommodate Claim

Feliciano's failure to accommodate claim fails because there is a dispute of fact as to whether his request to wear a four-inch beard—as opposed to a one-inch beard—would impose an undue hardship on DOCCS.

According to Defendants, granting Feliciano's request to wear a longer beard would cause undue hardship for two principal reasons: first, longer beards pose a safety risk to officers in the event of a physical confrontation with an inmate, and second, they can be used to smuggle contraband. In his deposition, Commissioner Annucci testified that "there are a lot of physical struggles, interactions between staff and incarcerated population," and "if there is a beard of excessive length, that would present a means for the combatant to grab and possibly disadvantage the officer." Pl. Ex. 108 at 97:11–24. According to Annucci, a beard "in excess of one inch" could create a danger for an officer. *Id.* at 99:23. Defendants' expert, William Bechtold, provided similar testimony, stating that "[d]uring an altercation, an inmate can grab a longer beard, thereby gaining control of the correctional officer's head movements," which "greatly reduces the correctional officer's ability to control the situation or defend himself." Bechtold Decl. ¶ 11. In June and July 2019, before this lawsuit was filed, two deputy superintendents at DOCCS submitted memos to DOCCS ADA Coordinator Julia Dennis, warning that shaving exemptions to permit long beards limits an officer's ability to react and avoid injury in an encounter with a combative inmate. Def. Ex. 1; Def. Ex. 2. As to smuggling contraband, Annucci testified that an officer could use a beard to hide contraband, asserting that "compromised staff" could "bring either drugs or weapons into a correctional facility that can be secreted in a beard." Pl. Ex. 108 at 98:10–13.

Plaintiffs counter that Defendants have not offered any evidence that Feliciano's decision to maintain a four-inch beard for several years has created a safety risk. Reply at 7. They also note

that one officer at Fishkill and one at the Bedford Hills facility were approved for "fist length" beards. Pl. 56.1 ¶¶ 68, 69; Pl. Ex. 64. Plaintiffs also make much of Commissioner Annucci's acknowledgment in his deposition that he was unaware of any instance in which an officer brought contraband in his beard. Pl. Ex. 108 at 99:6–8. But given that this assessment appears to have been based on the limited number of officers who were permitted to wear longer beards, it is hardly conclusive. Drawing all reasonable inferences in Defendants' favor, as the Court must, Defendants have presented enough evidence to create a genuine issue of material fact as to whether granting Feliciano's request would pose an undue hardship. *See, e.g., Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 759 (E.D.N.Y. 1998) (holding that defendant agency established undue hardship where granting religious exemption to wearing a hard hat would "threaten[] to compromise safety in the workplace"), *aff'd*, 189 F.3d 461 (2d Cir. 1999). Summary judgment is thus denied on Feliciano's failure to accommodate claim.

### b.      Feliciano's Title VII Disparate Treatment Claim

For similar reasons, Feliciano is not entitled to summary judgment on his disparate treatment claim. A plaintiff may establish a prima facie case of Title VII disparate treatment by showing "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). "If a prima facie showing is made, 'the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action.'" *Heckstall v. Metro. Transp. Auth.*, 2021 WL 1226443, at *3 (S.D.N.Y. Apr. 1, 2021). The plaintiff then bears the ultimate burden of showing that the proffered reason was "merely a pretext for an unlawful motive." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019).

Here, Defendants have offered a legitimate, nondiscriminatory reason for sending Feliciano a suspension notice and informing him he would be dismissed from state service: a four-inch beard might pose safety risks or be used to hide contraband. A reasonable juror could credit Commissioner Annucci and Defendants' expert's assertions about the potential risks posed by permitting security staff to wear longer beards. *See, e.g., Jenkins v. N.Y.C. Transit Auth.*, 201 F. App'x 44, 46 (2d Cir. 2006) (holding that defendants offered legitimate, nondiscriminatory reason for demoting employee where employee endangered passenger safety by opening the doors on the wrong side of a train she was operating); *Wilkerson v. Metro. Transp. Auth.*, 2021 WL 5761649, at *8 (S.D.N.Y. Dec. 3, 2021) (concluding that employer had a legitimate and nondiscriminatory reason for enforcing a respirator policy, namely, "ensuring the safety of their employees"). As to Feliciano's burden of demonstrating DOCCS's justification was pretextual, Feliciano has failed to adduce any evidence "to support a rational finding that the legitimate, non-discriminatory reasons proffered by [DOCCS] were false, and that more likely than not discrimination was the real reason for the [adverse employment action]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citation omitted). Feliciano does not assert, and the record is devoid of evidence, that he was subjected to discriminatory comments; nor does he point to any other evidence that he was treated differently because of his religion. *See, e.g., Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 339 (S.D.N.Y. 2020) (concluding that plaintiff failed to establish employer's proffered non-discriminatory reason was pretextual where record contained no evidence that "her supervisors made disparaging comments based on her race, color, or sex"). As a result, Feliciano is also not entitled to summary judgment on his disparate treatment claim.

### c.   Feliciano's First Amendment Claim

Plaintiffs do not specifically address whether Feliciano, as opposed to the other Individual Plaintiffs, is entitled to summary judgment on his Free Exercise claim given that he requested to wear a four-inch beard rather than a one-inch beard. *See* Mot. at 34 (asserting that Directive 3083, which permits senior officers to wear beards "trimmed within one inch," is "neither facially neutral nor general applicable" and numerous officers were permitted to wear one-inch beards for secular reasons). In the absence of briefing specific to Feliciano's claim, the Court concludes that several disputed issues of material fact preclude summary judgment on his First Amendment claim as well.

Under the Free Exercise Clause, "the government may sometimes burden the external practice of religion." *We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 2023 WL 4982325, at *8 (2d Cir. Aug. 4, 2023). A law that "incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review." *Id*. A law is not neutral if the government "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). A law lacks general applicability "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 1877.  Such a law "is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." *We The Patriots USA,* 2023 WL 4982325, at *8; *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33 (1993).

Based on the limited evidence in the record, there are few signs that DOCCS's policy as to longer beards was not neutral or generally applicable. Specifically, there is no indication that DOCCS had anything less than an across-the-board prohibition on beards longer than one inch, except in the two circumstances in which it appears to have granted accommodations for religious reasons, as opposed to secular reasons. *See Kane v. De Blasio*, 19 F.4th 152, 165 (2d Cir. 2021) (to demonstrate law is not generally applicable, "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct"). Aside from Deputy Commissioner McKay's deposition testimony suggesting that one officer may have been granted "an exception" to wear a beard longer than one inch, Pl. Ex. 112 at 218:15–23, the only evidence that DOCCS approved requests for longer beards is for two officers, one at Fishkill and one at Beford Hills, who were granted religious accommodations to wear "fist-length" beards. Nor is there any evidence the restriction on longer beards is intended to target religious practices and thus not neutral. *Fulton*, 141 S. Ct. at 1877.

The appropriate level of scrutiny in evaluating Feliciano's Free Exercise challenge to the policy is therefore rational basis review. *See Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dept. of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014). Applying that deferential standard, a reasonable juror could find that Defendants have "chosen a means for addressing a legitimate goal that is rationally related to achieving that goal." *Kane*, 19 F.4th at 166 (2d Cir. 2021). Because DOCCS's decision to prohibit longer beards is rationally related to its goal of protecting the safety of inmates and officers at its correctional facilities, it satisfies rational basis review. *See, e.g., We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 290 (2d Cir. 2021) (subsequent case history omitted) (concluding that vaccination requirements at healthcare facilities had a rational basis); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d

41

Cir. 2012) (holding that goal of providing "clear and accurate information about" food purchases was a rational basis for Kosher labeling requirements); *Katz v. N.Y.C. Hous. Pres. & Dev.*, 2022 WL 3156178, at *4–5 (S.D.N.Y. Aug. 8, 2022) (finding that enforcing apartment occupancy limits relevant to protecting health and safety satisfies rational basis test).

In sum, based on the record before it, the Court cannot conclude that Feliciano has met his burden at summary judgment on his Free Exercise Claim. His motion is therefore denied.

### C.      Mootness

Defendants' principal basis for opposing summary judgment as to the Religious Requirements and individual claims is that DOCCS's policies have changed since the commencement of this action. According to Defendants, (1) any officer who has received the COVID-19 vaccine is now permitted to wear a beard, and (2) all of the Individual Plaintiffs, except Feliciano, are permitted to wear a beard at the length they have requested, either because their applications for an accommodation were granted or because they have been vaccinated. Defendants' arguments, which sound in mootness, are unpersuasive.

It is well-settled that a federal court "has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Dean v. Blumenthal,* 577 F.3d 60, 64 (2d Cir. 2009) (citation omitted). As such, "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). However, "a case becomes moot only when it is impossible for a court to grant *any* effectual relief *whatever* to the prevailing party." *Chevron Corp. v. Donziger*, 833 F.3d 74, 124 (2d Cir. 2016) (emphasis in original) (citation omitted).

One exception to mootness exists when a defendant voluntarily ceases engaging in the conduct that is being challenged. As the Supreme Court has observed, the "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (alterations omitted). Under the voluntary cessation doctrine, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* "The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt.*, 819 F.3d at 603 (citation omitted). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)

First, Defendants argue that Plaintiffs are not entitled to relief on their claim challenging DOCCS's practice of denying accommodation requests based on the purported tenets of the applicant's faith because they "rely exclusively upon stale, outdated evidence." Opp. at 13. The Court disagrees. That some of the evidence Plaintiffs have presented regarding DOCCS's practices date back to 2019 and 2020 does not, on its own, indicate that those practices are not still in place. Commissioner Annucci testified at his May 18, 2022 deposition that DOCCS "has to" determine whether a practice or belief is a requirement of a particular religion when considering religious accommodation requests. Indeed, Defendants' continued contention, in recently filed briefing, that its practices are lawful further indicates that it has not ceased or could be repeated. *See Ahrens v.*

*Bowen*, 852 F.2d 49, 53 (2d Cir. 1988) ("It is precisely his insistence on the validity of the challenged practice that makes it 'reasonable' to expect that the conduct will be repeated.").

Defendants next argue that because some of DOCCS's policies have changed since this lawsuit was filed, the Court has no basis for granting declaratory and injunctive relief. According to Defendants, any officer vaccinated against COVID-19 who does not work a clean shaven post may wear a beard as a result of its vaccine incentive policy. Defendants further point out that "no religious accommodation request has been denied since November 5, 2021," Opp. at 1, the month that DOCCS implemented the policy. But the longevity of DOCCS's vaccine incentive policy is hardly assured given that its express purpose was to encourage officers to become vaccinated. *See* Pl. Ex. 130 (COVID-19 Vaccine Incentive Memo) (permitting vaccinated officers to wear beards "in an effort to protect the hard-working employees of this Department"). At oral argument, moreover, counsel for Defendants suggested that DOCCS might have to reconsider its grooming policies if "too many" officers wear a beard, stating:

> The more people that are exempted and elect to grow beards, then the more concern there certainly is. In terms of undue hardship, I would say that DOCCS is currently at the point when they go, whoa, we have too many people that have a beard, and we need to consider a different path in terms of how we manage this.

Arg. Tr. at 43:5–10. Given that the vaccine policy could be ended at any time, the Court has little confidence that there is "no reasonable expectation that the alleged violation will recur." *Mhany Mgmt., Inc.* 819 F.3d at 603; *see also Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020) (holding claim for injunctive relief was not moot where defendants did not "point[]to any safeguards that would prevent the new policy from being changed, rescinded, or honored in the breach" and defendants were "at liberty to reverse or revise this policy through a superseding memorandum or by other means"). In any event, as of this date, officers who are unvaccinated remain unable to wear a beard without seeking an accommodation.

Relevant to the Court's analysis, too, is that each of the Individual Plaintiffs (except Sofo) was granted an accommodation only after litigation commenced. The Second Circuit has explained that the "suspicious timing and circumstances" of a defendant's voluntary cessation of complained-of conduct weighs against a finding of mootness. *Mhany Mgmt., Inc.*, 819 F.3d at 604; *see United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996) ("[I]t is significant that the change of policy was instituted on the eve of the lawsuit."). On June 26, 2019, DOCCS denied Gleixner's request for an accommodation, and on August 23, 2019, it notified him he would be suspended for 30 days without pay. On August 27, 2019, however—the day after this lawsuit was filed—it granted Gleixner's request for a religious accommodation to wear a beard up to one inch. Alshamiri, for his part, was denied an accommodation request one year prior to the commencement of this lawsuit. He reapplied on November 21, 2019, and while his application was pending, he was told to shave or to leave work. Then, on November 27, 2019, he submitted a declaration in this action seeking an order protecting him from retaliation by DOCCS. Nine days later, his accommodation request was granted. The timing of DOCCS's decision to grant the Individual Plaintiffs' accommodation requests strongly suggest that DOCCS had a "litigation-driven motivation, as opposed to an authentic, durable commitment" to "mend its ways," leaving it far from "absolutely clear" that DOCCS would not revoke the accommodations in the future, or refuse to grant an accommodation again if Gleixner and Alshamiri were to be reassigned. *Am. Council of Blind of New York*, 495 F. Supp. 3d at 248.[8]

Accordingly, because there is no indication that DOCCS has abandoned its practice of denying religious accommodations based on its own determination of the tenets of their faith, and

---

[8] While Gleixner and Alshamiri have been granted accommodations, their authorization letters permitting them to wear beards specifically require them to reapply for an exemption to DOCCS's general facial policy if they change their posts or are transferred to a different facility.

because it is not "absolutely clear that [DOCCS's] wrongful behavior could not reasonably be expected to recur," *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal citation omitted), Plaintiffs' claims for declaratory and injunctive relief are not moot.

### D.  Injunctive Relief

Having concluded that Plaintiffs are entitled to summary judgment that DOCCS has a practice of denying applications for religious accommodations based on the tenets of applicants' religions, and that Gleixner, Alshamiri, and Sofo were unlawfully denied religious accommodations, the Court turns to Plaintiffs' requested relief.

#### 1.  DOCCS's Religious Requirements Practice

##### a.  Entitlement to a Permanent Injunction Enjoining DOCCS's Religious Requirements Practice

A plaintiff seeking a permanent injunction against government action taken pursuant to a statutory or regulatory scheme must demonstrate irreparable injury and actual success on the merits. *See Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). A permanent injunction also requires "a showing that remedies at law will inadequately compensate for the injury, that an equitable remedy is warranted in light of the balance of hardships between the plaintiff and defendant, and that the injunction would not disserve the public interest." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 911 F.3d 104, 109 (2d Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 2082 (2020).

"A court may grant injunctive relief even where a defendant has ceased the offending conduct upon consideration of 'the bona fides of the defendant's expressed intent to comply' with the law, 'the effectiveness of the discontinuance,' and 'the character of the past violations.'" *E.E.O.C. v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 211 (E.D.N.Y. 2018) (brackets omitted) (quoting *W.T. Grant Co.*, 345 U.S. at 633). "However, there must be 'something

more than the mere possibility of recurrent violations which serves to keep the case alive.'" *Id.* (quoting *W.T. Grant Co.*, 345 U.S. at 633).

Plaintiffs have met their burden with respect to DOCCS's Religious Requirements practice. All officers who were denied the right to an accommodation to wear a beard based on Defendants' conclusion that beards are not required by the tenets of their faith suffered the same deprivation of their constitutional rights. They have therefore established irreparable injury with no remedy at law. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 374 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Jolly*, 76 F.3d at 482 ("[T]he denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily."). For reasons already stated above, the balance of hardships tilts in favor of an injunction: DOCCS's vaccine incentive policy makes clear that granting grooming accommodations, at least for beards up to one inch and at non-clean shaven posts, will not impose significant burdens on DOCCS facilities. *See Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) (explaining that where there is "a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other ... the balance of hardships tips decidedly in plaintiff's favor."). Finally, "[e]njoining an unconstitutional regulatory scheme serves the public interest because the Government does not have an interest in the unconstitutional enforcement of a law," *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (citation and ellipses omitted), and no public interest is furthered by continuing DOCCS's current practices.

Defendants argue that an injunction is not warranted because Plaintiffs "failed to demonstrate that [the] alleged practice constitutes a *current* practice of NYDOCCS." Opp. at 16. But as discussed above, there is no indication that DOCCS has abandoned its practice of denying

religious accommodations based on its own determination of the tenets of their faith, and the vaccine incentive policy could be lifted at any time. Insofar as Defendants have not had an occasion to deny a religious accommodation application based on the tenets of the applicant's faith since the implementation of the vaccine policy in November 2021, the Court has no assurance that DOCCS's cessation of its conduct is anything more than temporary. Indeed, in cases where courts have held that a defendant's cessation of its wrongful conduct obviates the need for injunctive relief, courts have relied on evidence of enduring reform coupled with a change of circumstances, such as an amended policy and an individual plaintiff's successful administrative appeal, *see Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014), or an amendment to a challenged standard along with the defendant's abandonment of its prior litigation position, *see Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 108 (2d Cir. 2016). Those circumstances are not present here, where the relevant grooming and accommodation policies, Directive 3083 and Directive 2609, remain in place. *See Fishman by Fishman v. Daines*, 247 F. Supp. 3d 238, 249 (E.D.N.Y. 2017) (granting permanent injunction where state's regulations were unchanged, and as a result, defendants had not carried "their formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur") (citation omitted); *see also United States v. Hakim*, 462 F. Supp. 3d 418, 434 (S.D.N.Y. 2020) (granting permanent injunction where there was "cognizable danger of recurrent violation"); *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 661 (S.D.N.Y. 2013) (granting permanent injunction where defendant engaged in unlawful conduct during pendency of litigation).

### b.    Scope of Relief

In fashioning a remedy, "one of the most important considerations . . . is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33,

51 (1990). Notwithstanding a finding of liability, courts must exercise "restraint and initial deference to state institutional authorities in curing unlawful conditions." *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 204 (2d Cir. 2014) (citation and brackets omitted). "[F]ederal courts lack the facilities or expertise [to administer] plans designed to assure that a state will provide acceptable services." *Id.* (citation and ellipses omitted).

Plaintiffs seek three general categories of injunctive relief to cure Defendants' Religious Requirements practice. The first is a permanent change to Directive 2609, which governs DOCCS's religious accommodation policy. Plaintiffs have submitted extensive proposed language describing the standards for conducting "an appropriate sincerity analysis." Dkt. 314 at 4. The second is training for staff who administer Directive 2609, including all the staff in ODI and the Deputy Commissioner and Counsel, among others. They request that the Court appoint an independent training expert. Finally, they seek an order requiring DOCCS to maintain records of accommodations decided at each correctional facility, as well as documentation of grounds for denials and requests for additional information. Plaintiffs also request that the Court order a five-year monitoring period "to ensure that these reforms take hold." *Id.* at 14. Per Plaintiffs' proposed order, during the monitoring period, DOCCS would be required to provide monthly "reports and information to adequately assess the performance of DOCCS's religious accommodation practice." *Id.* at 15. Defendants, for their part, strenuously oppose the relief that Plaintiffs seek, arguing that the changes they seek "extend far beyond constitutional requirements," and that Plaintiffs' request for training, documentation, and monitoring are "unnecessary and overbroad." Dkt. 321 at 5, 11.

In light of the Court's determination on the merits, Plaintiffs are entitled to an injunction enjoining Defendants from enforcing their practice of denying religious accommodations based

on their own understanding of the tenets of the applicant's faith, as well as a change in Defendants' policies memorializing the end of that practice. The Court is mindful, however, that it is "only empowered to grant relief no broader than necessary to cure the effects of the harm caused by the violation," and that any relief must be "narrowly tailored to fit specific legal violations." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (citations omitted). Without now defining the contours of the ultimate relief here, Plaintiffs' request for monitoring every month over a five-year period as well as the three categories of new recordkeeping requirements appears likely to be unduly burdensome and may well be unnecessary to remedying Defendants' unlawful practices. Furthermore, given the Second Circuit's instruction that "a court should first 'give the state a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate for the purpose,'" *Knox v. Salinas*, 193 F.3d 123, 130 (2d Cir. 1999) (quoting *Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir.1996)), the Court declines to grant the far-reaching injunctive relief Plaintiffs propose at this time. Instead, consistent with the Second Circuit's guidance, and now subject to the Court's determination as to their liability on the merits, Defendants will be directed to advise the Court how they intend to comply with this Opinion and Order.

### 2.      Injunction for Gleixner, Alshamiri and Sofo

"Once a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it believes appropriate." *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1149 (2d Cir. 1991); *see* 42 U.S.C. § 2000e–5(g)(1) ("If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate.").

"The bounds of the court's discretion are set by the purposes of Title VII, which are to prevent discrimination and achieve equal employment opportunity in the future[.]" *Berkman v. City of New York,* 705 F.2d 584, 594 (2d Cir.1983). "The necessary determination is that there exists some cognizable danger of recurrent violation." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (quoting *United States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953)). As in other statutory contexts, "[t]he factors ... [that] are pertinent in assessing the propriety of injunctive relief" are "the balance of equities and consideration of the public interest." *Id*. (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)).

The Individual Plaintiffs have demonstrated that "there exists some cognizable danger of recurrent violation," and are therefore entitled to injunctive relief. *Id.* at 100; *see id*. (holding that district court abused its discretion by denying injunction where "nothing prevent[ed]" employer from rehiring harassing supervisor); *c.f. Ravina v. Columbia Univ.*, 2019 WL 1450449, at *17 (S.D.N.Y. Mar. 31, 2019) (denying injunctive relief where plaintiff no longer employed at workplace with harassing colleague). As discussed above, Gleixner and Alshamiri will both be required to reapply for a beard accommodation if they are assigned to different posts. DOCCS's grooming policy, Directive 3083, is still in place. And both were only granted a religious accommodation after they joined this action. Furthermore, Sofo's religious accommodation request has been denied, and there is no assurance that the vaccine policy will remain in place. Finally, for the reasons discussed in this Opinion, the balance of equities and the public interest weigh in favor of ordering injunctive relief, particularly because there is little evidence relief would be unduly burdensome given that Gleixner and Alshamiri have been permitted to wear beards since August 2019, and Sofo is currently eligible to wear a beard pursuant to the vaccine policy.

Accordingly, Gleixner, Alshamiri and Sofo are entitled to injunctive relief on their Title VII claims for failure to accommodate. Consistent with DOCCS's policies, however, relief is limited to circumstances in which Plaintiffs are not assigned to clean shaven posts. Accordingly:

- Defendants are ordered not to revoke or modify the existing accommodations for Gleixner and Alshamiri insofar as they are not assigned to clean shaven posts; and

- Defendants are ordered to grant a religious accommodation to Sofo permitting him to wear a beard up to one inch long insofar as he is not assigned to a clean shaven post, and are further ordered not to revoke or modify such accommodation insofar as he is not assigned to a clean shaven post.

## II.      Plaintiffs' Motion for Class Certification

In his R&R, Judge Aaron recommended that the Court grant Plaintiffs' motion to certify a class, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), consisting of "DOCCS security staff whose religious accommodation requests to wear beards were not granted after August 26, 2016, and all DOCCS security staff who will in the future submit requests for religious accommodations to wear beards." R&R at 10. He further recommended that the Court deny Plaintiffs' motion to certify a subclass consisting of "officers who since August 26, 2016 were denied religious accommodations based on DOCCS's policy of determining the tenets or requirements of some religions, but not others," concluding that "there is no need for the creation of the subclass" because Plaintiffs' claims "apply equally to members of the proposed Class and proposed Subclass." *Id.* at 19. Judge Aaron noted that each religious accommodation request was denied "by the same DOCCS officials in ODI, which is part of DOCCS's central office." *Id.* at 19. Defendants have objected to Judge Aaron's R&R. For the following reasons, the Court adopts Judge Aaron's R&R in full.

### A.      Defendants' Objections

Defendants raise two objections to Judge Aaron's R&R. First, they argue that because Plaintiffs failed to present any evidence of a likelihood of future harm, they have not satisfied the requirements of Rule 23(b)(2). Dkt. 304, Objections to R&R ("Objections") at 7. Second, they argue that Plaintiffs have not established commonality and typicality under Rule 23(a) because the proposed class includes officers of different religions who Plaintiffs claim were treated differently on the basis of their faiths. Obj. at 9. Neither objection is availing.

As an initial matter, Defendants' objections reiterate arguments that were made before, and addressed by, Judge Aaron. Accordingly, they are reviewable for clear error. *See, e.g.*, *Pullman v. Alpha Media Publ'g, Inc.*, 2014 WL 5042250, at *4 (S.D.N.Y. Sept. 10, 2014) (reviewing objection for clear error where magistrate judge "dealt directly with" it), *aff'd*, 624 F. App'x 774 (2d Cir. 2015). Nonetheless, for the reasons explained here, the Court would adopt Judge Aaron's R&R under a *de novo* standard as well.

### 1.      Whether the R&R Erred in Concluding Plaintiffs Satisfied Rule 23(b)(2)

To satisfy the Rule 23(a) requirements, a party moving for class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). In addition to Rule 23(a), the proposed class must also satisfy Rule 23(b). Plaintiffs here seek certification pursuant to Rule 23(b)(2), which authorizes class actions where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendants first argue that Plaintiffs have failed to satisfy the requirements of Rule 23(b)(2) because they have not presented any evidence of a likelihood of future harm. That objection, which is premised on the same assumptions as Defendants' mootness argument, fails. As Judge Aaron noted, "officers who have received accommodations because they received the COVID-19 vaccine (or otherwise) could have those accommodations lapse in the future," and Defendants "do not contend that the COVID Vaccine Incentive program is permanent or that it is intended to be long-term." R&R at 15. As a result, the R&R correctly concluded that, "[a]bsent an injunction, nothing will stop [Defendants] from revoking the program in the future." *Id*.

Moreover, Defendants' assertion that Plaintiffs have "failed to establish any potential for future harm for" for "Jewish, Sikh, or Rastafarian" officers in the class and those of other faiths, Obj. at 7–8, is similarly unpersuasive given that Defendants acknowledge they denied an accommodation request by an officer asserting Jewish beliefs on November 30, 2018. *See* Def. 56.1 ¶ 81. In any event, Plaintiffs challenge "central and systemic failures" of Defendants' religious accommodation policies as they affect the class as a whole. *See, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (rejecting defendants' argument that "due to the unique circumstances of each plaintiff's experience" defendants had not acted on ground "generally applicable to the class"). That individual class members may face a different likelihood of future harm does not require a denial of class certification. *See, e.g., Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015) ("Relief to each member of the class does not require that the relief to each member of the class be identical, only that it be beneficial.").

### 2.      Whether the R&R Erred in Concluding that Commonality and Typicality Exist

Next, Defendants argue that Plaintiffs have not satisfied the commonality and typicality requirements of Rule 23(a) because, according to Plaintiffs, DOCCS "[i]ntentionally treat[s] religious practices differently," granting religious accommodations for members of some faiths but denying accommodations to others. Obj. at 9. As a result, Defendants argue, Plaintiffs have "failed to identify what injury they attribute to Muslim, Jewish, Sikh, or Rastafarian officers, who, they allege always receive religious accommodations when they request them." Obj. at 10 (emphasis omitted). They also argue that Plaintiffs "lumped" together "Pagan, Heathen, Odinist, Asatru, Forn Sidr, and other variations of Norse Pagan religious traditions," defeating commonality "even among Plaintiffs' proposed subclass." *Id.*[need citation to Obj.].

The Court disagrees. The Second Circuit has made clear that to satisfy commonality, plaintiffs must demonstrate that there are "sufficiently … common questions of law or fact." *Sykes*, 780 F.3d at 86. As is relevant here, Plaintiffs' class claims challenge the same set of practices carried out by the same personnel, and they raise common questions about the legality of Defendants' practices, including whether DOCCS denied officers' applications absent a finding of undue hardship, and whether DOCCS had a practice of denying applications based on the tenets of officers' faiths. Judge Aaron correctly concluded that there are common questions of law and fact such that commonality and typicality are satisfied.

Insofar as Defendants argue that Plaintiffs "lack standing to pursue claims for injunctive relief, on a classwide basis or otherwise," Opp. at 2, the Second Circuit has held that courts "do not require that each member of a class submit evidence of personal standing," *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). Moreover, the class is expressly defined to include only those "DOCCS security staff whose religious accommodation requests to wear beards were

not granted after August 26, 2016, and all DOCCS security staff who will in the future submit requests for religious accommodations to wear beards"—that is, officers who have been harmed by Defendants' policies in the past, and those who will have their applications considered according to allegedly unlawful policies and practices in the future.

Accordingly, Defendants' objections are overruled, and Judge Aaron's R&R is adopted in full.

### III.    Preliminary Injunction on Plaintiffs' Classwide Claims

Lastly, Plaintiffs move for a classwide preliminary injunction enjoining DOCCS from denying religious beard accommodations absent an undue hardship. That motion is denied.

As an initial matter, the preliminary injunction that Plaintiffs seek far exceeds the requirements of Title VII. In their April 21, 2023 submission articulating the scope of their proposed preliminary injunction, Plaintiffs state that they seek to enjoin DOCCS "from ordering any class member who is not permanently assigned to a clean shaven post to shave or disciplining them for not shaving." Dkt. 314 at 15. As Defendants point out, this proposed injunction would require DOCCS to grant requests for accommodations without determining that the applicant held a "bona fide religious belief" that they were required to wear a beard. *See Baker*, 445 F.3d at 546. Moreover, in preventing DOCCS from ordering "any" class member to shave, this proposed preliminary injunction would give DOCCS no room to determine whether granting a specific accommodation would cause undue hardship, including applicants requesting to wear four-inch beards. That runs afoul of the principle that an injunction should be "no broader than necessary to cure the effects of the harm caused by the violation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (citation omitted).

In any event, Plaintiffs have failed to demonstrate they are entitled to a preliminary injunction. "The purpose of a preliminary injunction is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (citation omitted). When a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, a movant "must demonstrate that it will suffer irreparable harm absent injunctive relief" and "a likelihood of success on the merits." *Mullins v. City of New York*, 626 F.3d 47, 52–53 (2d Cir. 2010). The movant "carries the burden of persuasion" that they are entitled to relief. *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). As the Second Circuit has explained, "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). The Supreme Court has explained that plaintiffs seeking a preliminary injunction must show "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). A movant is not entitled to a preliminary injunction "based only on a possibility of irreparable harm[.]" *Id.*; *see Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (explaining that "the harm must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm").

Plaintiffs have not satisfied the irreparable harm requirement such that classwide relief is appropriate here. Specifically, they have not shown that, absent a preliminary injunction, the class faces an "actual and imminent" threat that DOCCS will deny religious beard accommodations without a showing of undue hardship. Several facts animate this conclusion. First, on October 10, 2019, shortly after the passage of new legislation amending the New York State Human Rights Law to allow for "wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion," DOCCS implemented Directive 2609, which provides that a religious accommodation "must be granted" to accommodate "sincerely held practices of the individual's religion" unless it "would create a specific concern, such as a safety concern or an undue hardship." Pl. Ex. 119 § 4. That policy, now in effect for nearly four years, contains detailed guidance for weighing undue hardship, including defining "undue hardship" to mean "an accommodation requiring significant expense or difficulty," such as "significant interference with the safe or efficient operation of the work place[.]" *Id*. § 3. It also lists factors to consider in weighing undue hardship, including the "identifiable cost of the accommodation" and the "costs of loss of productivity," the "number of individuals who will need the particular accommodation to a sincerely held religious observance or practice," and whether the accommodation "will result in the inability of an employee to perform the essential functions of the position in which he or she is employed." *Id.*

Relatedly, Plaintiffs have presented no evidence that, since the implementation of Directive 2609 in October 2019, DOCCS has denied religious accommodations based on a wrongful finding of *undue hardship* rather than, as described above, its view that wearing a beard is not a tenet of an officer's faith. *Compare* Pl. Ex. 20 (letter denying Gleixner on June 25, 2019 because his "request creates an undue hardship on facility operations and impacts the safety and security within

the facility"), *with* Pl. Ex. 50 (letter denying SzaFranski's request for an accommodation on November 22, 2019 because wearing a beard "is a personal preference and not a religious requirement"), *and* Pl. Ex. 24 (November 22, 2019 letter denying Sofo on same grounds). In sum, Plaintiffs have failed to adduce evidence that the preliminary injunctive relief they seek on behalf of the class—an order prohibiting DOCCS from "denying religious beard accommodations absent undue hardship," Opp. at 3—is needed.

In short, because Plaintiffs have not demonstrated that the class will suffer an actual and imminent injury of the kind their proposed injunction purports to avert—namely, denial of religious accommodations based on undue hardship—their motion is denied.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is granted in part and denied in part. Specifically, Plaintiffs' motion for summary judgment on their Religious Requirements Claim is granted, as is their motion on Gleixner, Alshamiri and Sofo's individual Title VII claims. Their summary judgment motion on Feliciano's claims is denied. Plaintiffs' motion for class certification pursuant to Rule 23(b)(2) is granted. Injunctive relief is ordered as described in this Opinion. Specifically, Defendants are:

- Enjoined from enforcing their practice of denying religious accommodations based on their own understanding of the tenets of the applicant's faith, and shall amend their grooming policies to memorialize the end of that practice;

- Ordered not to revoke or modify the existing accommodations for Gleixner and Alshamiri insofar as they are not assigned to clean shaven posts; and

- Ordered to grant a religious accommodation to Sofo permitting him to wear a beard up to one inch long insofar as he is not assigned to a clean shaven post, and are further ordered not to revoke or modify the accommodation insofar as he is assigned to a clean shaven post.

No later than October 6, 2023, Defendants shall advise the Court how they intend to comply with this Opinion and Order. Insofar as Plaintiffs wish to respond, they shall do so no later than October 13, 2023.

The Clerk of Court is respectfully directed to lift the stay in this matter and terminate Dkts. 254 and 255.

SO ORDERED.

Dated:   September 5, 2023
      New York, New York

                 Hon. Ronnie Abrams
                 United States District Judge